**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT GENE WILL, II, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-07-CV-1000 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

In 2002, a Texas jury found Robert Gene Will, II, guilty of murdering a police officer. Will received a death sentence. After unsuccessfully availing himself of Texas' appellate and habeas remedies, Will now seeks federal habeas corpus review of his conviction and sentence.

Will's federal habeas petition raises three claims, two of which champion his innocence. Respondent Rick Thaler argues that procedural limitations and substantive federal law make habeas relief unavailable to Will. This Court has liberally allowed the parties to develop the legal and factual issues raised by Will's petition. Having reviewed the record, the pleadings, and the applicable law, the Court denies Will's petition for habeas corpus relief.

## I. FACTUAL BACKGROUND

On December 4, 2000, police officers in Washington County, Texas stopped Will as he fled from Houston in a stolen vehicle. The murder of Harris County Sheriff's Deputy Barrett Hill had prompted a statewide alert for a car similar to the one driven by Will. After a short chase, a police officer arrested Will at gunpoint.

Will did not confess to the murder of Deputy Hill. The subsequent investigation did not turn up any eyewitness, forensic evidence, or other indisputable proof that Will was a killer. The State

of Texas, however, developed a strong circumstantial case against Will.

In 2002, Will stood trial for capital murder. Attorneys David Cunningham and Anthony Osso represented Will at trial.[1] Will's trial drew considerable interest, particularly from the law enforcement community. Spectators at trial wore ribbons to show their support for the Hill family, though the trial judge required witnesses to remove the ribbons before taking the stand. The Harris County Deputies Organization issued a "reminder for as many uniformed deputies, that can be there, [to] attend." (Docket Entry No.12, Appendix II).

Throughout the trial, uniformed police officers attended the proceedings. Defense counsel worried that the police presence could influence the jury and repeatedly brought the matter to the trial court's attention. At one point, trial counsel stated that 18 uniformed police officers were sitting in the spectator section of the courtroom gallery. Tr. Vol. 19 at 75. The trial court did not limit the number of police officers in the courtroom nor require them to attend only when not in uniform.

At trial, the prosecution adduced testimony and evidence that created a highly inculpatory version of the events leading up to Will's arrest. At around 6:30 a.m. on December 4, 2000, the police received a report that four males were breaking into a vehicle at an apartment complex. Deputy Hill and his training officer, Deputy Warren Kelly, responded to the call.[2] When the police officers pulled into the dark parking lot, they found two men standing outside. The men appeared to be removing parts from two vehicles. As Deputy Kelly pulled the police cruiser up to them, the men ran in different directions.

---

[1]     The Court will generally refer to Will's attorneys as "trial counsel" or "defense counsel" unless necessary to identify one of the lawyers who defended him.

[2]     Deputy Hill had worked for the Harris County Sheriff's Department for several years, but had only recently started patrol duties.

The officers got out of the car and gave chase.  Deputy Hill followed one of the men – later identified as Will – across the road into a field.  Deputy Kelly called for backup as he pursued the other man – later identified as Michael Alan Rosario – in the opposite direction.  The police officers' pursuit placed them out of each other's sight.  A few moments later, Deputy Hill was shot several times and died.

No one saw Will shoot Deputy Hill.  Only inferences explained what happened in the short time between when Deputy Kelly saw Deputy Hill begin pursuit and when he eventually saw Will flee the area.  Transmissions over the police radio, however helped tell the story of how Deputy Hill was killed.

Not long after giving chase, Deputy Hill announced over the radio: "I've got one, in custody." A minute later, the suspect that Deputy Kelly had been chasing disappeared around a tree.  Deputy Kelly radioed that he "lost him on the bayou[.]"  Eight seconds later, gunshots sounded over the radio.  The police radio then broadcasted gasping sounds and another burst of gunfire.

After hearing the gunshots, Deputy Kelly saw Will run from the area.  As Deputy Kelly began looking for his partner, Will fled to a nearby apartment complex.  Cassandra Simmons was dozing in her parked vehicle when Will opened her car door.  Will ordered her outside and pulled at her arm. Ms. Simmons screamed as Will put a pistol to her neck.  Will exclaimed that he had "just shot a policeman."  Tr. Vol. 21 at 74.  Will stole Ms. Simmons' car and drove away.

About a half hour later, searchers found the body of Deputy Hill approximately 470 feet from where Deputy Kelley had lost Rosario.  The police conducted a thorough investigation of forensic evidence at the crime scene.  The police recovered seven spent shell casings and two projectile fragments from the area near the body.  Deputy Hill's gun was in his holster, though it was not

snapped shut.  An investigator found Deputy Hill's handcuffs on the ground, but later he could not remember whether they were in an opened or closed position.  An autopsy revealed that Deputy Hill suffered gunshot wounds to the head, neck, chest, and wrist.  Will's blood was found on Deputy Hill's shoe.

Will drove west after visiting his apartment.  Will replaced the licence plates on Ms. Simmons' car with ones that he stole from a parked vehicle.  When the Washington County police took Will into custody around three-and-a-half hours later, he had a .40 caliber Sig Sauer pistol in his belt.  Will's handgun had three rounds left from a ten-bullet magazine.  Will had a full gun magazine in his pocket.  Will was bleeding from a wound on his left hand.  The police found bloody gloves and bleached-out dark clothing in the car.  Also, Will carried $2,300 cash in $100 bills.  No gunshot residue was found on Will's hands, though traces of gunshot residue were discovered in the paper bags the police placed over his hands.  A later police search of the apartment of Will's girlfriend turned up several guns and some stolen property.

The prosecution tied witness testimony and forensic evidence together into a coherent version of the events leading to Deputy Hill's death.  The prosecution's closing argument summarized the crime:

> The physical evidence tells you everything that happened out there.  As Deputy Hill goes to take [Will] into custody, that Sig Sauger [sic] comes out and the deputy is shot right here in the bullet proof vest.
>
> Don't you know that morning Deputy Hill must have felt pretty safe.  He's wearing his bulletproof vest.  He's protected from the bad guy and he's protected from that first shot.  The first shot goes into his side and gets stopped in the bulletproof vest.  And at that moment there's a huge bruise created as the result of the humongous amount of impact that that bullet had as it was discharged from [Will's] weapon.  . . .

4

At that point you know from the dispatch tape there's a pause.  As Deputy Hill reels back and [Will] realizes that he's just shot himself [in the hand]. . . .  And at that point Deputy Hill probably goes to reach for his radio and his arm comes up, we know that a shot goes through his wrist.  It goes through his wrist and into his shirt. . . .

And at some point he falls over.  And at that point, [Will] had an opportunity to get away; but he doesn't take it.  [Will], based on the physical evidence out there, takes that opportunity to take his .40 caliber Sig Sauer that he's already shot several times and finish the job.  And he takes that gun and you know, based on the evidence out there, as Deputy Hill lays on the ground, the shots are filed into his head, into his face.  There's bullet fragments found near his head in the ground, inches under the dirt of the ground surrounding Deputy Hill's head.  The shots, the final shots, are fatal.  Those are the ones that kill Deputy Hill.

Tr. Vol. 26 at 96-97.

Notwithstanding the strong circumstantial evidence, trial counsel maintained that "Robert Gene Will's not a killer."  Tr. Vol. 17 at 42-43.  The defense's case focused on the few moments when Deputy Hill, Will, and Rosario were unobserved.  Because Deputy Kelly could not see any of those three men for a short period, Will claimed that Rosario actually shot Deputy Hill.  The defense's closing argument summed up their theory: "[i]n the darkness . . . the real bad guy slipped away. . . from justice and made his way . . . home where his father's a police officer."  Tr. Vol. 26 at 107.  Trial counsel conjectured that Rosario escaped from Deputy Kelly, circled back around, shot Deputy Hill, freed Will, and then escaped by a different route.  The defense's opening arguments outlined this version of the crime:

Detective Kelly – and we'll hear his voice on the transmissions dealing with the dispatch – ultimately loses the person he was chasing.

Shortly after that happens, you'll hear that Deputy Hill sends a dispatch, radios in to dispatch, I've got one in custody.  The person in custody cuffed and immobilized, is Robert Will.  44 seconds after . . . that, Deputy Hill is ambushed, not by Robert Gene Will, but by someone waiting there and in the process he suffers – Deputy Hill – a horrible, tragic death.

5

In the process, Robert Gene Will is freed, he gets the guns and he, dazed and confused, runs across the street, thinking he's going for a friend's apartment, thinks he sees a car that might belong to a friend. That's Cassandra Simmons' car. He takes that car, uses a gun . . . and then he makes his way northward, dazed and confused.

Tr. Vol. 17 at 41-42.

Throughout trial, the prosecution responded to the defensive theory. The prosecution argued that it was impossible for Rosario to have covered the distance from where Deputy Kelly lost sight of him to where Deputy Hill died in enough time to kill. Also, the prosecution emphasized that certain evidentiary factors, such as the gunshot wound on Will's hand and the trajectory of bullets, pointed to Will as the shooter.

To bolster the defense, trial counsel hinted that Rosario acted suspiciously after evading the police, suggesting that he was guilty of more than stripping cars and running from officers. Allegations that Rosario boasted to inmates that he was the killer became the strongest facet of the defense. Trial counsel's opening asserted: "Ultimately in jail, although he has not been candid with law enforcement, Mr. Rosario brags to those people around him, brags about the killing and tells them facts that only the killer would know." Tr. Vol. 17 at 43.

Harris County Jail inmate Victor Coronado was the centerpiece of the defense's case. While incarcerated, Rosario allegedly told Coronado that "they were stripping a car trying to get the rims, stereo system out of it and a unit pulled up . . . and that he had no choice but to shoot the cop. It was just instinct and he ran. He eluded police one time by slipping through them and when he got closer to home, that's when he was arrested." Tr. Vol. 26 at 10-11. Rosario reportedly said that "his father

was a police officer and that it was really nothing anybody could do to him[.]"  Tr. Vol. 26 at 11.[3]

The prosecution did not present any direct evidence that Coronado had manufactured this story, but nevertheless strongly questioned his credibility.  Outside the jury's presence, however, the prosecutor told the court: "My understanding, from talking to another inmate, is that the defendant is offering up protection, cigarettes and other things in order to get people to come and tell this story. . . . Including protection of the people that he's aligned himself with, which are the Aryan Circle." Tr. Vol. 26 at 28-29.  The prosecution never called a witness to verify that Will engineered the testimony blaming the murder on Rosario.

The jury found beyond a reasonable doubt that Will shot and killed Deputy Hill.  In a separate punishment phase, the prosecution emphasized Will's criminal history and argued that the offense merited a death sentence.[4]  The jury answered Texas' special issue questions in a manner requiring

---

[3]    Coronado testified that he later met Will in jail and told him what Rosario had said.  Tr. Vol. 26 at 13-14.

[4]    On direct appeal, the Court of Criminal Appeals summarized the testimony and evidence from the punishment phase as follows:

[Will] also has convictions for evading arrest (a misdemeanor) and unauthorized use of a vehicle (a state jail felony) for which he received community supervision.  While on this community supervision, [Will] committed an aggravated robbery for which he was placed on deferred adjudication community supervision.  As a condition of community supervision for this aggravated robbery, [Will] was sent to boot camp for three months, where efforts were made to rehabilitate him.  [Will] was not a disciplinary problem during his three months at boot camp, and he "complete[d] fully the boot camp experience."  [Will] was still on deferred adjudication community supervision for the aggravated robbery when he murdered the police officer in this case.  [Will] committed three "minor" disciplinary rule violations (banging on a door, possession of tobacco and threatening another inmate) while incarcerated in the county jail awaiting trial for this capital offense.

[Will] presented some good character evidence.  He also presented evidence of his "minimal" involvement in the aggravated robbery offense for which he was on probation when he committed this capital offense.  He presented evidence that a life sentence for this capital offense "stacked" onto the sentence for his aggravated robbery offense would insure that he would spend the rest of his life in prison.

He also presented the testimony of a criminal-justice professor who testified that murderers

(continued...)

7

the imposition of a death sentence.

The Court of Criminal Appeals affirmed Will's conviction and sentence on direct appeal. *Will v. State*, No. 74,306, 2004 WL 3093238 (Tex. Crim. App. Apr. 21, 2004). The Court of Criminal Appeals denied Will's initial state application for writ of habeas corpus. *Ex parte Will*, WR-63,590-01 (Tex. Crim. App. March 29, 2006). Federal review followed.

## II. PROCEDURAL POSTURE OF THE CASE

On March 26, 2007, Will filed a federal petition for habeas corpus relief. (Docket Entry No. 1). Will's federal habeas petition raises three grounds for relief:

1.   *Actual Innocence of Capital Murder* - Three inmates (Rene Gonzales, Richard Lucio, and Antonio Riojas) have provided affidavits stating that Rosario allegedly said that he, not Will, shot Deputy Hill.

2.   *Ineffective Assistance of Counsel* - Trial counsel provided constitutionally deficient representation by not securing and presenting testimony from the three inmates who have provided affidavits in this case.

3.   *Coercive and Intimidating Trial Atmosphere* - The conspicuous presence of numerous uniformed police officers as trial spectators violated Will's constitutional rights.

When Will filed his federal petition, he had only presented his third claim to the state courts.

Will filed a motion to stay and abate the federal proceedings so that he could litigate the unexhausted

---

[4]      (...continued)

and older prisoners are not likely to commit violence in a structured prison environment. This testimony was based on the "internal workings [and policies] of the Texas prison system" to keep the number of criminal acts that occur within the prison system significantly low. It was also based on "risk assessments or factors that may be considered for determining whether or not someone would commit acts of violence in the future." This testimony was also based on a "number of different studies that have looked at what are called actuarial predictions of offending behavior or recidivism and /or offending behavior while in prison." On cross-examination, the professor testified that these actuarial studies cannot predict "the specific behavior of a particular person."

*Will v. State*, 2004 WL 3093238, at *1 -2  (Tex. Crim. App. 2004).

issues in state court.  (Docket Entry No. 2).[5]  On April 20, 2008, this Court granted Will's motion and administratively closed this case.  (Docket Entry No. 3).

Upon returning to state court, Will faced harsh procedural impediments.  Texas law enforces a strict abuse-of-the-writ doctrine, codified in article 11.071§ 5 of the Texas Code of Criminal Procedure.  Texas authorizes successive habeas proceedings only if an inmate relies on new law, presents new facts, or makes a persuasive showing of actual innocence.  *See* TEX. CODE CRIM. PRO. art 11.071 § 5(a).  In his successive habeas proceeding, Will argued that "based on newly discovered evidence" –  namely, the same three affidavits he attached to his federal petition – "no reasonable juror could have found him guilty[.]  In addition, because trial counsel failed to interview potentially exculpatory witnesses, he was deprived of effective assistance of counsel."  *Ex Parte Will*, No. 63,590-02 at 3.  In a succinct order, the Court of Criminal Appeals disallowed the filing of a new habeas action.  *Ex Parte Will*, 2007 WL 2660290, at *1 (Tex. Crim. App. 2007) ("We have reviewed the application and find the allegations fail to satisfy the requirements of Article 11.071, § 5(a).").

On August 26, 2007, Will filed an amended federal petition raising the same claims as his initial one.  (Docket Entry No. 6).  The Court reopened the federal action.  (Docket Entry No. 7).  Respondent filed an answer that asserts: (1) Will's actual-innocence claim does not present a cognizable ground for federal habeas corpus relief; (2) state procedural law prevents federal consideration of Will's actual-innocence and ineffective-assistance claims; and (3) Will's three claims lack merit.  (Docket Entry No. 10)  Will filed a reply disputing Respondent's arguments and maintaining that factual issues remained undeveloped and unresolved.  (Docket Entry No. 12).

---

[5]      The Anti-Terrorism and Effective Death Penalty Act generally forecloses federal review of any claim not first litigated in state court.  *See* 28 U.S.C. § 2254(b)(1).

Because the record before the Court did not show any statement or affidavit from defense attorneys which answered Will's accusation of ineffective assistance, this Court ordered Respondent to supplement the record with affidavits from Will's trial counsel. (Docket Entry No. 15). When Respondent questioned whether one of the inmates could even have had contact with Rosario, this Court allowed further expansion of the record. As a result, Will has submitted jail records and other evidentiary support. (Docket Entry Nos. 30, 40). Will has recently filed an amended reply. (Docket Entry No. 39). The parties have extensively briefed the legal and factual issues present in this case. Will's federal petition is ripe for adjudication.

### III. STANDARDS OF REVIEW

Habeas corpus review provides the federal courts with an important, but limited, examination of state criminal judgments. "[T]he Framers considered the writ a vital instrument for the protection of individual liberty." *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229, 2246 (2008). Nevertheless, "[t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982) (quotation omitted); *see also Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998) ("Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.") (quotation omitted). Accordingly, principles of finality, comity, and federalism all underlie the limited scope of federal habeas review. *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993); *see also Wright v. West*, 505 U.S. 277, 293 (1992) ("In various contexts, we have emphasized that these costs, as well as the countervailing benefits, must

10

be taken into consideration in defining the scope of the writ."). Recognizing "the profound societal costs that attend the exercise of habeas jurisdiction," *Smith v. Murray*, 477 U.S. 527, 539 (1986), "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") includes traditional limits on federal habeas review. Placing primary emphasis on the State's consideration of constitutional issues, the AEDPA mandates a deferential review over those claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Federal habeas relief on exhausted and adjudicated claims only becomes available when an inmate shows that the state decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1),(2). In practice, this standard gives wide latitude to state courts. Section 2254(d) guides review of Will's third claim which he presented on direct appeal.

Section 2254(d) does not govern Will's first and second claims because the state courts never addressed their merits. However, other jurisprudential doctrines narrow federal review and restrict habeas relief. The Texas Court of Criminal Appeals applied independent state procedural law to prevent review of Will's first and second claims in a successive state habeas action. Absent special circumstances which the Court will discuss at length below, that procedural ruling forecloses federal review. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).[6] Also, the Supreme Court has disallowed

---

[6]        Will argues that the Court of Criminal Appeals' invocation of art. 11.071 §5 does not amount to a procedural ruling that would foreclose federal review. Will relies on two Fifth Circuit cases, *Rivera v. Quarterman*, 505 F.3d 349, 352 (5th Cir. 2007) and *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007), where the Fifth Circuit found that the 11.071 §5 bar was not independent of federal law. In both *Rivera* and *Ruiz*, the Court of Criminal Appeals touched on the merits of the inmate's constitutional claims. The Fifth Circuit's action in those cases, however, was fact
(continued...)

habeas relief on new constitutional rules because federal habeas review exists to enforce, not create, constitutional law. *See Teague v. Lane*, 489 U.S. 288 (1989). If Will's claims require the institution of new constitutional principles, this Court cannot grant relief.

With these limitations in mind, the Court turns to Will's federal claims.

## IV. ANALYSIS

### A.    Actual Innocence

Will maintains that he did not kill Deputy Hill. Allegations of actual innocence claims arise in two separate contexts: as a substantive ground for relief and as a mechanism that allows review of otherwise procedurally deficient claims. Before addressing the legal standards that govern both categories of claims, the Court will review the arguments and evidence supporting Will's alleged innocence.

As previously noted, the prosecution presented a strong, but circumstantial, case against Will. No eyewitness saw the shooting of Deputy Hill. Deputy Hill's radio call suggested that he had some measure of control over Will before shots were fired. The police found no gunpowder residue on Will's hands when he was arrested hours later. These facts allowed the defense to argue that, once

---

[6]                   (...continued)

dependent and did not universally condemn Texas' abuse-of-the-writ practice as always insufficient to preclude federal review. Nothing in the Court of Criminal's dismissal in this case indicates that it interwove federal law into its procedural determination. As the Fifth Circuit has observed in a subsequent case similar to that before the Court:

> No application or interpretation of federal law is required to determine whether a claim has, or could have, been presented in a previous habeas application. The Texas Court of Criminal Appeals did not need to consider or decide the merits of [the inmate's] constitutional claims in reaching its decision to dismiss those claims as an abuse of the writ pursuant to Article 11.071, Section 5. Furthermore, there is nothing in its perfunctory dismissal of the claims that suggests that it actually considered or ruled on the merits. Accordingly, its decision was independent of federal law for purposes of application of the procedural default doctrine.

*Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

Rosario had evaded the pursuing police officer, he backtracked quickly, shot Deputy Hill, liberated Will, and then slipped away undetected.

At trial, only inmate Victor Coronado could verify that theory. Will now presents affidavits from three inmates – Antonio Riojas, Rene Gonzales, and Richard Lucio – in an effort to show that Rosario actually shot Deputy Hill. Each inmate says that, while they were incarcerated with Rosario, he confessed to committing the murder. The Court will briefly review the contents of the affidavits upon which Will bases his actual innocence claim.

Antonio Riojas stated that he "was incarcerated at Harris County Jail on a parole violation" in 2000 for "a total of about two or three weeks." During "the first three or four days" in jail, Riojas was "on the same cell block as a young man named Alan Rosario." While there, Rosario "often bragged" to Riojas and others that he "kill[ed] a police officer." Riojas described the story Rosario allegedly told:

> Alan Rosario said that he and his partner were stealing cars when the police came. Alan Rosario and his partner tried to run away, but Mr. Rosario ended up killing one of the officers. Alan Rosario said that his father was a police officer and had a lot of influence. He said that he was going to blame the murder on his partner. I remember Alan Rosario saying that having a father who was a police officer was like having a license to kill. Alan Rosario said that he killed the police officer and that he was going to get away with it. He seemed very proud of himself.

(Docket Entry No. 6, Affidavit of Antonio Riojas, signed January 28, 2007). Riojas claimed that he had never met Will, but would have testified at trial if called as a witness.

In 2000, Rene Gonzales, a member of the Texas Syndicate prison gang, was serving time in the Harris County jail. Gonzales described meeting Rosario in prison:

> In the recreation yard, Alan Rosario saw my [Texas Syndicate] tattoo and called me over to the protective custody cage. He asked me if I knew some of the T.S. members he knew, but I didn't recognize their names. Alan Rosario wanted to be a

> member of T.S. and was trying to gain points with [gang] members such as myself.
> Alan Rosario bragged to me and other T.S. members about getting away with killing
> a police officer.  He told me what kind of gun he used and its caliber and how many
> times he shot the police officer.  He said his partner was getting blamed for the
> murder.

"About four or five months" later, Gonzales was speaking with "two gang related government informants[.]"  They told Gonzales if he "told them what [he] knew about any T.S.-related murders, they might be able to put in a good word for [him] and get [him] a much lower sentence."  When Gonzales told them "about the son of a police officer who had killed another police officer," they "seemed to immediately know that [he] was talking about Alan Rosario."  When Gonzales related the information he heard from Rosario, the informants "believed [him] because nobody knew what kind of gun was used.  That information hadn't been given to the media."  In fact, they told Gonzales that the information he gave "was pinpoint accurate."  Gonzales refused to give them a statement because he "didn't want to sign [his] name to anything that might get [him] in trouble with T.S." "Sometime between two and four months later," the informants "finally told homicide investigators what [he] told them."  Gonzales repeated the story to homicide investigators, but would not sign a statement.

In June 2001, Gonzales was housed on the same cellblock as Will.  Will told Gonzales that "he was in jail for murdering a police officer but that he didn't do it.  He told [him] his partner was the one who murdered the police officer . . . [but] didn't get in trouble because his father was a police officer."  Gonzales told Will what he heard from Rosario "about a year and a half earlier."  Gonzales, however, could not help Will:

> Robert Will wanted my help, but since I was a member of T.S., I couldn't do
> anything for him.  I was subpoenaed by Robert Will's attorney and was brought to
> court to testify on multiple occasions.  Each time, I refused to testify.  On one of the

occasions I was brought to court to testify, I was put in the court's holding cell area, only a few cells away from Alan Rosario.  Alan Rosario threatened me and said I'd better not testify about what he told me.  I told him I wasn't going to testify.  If any of my T.S. brothers found out I was testifying against somebody, my life would be in danger.  At that time, I was extremely loyal to T.S.

I am no longer a member of T.S. and therefore am now willing to share my knowledge, even if it means I will have to go to court to testify.

(Docket Entry No. 6, Affidavit of Rene Gonzales, signed January 25, 2007).

The third affidavit comes from Richard Lucio.  "During the Summer of 2002, [Lucio] was an inmate at the Harris County jail," housed on the same floor as Will.  When in the courthouse for a court appearance, Rosario approached him.  He "was familiar with Mr. Rosario as he saw his face on television and he was described to [him] by Robert Will."  When Lucio told Rosario that he knew Will, Rosario admitted to killing Deputy Hill:

Rosario told me that he and Robert [Will] were going from car to car searching for valuables when a police car approached.  He and Robert ran and eventually separated. Rosario told me that he got away from the officer who was chasing him, but that the other deputy had apprehended Will.  Rosario said he came upon Robert Will and the deputy.  Robert had been handcuffed.  Rosario said he shot the deputy.  He said that in order to remove Robert's handcuffs he mistakenly shot Robert in the hand. Rosario said that he had to give Robert up because Rosario had a young child and didn't want to go to jail for murder.

(Docket Entry No. 6, Affidavit of Richard Lucio, signed March 21, 2007).

Based on the contents of those three affidavits, Will claims that he is actually innocent of murdering Deputy Hill.  To summarize, Will alleges that Rosario killed Deputy Hill and that, by misconstruction of the evidence, the State of Texas improperly charged and convicted him of capital murder.  Will relies on the affidavits both as a substantive means for voiding his conviction and as a vehicle for the federal consideration of otherwise-barred claims.

15

1.      *Substantive Claim of Actual Innocence*

Claims of actual innocence showcase the limited, and conflicted, nature of federal habeas review.  On one hand, the habeas writ exists as a vital "bulwark against convictions that violate fundamental fairness." *Brecht*, 507 U.S. at 633 (quotation omitted).  On the other hand, important principles of comity, federalism, and finality restrict federal habeas relief.  While the habeas writ protects against fundamental unfairness in the criminal process, it cannot issue merely because an inmate claims that he did not commit the crime for which a jury convicted him.

A person who stands trial enjoys a presumption of innocence, and the State must prove his guilt beyond a reasonable doubt.  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera v. Collins*, 506 U.S. 390, 399 (1993).  Thus, by the time an inmate invokes federal habeas jurisdiction he "comes before the habeas court with a strong – and in the vast majority of the cases conclusive – presumption of guilt." *Schlup v. Delo*, 513 U.S. 298, 326 (1995); *see also Herrera*, 506 U.S. at 399-400 (stating that a petitioner "does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law"); *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) ("[T]here is no presumption of innocence at a habeas proceeding.").

Accordingly, the Supreme Court has not accepted actual innocence as a cognizable ground for habeas corpus relief.  In *Herrera v. Collins*, the Supreme Court stated that "[c]laims of actual

innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. at 400.  Similarly, in *Schlup v. Delo*, the Supreme Court again noted that a petitioner's "claim of innocence does not by itself provide a basis for relief."  513 U.S. at 315. Following that reasoning, the Fifth Circuit has repeatedly and unequivocally held that the Constitution does not endorse an independent actual-innocence ground for relief.  *See Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Robison v. Johnson*, 151 F.3d 256, 267 (5th Cir. 1998); *Lucas v. Johnson*, 132 F.3d 1069, 1074-75 (5th Cir. 1998).[7]  Although this is not a position that this Court would have reached independently, Supreme Court and Fifth Circuit precedents admit of no other answer.

Irrespective of the strength or weakness of Will's evidence, "[f]ederal courts are not forums in which to relitigate state trials."  *Barefoot*, 463 U.S. at 887.  As it currently stands, federal law defers to a jury's finding of guilt.  Nevertheless, an inmate's factual innocence is not a meaningless factor on federal review.  Actual innocence may still provide a vehicle for the consideration of constitutional claims that would otherwise be subject to a procedural bar.

---

[7]        The Fifth Circuit has observed that, even if  an actual-innocence constitutional claim existed, the petitioner would have to show the following:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of the trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial.

*Lucas*, 132 F.3d at 1076 (citation omitted).  As will be discussed at length with regard to the procedural aspects of an actual innocence argument, Will has not met the Fifth Circuit's hypothetical requirements for an actual innocence claim. However, should the Supreme Court accept actual innocence as a substantive constitutional claim in the future, Will may be able to advance that issue in a successive habeas petition.  *See* 28 U.S.C. § 2244(b)(2)(A) (allowing a successive petition to proceed when "the claim relies on a new rule of constitutional law . . . that was previously unavailable").

2.        *Actual Innocence as a Procedural Vehicle*

As previously noted, Will's federal petition raises a procedurally barred ineffective-assistance claim.[8]  The Texas Court of Criminal Appeals found that Will abused the habeas writ under Tex. Code Crim. Pro. art. 11.071 § 5 when he raised that claim in a successive state habeas application. Will does not dispute that ruling as a sufficient basis to foreclose federal review.  Instead, Will argues that his innocence trumps the resultant procedural bar.

The Supreme Court has recognized that:

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, *or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.*

*Coleman*, 501 U.S. at 750 (emphasis added).  Will relies on the fundamental-miscarriage-of-justice exception to allow federal consideration of his second claim.  "The fundamental miscarriage of justice exception to the rule that state procedural default bars federal habeas review is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him."  *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *see also Henderson v. Cockrell*, 333 F.3d 592, 605 n.4 (5th Cir. 2003).  Will argues that he can now prove his innocence.

A two-part inquiry explores whether an inmate has shown a fundamental miscarriage of justice.  An inmate must first question the integrity of his trial proceedings by producing "*new reliable evidence* – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts,

---

8        Technically, Will's substantive actual-innocence claim is also subject to a procedural bar.  This Court, however, does not need to address the procedural bar of that claim because (1) it is not cognizable on federal habeas review and (2) any review would become circular, where Will would need to show actual innocence for the Court to decide if he is innocent.

18

or critical physical evidence – *that was not presented at trial*."  *Schlup*, 513 U.S. at 324 (emphasis added); *see also Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) ("Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.").  Next, an inmate "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327; *House v. Bell*, 547 U.S. 518, 538 (2006) (stating that a petitioner must show that it is "that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt").

Before turning to Will's arguments, the Court comments on a petitioner's heavy burden in claiming actual innocence.  The Supreme Court has "often emphasized 'the narrow scope' of the [actual innocence] exception." *Calderon*, 523 U.S. at 559 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992)).  "Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected." *Calderon*, 523 U.S. at 560 (quotation omitted); *see also Schlup*, 513 U.S. at 324 ("[C]laims of actual innocence are rarely successful.").  In part, this is because a reviewing court does not look at the new evidence in isolation, but makes "a holistic judgment about 'all the evidence'" including "how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 539 (quoting *Schlup*, 513 U.S. at 328)).  With the "extremely rare" success of actual innocence arguments in mind, *Schlup*, 513 U.S. at 324, the Court considers whether Will has brought forth new, reliable evidence which could cause a reasonable juror not to convict.

19

a.    New, reliable evidence

Will must show that the three affidavits, two of which were sworn to by individuals trial counsel identified as possible witnesses, are "new" and "reliable" evidence.  Courts are not uniform in defining the modifier "new" in this context.  Some courts only recognize evidence as "new" if it relies on a factual predicate that arose well after trial.  *See Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only new if it was not available at trial and could not have been discovered earlier through the exercise of due diligence.") (quotation omitted).  Other courts treat evidence as "new" if it was available, but not presented, at trial.  *See Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) ("All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial."); *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) (requiring "newly presented," not newly available evidence).  The question, in essence, is "whether *Schlup* requires 'newly discovered' evidence or merely 'newly presented' evidence."  *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006).  The Supreme Court and the Fifth Circuit have not yet conclusively spoken on that debate.  *See id.*; *cf. United States v. Davies*, 394 F.3d 182, 191 n.8 (3rd Cir. 2005) (refusing to "weigh in today on the 'newly presented' versus 'newly discovered' issue[]").

The Fifth Circuit, however, has found that evidence will not meet the *Schlup*'s "new" standard if "it was always within the reach of [the inmate's] personal knowledge or reasonable investigation."  *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008).[9]  Under that definition, Will's allegations are not "new"; he presented similar testimony at trial.  In fact, trial counsel tried

---

[9]    Under the Fifth Circuit's definition in *Moore*, an inmate cannot succeed on an actual-innocence claim and an ineffective-assistance-of-counsel claim which rest on the same set of facts.  If trial counsel should have presented certain information before the jury, then the information "was always within the reach of [the inmate's] personal knowledge or reasonable investigation"  *Moore*, 534 F.3d at 465.

to call two of the affiants as witnesses.  Will communicated to trial counsel that inmates could echo Corona's testimony.  The inmates, however, would not cooperate with the defense.  Allegations of actual innocence hardly seem new when they spring from facts known to the defense well before trial.[10]

Even if the information can be classified as new, discrepancies in the affidavits belie the label "reliable."  Each affidavit contains allegations that lessen its reliability.  Both Gonzales and Lucio guarantee that they would provide favorable information if called as a witnesses.  Trial counsel tried to call them as witnesses, but both refused to testify.  This Court cannot take at face value their assurance that they would now testify.[11]

The reliability of Riojas' affidavit has become an important factor in this case.  Trial counsel maintained from their review of jail records that Riojas and Rosario were never incarcerated together.  The Court has allowed the parties to develop the record with particular attention to the allegations made by Riojas.  Riojas claims that Rosario confessed to him during the "first three or four days" of his incarceration in 2000.  Respondent initially argued that Riojas' account was not credible because Rosario was not incarcerated during that time.  In fact, Deputy Hill had not been murdered when Riojas says that Rosario confessed.

_____

[10]     Some circuits have also held that evidence is not "new" if it merely corroborates testimony from trial. *See McCoy v. Norris*, 125 F.3d 1186, 1191 (8th Cir. 1997) ("It is apparent that the evidence at issue . . . was before the court at trial. The fact that . . . a different witness . . . could have been called to testify to the same thing, and that he could have brought the [information] to court as an exhibit, does not convert [the witness'] proffered testimony into new evidence that was not presented at trial. It is more accurately described as cumulative evidence.").  The affidavits attached to Will's federal habeas petition support information already before the jury.  While the three additional accounts would bolster the defense's case, the jury had already rejected the theory that Rosario was the shooter.  Will does not add new information to the evidentiary picture viewed by the jury, he only provides more support for the defense he made at trial.

[11]     Lucio claims that Rosario admitted to the murder "[d]uring the Summer of 2002," Will's trial ended and he was sentenced in January 2002.  Even so, trial counsel was aware of Lucio and apparently anticipated calling him as a witness at trial.  Tr. Vol. 27 at 55.  Lucio refused to testify.  Tr. Vol. 27 at 57.

Will, however, has recently filed an affidavit from a Harris County Sheriff's Office employee attesting that Rosario and Riojas were indeed housed near each other in March 2001. (Docket Entry No. 40). While this period of incarceration differs from Riojas' affidavit wherein he claims that he spoke with Rosario in 2000, it coincides with another of Riojas' many arrests. On that basis, Will argues that "although Riojas may have been confused regarding the date of his incarceration given the number of times he has been incarcerated," his affidavit credibly shows that Rosario claimed to be the killer. (Docket Entry No. 40 at 1-2). Still, Will's related ineffective-assistance-of-counsel claim presumes that trial counsel could have verified Riojas' account. That argument presupposes that Will could have uncovered Riojas' story with "reasonable investigation." *Moore*, 534 F.3d at 465.

As the Court will discuss at length in the section that follows, the three affidavits do not engender any credibility for the potential witnesses. The three inmates provide accounts that conflict with unimpeached facts from trial. Given the availability of the information, the affiants' refusal to testify at trial, and obvious conflicts with the factual record, the Court finds that Will has not shown that the three affidavits are "new reliable evidence" which would support a valid claim of actual innocence.

      b.    No reasonable juror standard

Even if Will's evidence qualifies as new and reliable, he has not shown that a reasonable juror, if presented with the information in the affidavits, would not convict him of capital murder. "If the petitioner asserts his actual innocence of the underlying crime, he must show 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence' presented in his habeas petition." *Calderon*, 523 U.S. at 559-60 (quoting *Sawyer*, 505 U.S. at 327). The

relationship between the new evidence and a jury's evaluation of reasonable doubt defines this

analysis.  *See Bosley*, 409 F.3d at 662 ("Because our legal system has no means of defining

innocence independently of the finding of reasonable doubt, 'the analysis must incorporate the

understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and

innocence.'").  This standard requires

> the district court to make a probabilistic determination about what reasonable,
> properly instructed jurors would do.  Thus, a petitioner does not meet the threshold
> requirement unless he persuades the district court that, in light of the new evidence,
> no juror, acting reasonably, would have voted to find him guilty beyond a reasonable
> doubt.

*Schlup*, 513 U.S. at 329.

Of particular concern, the new affidavits create a factual scenario that conflicts with trial

evidence.  The Court does not look at the affidavits in isolation.  The Court must consider the

reliability of the affidavits in the context of the trial evidence and trial counsel's reasons for not

calling each affiant.  For example, the facts of the case did not strongly support Will's claim that

Rosario escaped pursuit by heading in the opposite direction from him, backtracked a distance of

hundreds of yards in seconds, snuck up on Deputy Hill undetected, shot him, gave Will the murder

weapon, and then slipped away.  The prosecution strongly asserted that Rosario did not have enough

time to have been the shooter.  The affidavits make the incredible claim that the police knew Rosario

killed one of their own but framed Will nonetheless.  The trial evidence showed that Will shot

himself in the hand, not that he was accidentally shot as someone removed the handcuffs from him.

The affidavits do not diminish the force of inculpatory trial testimony such as that Will told a woman

that he shot a police officer.

The defense could not sway the jury with Coronado's testimony.  The new affidavits only

corroborate the information provided by Coronado, which weakens their impact as an actual-innocence claim. *See Graves*, 351 F.3d at 153 (noting that "another witness . . . at trial . . . supplied Graves with essentially the same alibi [the new witness] would have provided, so testimony that [he] might have offered would be cumulative"); *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007) (rejecting a *Schlup* argument when "the testimony of the defendant's new expert did not carry much weight because his testimony was similar to the trial testimony of another defense expert that the jury apparently rejected"). Will's claims presuppose that corroboration by the new affiants would reach a tipping point where the jury which rejected his defense would find him not guilty.

Trial counsel tried to pin the murder on Rosario, though they only called Coronado as a witness. One reason they relied on his testimony alone was that several inmates identified by Will "were combative and indicated that Mr. Will was putting people up to testifying on his behalf." (Docket Entry No. 26). Nonetheless, even if the affidavits provide a credible account, that does not mean that Will is innocent. At best, the new affidavits may show that Rosario told several inmates the same story. They do not, however, change the manner in which the jury would view the evidence before it. The same factors which made Coronado's account unpersuasive to the jury, and several new ones including obvious inconsistencies with the trial evidence, would not predispose a reasonable juror to find Will not guilty based on the new affidavits. *See Williams v. Thaler*, 602 F.3d 291, ___ (5th Cir. 2010) (finding that an inmate failed to meet the *Schlup* standard when relying on an affidavit stating that another man claimed to be the killer, especially noting that the trial evidence contradicted the new account); *Foster v. Thaler*, ___ F. App'x ___, 2010 WL 924885 (5th Cir. March 14, 2010) (finding that new exculpatory evidence was not reliable and that "[o]ne more contradictory story would not have compelled jurors to find [the petitioner] guilty").

24

Will has not shown a fundamental miscarriage of justice and, therefore, has not overcome the procedural bar of his ineffective-assistance-of-counsel claim. Nevertheless, as the AEDPA allows for the dismissal of an unexhausted habeas claim on the merits, the Court will briefly address Will's federal ineffective-assistance claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

**B.      Ineffective Assistance of Trial Counsel**

Will claims that trial counsel provided constitutionally ineffective assistance by not adducing testimony from Gonzales, Lucio, and Riojas.[12] Will's ineffective-assistance claim closely tracks his claim of actual innocence. The Court must decide under the standard which judges attorney representation whether trial counsel erred and also ascertain what effect that information would have had at trial.

The Court reviews Will's ineffective-assistance-of-counsel claim under a familiar standard. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "Failure to make the

---

[12]      The Court does not base its alternative discussion of Will's procedurally barred ineffective assistance of counsel claim on the AEDPA's deferential standards as the state courts did not adjudicate the claim on the merits.

required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. This review looks at whether trial counsel made a reasonable and informed decision about defense tactics based on a thorough investigation of pertinent facts, relevant law, and the plausible options open to the defense. *See Knowles v. Mirzayance*, ___ U.S. ___, 129 S. Ct. 1411, 1421 (2009) (citing *Strickland*, 466 U.S. at 690).

Nevertheless, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689. An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90. Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Mirzayance*, ___ U.S. ___, 129 S. Ct. at 1420 (quoting *Strickland*, 466 U.S. at 690).

Even if a petitioner shows that trial counsel should have performed differently, he must also show how that would have affected his trial. A petitioner must also prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have

been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534.  The Court does not consider prejudice in a vacuum: "[i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  *Strickland*, 466 U.S. at 695; *see also Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 386 (2009) (stating that it is "necessary to consider all the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path – not just the [favorable evidence counsel] could have presented").  The burden to show *Strickland* prejudice never leaves the petitioner.  *See Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386.

      1.    *Strickland's Performance Prong*

Will faults trial counsel for not calling as witnesses the three inmates who have given affidavits that blame the murder on Rosario.  Will's federal petition asserts that the three affiants "had information vital to the case.  They could have provided testimony which cumulatively would have bolstered counsel's trial strategy.  Counsel, however, made no effort to contact them.  Any counsel performing reasonably would have interviewed and presented these witnesses."  (Docket Entry No. 6 at 9).  Will's petition assumes that trial counsel made no effort to secure the information provided by Lucio, Gonzales, and Riojas on federal habeas review.

This Court ordered Will's trial attorneys to provide affidavits in response to the claims of ineffective assistance.  Mr. Cunningham and Mr. Osso explained their efforts to defend Will against the capital murder charge.  The affidavits show that trial counsel careful explored the possibility of pinning the murder on Rosario.  Before trial, Will told his attorneys that several in individuals could provide information showing that Rosario was the shooter.  Specifically, Will told trial counsel on

January 7, 2001, that inmates Richard Lucio, Scott Craig, Antonio Riojas, and Victor Coronado, as well as Rosario's girlfriend Michelle Scardino, knew that Rosario (identified by Will as "Rock-E") confessed to the murder.  (Docket Entry No. 26, Exhibit E).[13]  Using this information, Mr. Osso stated that the defense team diligently tried to develop the proposed actual innocence defense at trial: "The defense team in this case spent a substantial amount of time trying to develop the defensive theory relating to Alan Rosario in this case."  (Docket Entry No. 26 at 2).  Trial counsel's investigation discovered that other individuals, including Gonzales, said that Rosario had confessed to them.

Will's lawyers performed a three-pronged investigation into the possibility that Rosario was the shooter.  Trial counsel explained: "First, obviously, we attempted to speak with Michael Rosario. His lawyer, Christopher Downey, refused to allow us to speak with his client."  (Docket Entry No. 25 at 1).  Trial counsel then tried to verify Will's proposed defense by scientific investigation: "Second, we sought to investigate the physical and forensic evidence to see if it would support a factual scenario implicating Rosario as the shooter.  After securing the expert assistance and reviewing the physical/forensic evidence with the expert, we decided against presenting his testimony at trial."  (Docket Entry No. 25 at 1).  Third, trial counsel sought to verify that witnesses could credibly testify that Rosario confessed to killing Deputy Hill.

Trial counsel and the defense investigator interviewed most of the individuals identified as knowing about Rosario's inculpatory statements.  Trial counsel did not call some individuals as

---

[13]    In the course of trial counsel's subsequent investigation, trial counsel found an "an additional three individuals that were privy to statements made by Rosario.  These three people were Brandon Scott Craig, Billy Coronado, and Natasha Helalian. . . . All but Helalian were Harris County inmates who were privy to Rosario's purported inculpatory statements."  (Docket Entry No. 25 at 2; *see also* Docket Entry No. 26 at 1).  Will does not rely on testimony from those individuals in this action.

witnesses because they "advised [them] that Will was a gang banger and putting people up to testifying for him." (Docket Entry No. 26 at 2). Trial counsel investigated the possibility of calling Lucio and Gonzales to testify about conversations they had with Rosario. According to trial counsel, Lucio and Gonzales, "refused to cooperate and would not testify. Attempts were made to call them as witnesses but they refused to cooperate and made damaging statements." (Docket Entry No. 26 at 2). Will does not show what counsel could have done differently at trial to secure their testimony.

The reluctance to testify exhibited by Lucio and Gonzales was not atypical of the individuals trial counsel contacted. Some individuals were not just recalcitrant, but would have provided testimony that hurt the defense. Mr. Osso remembered: "Several of the witnesses were combative and indicated that Mr. Will was putting people up to testifying on his behalf. Despite the problems we ran into, we were able to provide testimony from two witnesses regarding the statements made by Alan Rosario." (Docket Entry No. 26 at 2). Because trial counsel tried to secure testimony from Lucio and Gonzales but could not, they did not perform deficiently in that regard.

With respect to Riojas, trial counsel apparently tried to verify that possible witnesses could provide a credible account. Trial counsel recognized that "an effective cross-examination tool is to show, via jail records, that the 'snitch' and defendant were not . . . housed together at the same time the purported statements were made." (Docket Entry No. 25 at 2). To that end, "the defense team spent considerable time checking records to ensure that Rosario and the jailhouse witnesses were together at the time of Rosario's purported admissions." (Docket Entry No. 25 at 2). Trial counsel made great efforts to assure that the circumstances allowed for the alleged statements to have taken place: "We would compare docket sheets, court settings, and jail housing locations to determine if the inmates would have access to Rosario as claimed. We even contacted via subpoenas deputies

from the gang intelligence unit of the Harris County Jail to gather information about Rosario and his

purported statements."  (Docket Entry No. 25 at 2;  *see also* Docket Entry No. 26 at 2).  Based on

that information, trial counsel determined that Riojas could not provide credible testimony because

"it would be impossible" for Rosario to confess in the time frame identified by Riojas "since the

shooting of Officer Hill had not yet occurred."  (Docket Entry No. 26 at 2).  Even during the two

days that Riojas and Rosario were both incarcerated in 2000, "they were housed on different floors,"

and thus Rosario could not come to Riojas' cell as provided by his affidavit.  (Docket Entry No. 26

at 2).[14]

---

[14]     Mr. Cunningham described why the defense did not call Antonio Riojas as a witness:

Unlike the other five witnesses that were located and interviewed prior to trial, Riojas was not
connected with the case. A review of Riojas' affidavit reveals many inaccuracies. Riojas was booked
into the Harris County Jail on October 16, 2000 and remained there until December 7, 2000. He was
housed in cell block 6-C-5. Our review of the records shows that Rosario was booked into the Harris
County Jail on December 5, 2000 and was housed in cell block 10-B-4. These two inmates were
housed on different floors and then for only two days in 2000. Riojas claims in his affidavit he spent
[his] first 3-4 days in this stint in jail in the same cell block as Rosario and Rosario confessed to him
at this time. However, Riojas' claim that Rosario bragged about the killing during the first 3-4 days
of Riojas' October-December stay is incredible for several reasons: First, Deputy Hill was not killed
until December 4, 2000. Second, Rosario was not even in jail in October 2000. It was only from
December 5-7 that the two were in jail together and at that time they were housed on totally different
floors.

(Docket Entry No. 25 at 2-3).  Mr. Osso also depicted a similar concern about the credibility of Riojas'
statement:

Riojas was not connected to the case because he was not in custody. His affidavit attached to Will's
writ states information which is incorrect. First, it was Will who provided Riojas' name as a potential
witness. The information was provided by Will on January 7, 2001 as reference in attached Exhibit
"F" which is a note from Will dated January 7, 2001. However, Rosario was booked into the Harris
County Jail on December 5, 2000 and was housed in 10B4-05. During 2000, Riojas was in the Harris
County Jail from October 16, 2000 until December 7, 2000 and was housed in 6C5-03. These are
totally different floors so these inmates could not have been housed in the same tank during this period
as Riojas claims in his affidavit. Riojas states that the first 3 or 4 days that he was in custody in 2000
he was in the same cell block as Alan Rosario. This would be impossible since the shooting of Officer
Hill had not yet occurred and Rosario was not in custody at the time. It was not until the last two days
of Riojas' confinement in the Harris County Jail in 2000 that Rosario was booked into jail and again,
they were housed on different floors during the two day period.

(continued...)

Pursuant to Will's request, the Court has allowed the parties to submit jail records relating to Riojas' incarceration in 2000. Will has recently produced an affidavit from a jail employee showing that Rosario and Riojas were near each other in March 2001. Will presupposes that additional investigation by trial counsel would have verified that Rosario and Riojas were housed near each other. Will faults trial counsel for not adequately ascertaining if Riojas could provide credible testimony, though that investigation has taken a substantial amount of time on federal habeas review.

Respondent argues that "the information available to trial counsel while preparing the case indicated that Riojas was incarcerated from October 16-December 7, 2000." (Docket Entry No. 43 at 5). In the end, trial counsel tried to build the defense that Will faults them for not presenting, but ultimately the facts thwarted their efforts to present the full scope of evidence Will marshals on federal review. The affidavits from Will's trial attorneys affirm that they "spent a substantial amount of time trying to develop the defensive theory relating to Alan Rosario" but witnesses were unhelpful or provided damaging information. They "explored several different avenues to pursue this theory of the case and utilized the witnesses [they] believed would be considered credible and not hurt Mr. Will." (Docket Entry No. 26). Trial counsel made a probing investigation into the defense that Will proposes in his federal habeas petition. Trial counsel attempted to secure testimony from inmates Gonzales and Lucio, but they would not assist the defense. Trial counsel apparently investigated the possibility that Riojas could testify, but found that the circumstances surrounding his putative testimony detracted from his credibility. Still, trial counsel presented the same testimony through

---

[14]    (...continued)
(Docket Entry No. 26 at 2).

Coronado.  Will has not met *Strickland*'s deficient performance prong by showing that trial counsel

did not engage in a reasonable investigation, made ill-informed strategic decisions, or should have

done more to bolster the chosen defense.

   2.     *Strickland's Prejudice Prong*

   Even if trial counsel should have, and could have, called the three affiants as witnesses, Will

must show that the absence of their testimony prejudiced his trial.  This Court has already found

under the actual innocence discussion that Will failed to show that "it is more likely than not that no

reasonable juror would have found petitioner guilty beyond a reasonable doubt" based on the three

affidavits.  *Schlup* requires a "stronger showing than that needed to establish [*Strickland*] prejudice."

513 U.S. at 327.  Under *Strickland* prejudice, a petitioner must show "a reasonable probability that

. . . the result of the proceedings would have been different" had the attorney's deficient performance

not occurred.  466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  Even under *Strickland*'s less

onerous prejudice standard, Will has not shown that counsel's efforts harmed his defense.

   While the affidavits provided by each of the inmates facially would benefit Will's defense,

calling each individual as a witness would provide unfavorable results.  Lucio and Gonzales would

not cooperate at the time of trial despite counsel's efforts and, according to trial counsel, "made

damaging statements." (Docket Entry No. 26 at 2).[15]  Moreover, trial counsel adduced the substance

of the information contained in the three affidavits through Coronado's testimony.  The prosecution's

cross-examination of the three affiants would likely follow the same lines as that of Coronado,

emphasizing that they were gang members, Tr. Vol. 26 at 15-17, and hinting that Will bribed them,

---

[15]     While Gonzales now claims that he is no longer a gang member and thus free to testify, this Court's
inquiry under *Strickland* is on the circumstances that defense counsel faced at the trial.

Tr. Vol. 26 at 19, 22.  Will has simply not shown a reasonable probability of a different result based on the affidavits provided by Riojas, Gonzales, and Lucio.

Even if this Court could consider the substance of Will's ineffective-assistance claim, he has not shown *Strickland* prejudice.  The Court alternatively denies his *Strickland* claim on the merits. *See* 28 U.S.C. § 2254(b)(2).

## C.    Presence of Uniformed Police Officers in the Courtroom

Will claims that the presence of many uniformed police officers as spectators during his trial created a hostile atmosphere that violated his constitutional rights.  The Harris County Deputies Organization encouraged uniformed officers to attend trial proceedings, ostensibly as a show of support for the Hill family.  Before the opening arguments at the guilt/innocence stage of trial, defense counsel asked the trial court "to limit the nontestifying Harris County deputies from attending in their uniform just because of the intimidating nature that it can have with respect to the jury."  Tr.  Vol. 17 at 15.  Trial counsel observed that

> [t]here are a number of uniformed Harris County deputy sheriffs in the courtroom[.] . . .  We are concerned if there . . . are a number of nontestifying, noncourtroom security uniformed Harris County deputies in the courtroom[.] . . .  While we recognize that these officers certainly have the right to be here – this is, of course, a public forum – we believe that allowing them to come sit in their uniforms can be an intimidating factor for the jury.

Tr. Vol. 17 at 14-15.[16]  Trial counsel proposed that the police officers attend only in plainclothes.

_____

[16]        Trial counsel also objected because

a number of members of Mr. Hill's family and friends . . . were wearing blue ribbons intertwined, much like we see in the wake of the September 11th tragedy.  And on these ribbons I see the number 4133.  . . .  I have a concern of those witnesses are allowed to testify wearing those ribbons, I would ask the Court – again, because the prospect of unduly influencing the jury, I'd ask that those people, while I respect their rights and understand the pain that they're going through, I would ask that the Court request and order them to remove those ribbons, particularly if they are going to testify.

(continued...)

33

Tr. Vol. 17 at 15.  The trial court left the matter to the parties: "Maybe y'all could, you know, work out something where if they're not on duty or not going straight to work they could wear plain clothes.  That just solves that issue.  If they want to wear their uniforms, I'm certainly not going to prevent them from doing that."  Tr. Vol. 17 at 16.

That same morning, trial counsel again complained about the presence of uniformed police officers:

> Consistent with my earlier motion, asking that the uniformed police officers nontestifying be excused, at this point before final argument (sic) I'd like the record to reflect 1, 2 – 8, 12 – there are at least 13 uniformed officers in the courtroom and I'd like especially the record to reflect that on the right side of the courtroom on the right side of the aisle, there are 12 uniformed Harris Country deputy sheriffs sitting in that part of the courtroom closest to the jury.  And we would renew our motion.

Tr. Vol. 17 at 26.  The trial court again denied the defense's motion.  Tr. Vol. 17 at 26.  Two days later, trial counsel again unsuccessfully objected, this time observing 18 police officers in the audience.  Tr. Vol. 19 at 75-76.

The defense only once mentioned the uniformed police officers to the jury.  During closing arguments in the punishment phase, defense counsel stated:

> No matter how much all of us would like to bring Barry Hill back, a verdict of death won't do that.
>
> Try as we all might to reunite that good father with his best friend, his wife, his confidante, we can't do that.  Try as we might to put an 8-year-old daughter and a 20-year-old daughter back with a wonderful father, we won't be able to do that.  Unfortunately we can't heal the pain and loss and incomprehensible void that a

---

[16]    (...continued)

Tr. Vol. 17 at 14-16.  The trial court ordered: "I would prefer we not have anybody on the witness stand with the ribbon just so there's not any issues with that.  If y'all would please ask those witnesses who are intending to testify to please take their ribbon off before they enter the courtroom to testify."  Tr. Vol. 17 at 16.  Because from the jury box it was "very difficult to see who even has a ribbon on" and the trial court thought it was unlikely that the jurors could "distinguish a ribbon from the ribbons we've seen around the courthouse wearing because of our support for the troops in Afghanistan," the trial court did not require spectators to remove their ribbons.  Tr. Vol. 17 at 17.

> mother and father feel for the loss of a good man.  And try as we might, *we look out here, we see all these officers and they're all good officers.  Try as we might, they've lost a good friend, a confidante and one of theirs, we can't bring Barry Hill back.*

Tr. Vol. 31 at 90-91 (emphasis added).

Will contends that the uniformed police officers in the spectator area of the courtroom was so inherently prejudicial that it denied him a fair trial.  Will argues: "The officers had no legitimate reason for wearing their uniforms during the trial.  The officer's sole purpose in wearing their uniforms was to pressure the jury to return a guilty verdict and a death sentence.  The officers created an atmosphere in which calm deliberation by the jury was not possible.  Intimidating the jury by wearing their uniforms throughout trial and placing themselves near the jury box was constitutionally impermissible."  (Docket Entry No. 6 at 13).

The Constitution guarantees a criminal defendant a trial free from an unduly hostile atmosphere.  *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) and *Carey v. Musladin*, 549 U.S. 70 (2006), constitute the primary Supreme Court authority that this Court must consider with respect to this claim.  In *Flynn*, four uniformed police officers sat in the spectator section immediately behind the defense table at trial.  Throughout trial, uniformed policemen remained present as security.  The *Flynn* Court confronted two questions about the constitutional effect of their trial participation.  First, the Supreme Court confronted the question of "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."  *Id.* at 568-89.[17]  While recognizing that "the sight of a security force

---

[17]     The Supreme Court considered *Flynn* in the context of two previous cases: (1) *Estelle v. Williams*, 425 U.S. 501 (1976), where the Supreme Court found that standing trial in prison clothing creates an inherently prejudicial (continued...)

within the courtroom might under certain conditions create the impression in the minds of the jury

that the defendant is dangerous or untrustworthy," the *Flynn* Court refused to find that the presence

of security guards in the courtroom was inherently prejudicial.  475 U.S. at 569 (quotation omitted).

In particular, the Supreme Court was unwilling to make unwarranted assumptions about how a jury

would interpret police presence in the courtroom:

> [T]he presence of guards at a defendant's trial need not be interpreted as a sign that
> he is particularly dangerous or culpable.  Jurors may just as easily believe that the
> officers are there to guard against disruptions emanating from outside the courtroom
> or to ensure that tense courtroom exchanges do not erupt into violence.  Indeed, it is
> entirely possible that jurors will not infer anything at all from the presence of the
> guards.  If they are placed at some distance from the accused, security officers may
> well be perceived more as elements of an impressive drama than as reminders of the
> defendant's special status.  Our society has become inured to the presence of armed
> guards in most public places; they are doubtless taken for granted so long as their
> numbers or weaponry do not suggest particular official concern or alarm.

*Flynn*, 475 U.S. at 569.  The Supreme Court, therefore, found that "a case-by-case approach" would

guide how to evaluate police presence in the courtroom.

Second, the *Flynn* Court's fact-specific approach questioned whether the number of

uniformed officers in that case – four uniformed police officers serving as security, but still sitting

in the first row of the spectators section of the courtroom – impinged on the fairness of trial.  The

Supreme Court approached the prejudicial effect of their presence with some caution: "We do not

minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's

chances of receiving a fair trial."  *Id.* at 571.  The Supreme Court, however found no "unacceptable

risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's

---

[17]         (...continued)

environment; and (2) *Illinois v. Allen*, 397 U.S. 337 (1970), which held that a defendant cannot appear before the jury
bound and gagged.

spectator section." *Flynn*, 475 U.S. at 571. The Supreme Court particularly linked "the deployment of troopers . . . to the State's legitimate interest in maintaining custody during the proceedings." *Flynn*, 475 U.S. at 572. To that end, the Supreme Court advised federal courts to "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 572.

More recent Supreme Court authority defines *Flynn*'s application on federal habeas review. In *Carey v. Musladin*, 549 U.S. 70 (2006), members of a murder victim's family attended the defendant's trial wearing buttons with photographs of the victim. The defendant claimed that the buttons violated his Sixth and Fourteenth Amendment rights and invoked *Flynn*'s "inherent prejudice" review. The federal circuit court in *Musladin* had granted habeas relief, finding that the spectators' courtroom conduct created an unacceptable risk of prejudice. *See Musladin v. Lamarque*, 403 F.3d 1072 (9th Cir. 2005). The Supreme Court reversed, distinguishing *Flynn* as a case of "government-sponsored practice." In essence, "some practices are so inherently prejudicial that they must be justified by an 'essential state' policy or interest." *Musladin*, 549 U.S. at 75. The *Musladin* Court found that the limits of habeas review prevented any extension of *Flynn* to apply an inherent prejudice caused by private spectator conduct. The Supreme Court recognized that it "has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Musladin*, 549 U.S. at 76.

This Court must consider Will's claim against the legal background provided by *Flynn* and *Musladin*, but also in the context of the limited nature of habeas review. Will exhausted this claim

37

on direct appeal.  Because a state court adjudicated this claim on the merits, habeas relief is only available if Will shows that the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In practice, these standards generously defer to state adjudication.  The Supreme Court has held that a state court decision is only "contrary to" federal precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  A state court may unreasonably apply federal law if it "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.

Here, the Court of Criminal Appeals recognized *Flynn* as the governing legal authority.  This Court, therefore, focuses on whether the state court unreasonably applied that precedent to his case. *See Goodrum v. Quarterman*, 547 F.3d 249, 257 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 1612 (2009).  In doing so, "[AEDPA] compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning."  *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) ("[A] federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written

opinion explaining that decision.").

The Court of Criminal Appeals found that Will's claim did not merit relief under *Flynn*. On direct appeal, Will "concede[d] . . . that he cannot show actual prejudice or that the police uniforms actually influenced the jury," but instead argued under *Flynn* that "uniforms were inherently prejudicial by creating an unacceptable risk that impermissible factors came into play to influence the jury." *Will*, 2004 WL 3093238, at * 4. The Court of Criminal Appeals found that the police officers' attendance did not result in inherent or actual prejudice for several reasons. First, Will "objected to the officers' uniforms on only two occasions during a two and one-half week trial consisting of 12 days of testimony," thus making a record that "was too scant to make a case for inherent prejudice." *Id*. at *4 (quotation omitted). Second, the Court of Criminal Appeals distinguished Will's case from "some type of state action like shackling a defendant during trial that branded the defendant in the jury's eyes 'with an unmistakable mark of guilt'" or created "'the impression in the minds of the jury that the defendant [was] dangerous or untrustworthy.'" *Id.* (quoting *Flynn*, 475 U.S. at 571). Third, the Court of Criminal Appeals reasoned that "the presence of the uniformed officers in the courtroom merely showed their solidarity and support for a fellow slain officer," not that Will was a special security concern. *Will*, 2004 WL 3093238, at *4. Finally, the Court of Criminal Appeals found no evidence that the juror's sympathies were susceptible to being swayed by the police presence, such as it would, for instance, if the jurors had close ties to law enforcement.

As in the Court of Criminal Appeals, Will seems to focus on the inherent, rather than actual, prejudice caused by the police presence at trial. Will argues that the police officers attendance at trial was "inherently prejudicial to [his] fair trial rights." (Docket Entry No. 12 at 11). Will has not

shown, however, that the Court of Criminal Appeals' decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

Although the Court of Criminal Appeals denied Will's claim before the Supreme Court decided *Musladin*, Respondent relies heavily on that case in disputing Will's arguments.  The *Flynn* and *Musladin* cases approached two separate circumstances: "government-sponsored conduct" and "the conduct of independently acting courtroom spectators."  *Wright v. Van Patten*, 552 U.S. 120, 123 (2008).  Respondent asks this Court to deny relief because, unlike in *Flynn*, the numerous uniformed police officers at trial were not present pursuant to a security assignment.  Thus, as in *Musladin*, "inherent prejudice" cannot arise from the conduct of private actors.

This case traces the middle ground between the facts confronted in *Flynn* and *Musladin*.  This is not a case of conduct officially mandated by governmental authorities.  The police officers were present as spectators, not courtroom security.  Yet jurors cannot always be expected to know whether uniformed police officers sitting in the spectator's section are there from security assignment, from a request by fraternal organizations, or from personal interest in the trial.[18]  Will argues "that there is no evidence as to whether the officers were on or off duty, whether their supervisors encouraged or condoned their actions and the reason that they decided to wear their uniforms in court."  (Docket Entry No. 12 at 11).  The jury could only see the uniforms, they could not see the motivation behind

---

[18]     Federal law prevents this Court from granting relief on pure spectator conduct.  On habeas review, this Court's core concern is whether the state judgment's denial was in direct contravention of, or an unreasonable refusal to extend, federal law.  *See* 28 U.S.C. § 2254(d).  The Supreme Court, however, recognized that "'clearly established Federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's decisions as of the time of the relevant state-court decision.'" 549 U.S. at 74 (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  Thus, "[g]iven the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct . . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Musladin*, 549 U.S. at 77 (quoting 28 U.S.C. § 2254(d)(1)).  Thus, the limited nature habeas review prevented extension of *Flynn* to pure spectator conduct.

their presence.  The police officer's uniforms could certainly send the message that they attended the proceedings in an official, rather than personal, capacity.  The concern raised by uniformed police officers is different than those raised by grieving family members.

While the facts of this case bear some similarity to *Flynn* in that uniformed police officers attended trial, two factors make habeas relief unavailable to Will.  First, Will's argument presupposes inherent prejudice.  The *Flynn* Court did not find that the presence of uniformed police officers was inherently prejudicial.  *Flynn* seemed most concerned with whether the police presence "create[d] the impression in the minds of the jury that the defendant is dangerous or untrustworthy." *Flynn*, 475 U.S. at 569 (quotation omitted).  Unlike shackling that always sends a message that a defendant is dangerous or prison clothing that communicates guilt, law enforcement personnel sitting in the spectator gallery may signal nothing more that fraternal support for a fallen officer's family. The message communicated by the uniforms may have nothing to do with the jury.  As in *Flynn*, the Court cannot speculate that the police presence unfavorably swayed the jury's deliberations.[19]  The Court of Criminal Appeals finding of no inherent prejudice at trial complies with federal precedent. As the Supreme Court has not yet held that the presence of uniformed police officers as spectators inherently violates the Constitution, to rule in Will's favor would create new law, a power unavailable on habeas review.  *See Teague v. Lane*, 489 U.S. 288 (1989).

Second, while *Flynn* allowed for the possibility that uniformed police officers could pose a constitutional concern, Will has not shown actual prejudice.  In fact, Will "conced[ed] on appeal that

---

[19]        Inescapably, "trials are open to the public, including to police officers[.]"  *Lambert v. McBride*, 365 F.3d 557, 563-64 (7th Cir. 2004).  Defense counsel's objection contemporaneous with trial asserted that they were "noncourtroom security uniformed Harris County deputies" and "recognize[d] that these officers certainly have the right to be here – this is, of course, a public forum," but argued that they "uniforms can be an intimidating factor for the jury." Tr. Vol. 17 at 14-15.

he [could not] show actual prejudice or that the police uniforms actually influenced the jury." *Will*, 2004 WL 3093238 at *4. *Flynn* carefully avoided misinterpreting how a jury would respond to the presence of uniformed police officers as security personnel.  The Court of Criminal Appeals found that the unformed police officers did not prejudice the defense, observing that the message sent to the jury was not one that would make Will seem guilty or dangerous.  Will has not shown that decision to be unreasonable.

In conclusion, habeas relief is not available when  no "decision of [the Supreme] Court . . . squarely addresses the issue," nothing "clearly establishes [application of a legal rule in a] novel factual context," or the law does "not clearly hold" differently than the state court adjudication. *Van Patten*, 552 U.S. at 125; *see also Beghuis v. Smith*, ___ U.S. ___, 130 S. Ct. 1382, 1395-96 (2010) (stressing that habeas relief exists for "clearly established" Supreme Court precedent).  The Court of Criminal Appeals was not unreasonable in finding that the police presence at trial did not prejudice Will's right to a fair trial.  *See Van Patten*, 552 U.S. at 126 (finding when the Supreme Court cases "give no clear answer to the question presented, let alone one in [the inmate's] favor, it cannot be said that the state court unreasonably appli[ed] clearly established Federal law") (quotations omitted); *Mirzayance*, ___ U.S. at ___, 129 S. Ct. at 1419 (finding that it is not "'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.").  Accordingly, the Court of Criminal Appeals' denial of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  This Court might well have reached a different conclusion if reviewing the matter on direct appeal.  On habeas review, however, the Court must deny Will's exhausted claim.

## V.  CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  Will has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Will's claims.  Under the appropriate standard, Will has not shown that this Court should authorize any issue for appellate review.  This Court will not certify any issue for consideration by the Fifth Circuit.

## VI.  CONCLUSION AND ORDER

Petitioner has received extremely able representation from his habeas counsel.  They have made sound arguments.  This Court's authority on habeas review is, however, tightly circumscribed. The Court cannot, under governing law, offer redress.  Based on the discussion above, the Court **DENIES** Will's petition for habeas corpus relief.  The Court will not issue a Certificate of Appealability.

The Clerk will provide a copy of this Order to the parties.

**SIGNED** at Houston, Texas, on this 25th day of May, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE