IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROBERT GENE WILL, II, § | |
| § | |
| Petitioner, § | |
| § | |
| v. § | CIVIL ACTION NO. 7-CV-1000 |
| § | |
| RICK THALER, Director, Texas § | |
| Department of Criminal Justice, § | |
| Correctional Institutions Division, § | |
| § | |
| Respondent. § | |

## MEMORANDUM AND ORDER

On May 25, 2010, this Court denied Robert Gene Will's petition for a writ of habeas corpus. (Doc. No. 44.) Mr. Will's case comes before the Court now on Will's Motion to Alter Judgment under Rule 59 of the Federal Rules of Civil Procedure ("Motion"). (Doc. Nos. 46, 47.) The Court has already denied this Motion in part. (Doc. No. 66.) The only issue remaining for consideration is whether a declaration from Will's former girlfriend, Brenda Venegas ("Venegas"), provides a sufficient basis to reopen judgment. With Venegas' declaration, Will hopes to prove that he is actually innocent of capital murder. In light of Supreme Court and Fifth Circuit case law holding that the Constitution does not endorse an independent actual-innocence ground for relief, *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), Will's allegations of actual innocence can serve only as a vehicle through which to seek review of otherwise procedurally deficient claims. Here, the Court only considers Will's actual-innocence claim in an effort to obtain review of his

1

procedurally barred ineffective-assistance-of-counsel claim, as the Court has already denied Will's Rule 59(e) Motion with respect to his independent actual-innocence claim. (Doc. No. 66 at 3-4.) Thus, in order to reach Will's ineffective assistance claim, the Court must find: (1) that proceedings should be reopened under Rule 59; and (2) that Will's actual innocence claim allows for the consideration of Will's otherwise barred ineffective assistance claim. Because the Court concludes that Will has not met the standard for reopening judgment under Rule 59, the Court does not reach the second issue.

## I.     BACKGROUND

Federal law does not recognize actual innocence as a mechanism to overturn an otherwise-valid conviction; thus, actual-innocence claims, especially in the capital context, raise troubling issues for a federal court. By this late point in the post-conviction process, the presumption of innocence has run its course, and Will stands as a person lawfully incarcerated. *See Herrera*, 506 U.S. at 399. Fortunately, the law does not disregard entirely the unsettling reality that innocent people may be sentenced to death; thus, actual innocence can serve as a vehicle to the consideration of procedurally deficient claims. *See Schlup v. Delo*, 513 U.S. 298, 318 (1995). Even so, federal law erects a demanding standard of innocence that an inmate can meet only in the "extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quotation omitted).

Because the implications of an actual-innocence claim are so great, the Court has liberally allowed Will to develop the factual basis for his actual-innocence argument. On October 19, 2011, the Court held an evidentiary hearing to consider whether Venegas' account would provide a basis for reopening judgment under Rule 59. The Court was interested in: (1) whether the account that Venegas provides in her declaration is a

credible basis for reopening these proceedings; and (2) whether arguments relating to Venegas' declaration could, and should, have been made before the entry of judgment. (Doc. No. 70.) The parties called five witnesses: Venegas, a police officer who arrested Venegas and participated in her questioning, Will's two trial attorneys, and, for the first time testifying in this case, Will himself. The content of the witnesses' testimony addressed several issues, including trial counsel's efforts to defend Will. Venegas' declaration and in-court testimony are most relevant to the threshold question, which the Court must answer in the affirmative before reaching Will's ineffective assistance claim, of whether judgment should be reopened in this case. After reviewing the record evidence, the evidentiary hearing testimony, and the law, the Court finds that Will has not shown a sufficient basis to reopen judgment in this case.

The Court has elsewhere reviewed at length the factual basis for Will's conviction and his post-judgment arguments. (Doc. No. 44 at 2-8, 13-15; Doc. No. 66 at 4-8.) The Court again briefly reviews the relevant facts. In 2000, the State of Texas charged Will with capital murder for the killing of Harris County Sheriff's Deputy Barrett Hill. There were no eyewitnesses to the murder. No DNA or other evidence definitively established who fired the shots that killed Deputy Hill. Only circumstantial evidence, including Will's own statement during a carjacking that he had "just shot a policeman" (Tr. Vol. 21 at 74), incriminated Will in the murder.

At trial, Will's defense counsel attempted to pin the murder on Michael Alan Rosario ("Rosario"), who was with Will on the morning of the offense. Will's defense at trial was that Rosario evaded police detection, unexpectedly shot Deputy Hill, and then freed Will from handcuffs that Officer Hill had affixed. Trial counsel bolstered this

3

defense by calling a Harris County Jail inmate, Victor Coronado ("Coronado"), who claimed that Rosario had confessed to being the killer. Trial counsel supported Coronado's testimony by calling Natasha Helalian ("Helalian"), who saw Rosario laundering clothing in Venegas' apartment after the murder. Helalian testified that Rosario seemed "[n]ervous, in a hurry, rushing to leave" and told them "[n]ot to say anything to the cops about him because they could trace it back to what him and [Will had] done." (Tr. Vol. 25 at 184, 199.) The trial court sustained the prosecution's objection to Helalian's testimony regarding a statement by Rosario that "[t]he blood came off" his pants. (*Id.* at 198.) The jury convicted Will of capital murder and answered Texas' special issue questions in a manner that resulted in a death sentence.

Since his conviction and death sentence, Will has continued to maintain his innocence. The manner in which he has presented claims to the courts, however, has frustrated judicial consideration. Will's initial state appellate and habeas proceedings did not fault counsel for failing to call three inmates who, according to Will's later arguments before this Court, would have testified as to incriminating statements allegedly made by Rosario. It was not until his federal habeas petition that Will raised actual-innocence and ineffective-assistance claims based on affidavits from three more inmates. By that point, federal law foreclosed judicial consideration of procedurally deficient claims unless Will made a demanding procedural showing. To overcome the procedural bar, Will claimed that his actual innocence would allow plenary consideration of an ineffective-assistance claim based upon the failure to call the three inmate witnesses. After authorizing factual development on that issue, the Court found that Will had not adduced new reliable evidence which would support a viable claim of actual innocence. (Doc. No. 44 at 18-25.)

Even though Will had procedurally defaulted his ineffective-assistance-of-counsel claim, the Court considered the merits of such a claim, and ultimately denied it. (*Id.* at 25-33.)

Will then moved for relief under Federal Rule of Civil Procedure 59. (Doc. Nos. 46, 47.) The Court has denied Will's Motion with regard to all issues except the newly provided declaration of Venegas. (Doc. No. 66.) In her declaration, Venegas asserts that, on the day of the murder, Rosario confessed to being the killer. She claimed that she gave this information to the police, but that "[t]hat was the last time anybody ever asked [her] about the day of the murder until now." (Doc. No. 46-1, "Declaration of Brenda Venegas," signed June 17, 2010 ¶ 5.)[1] Will argues that Venegas' declaration supports this Court's reopening of the case under Rule 59.

## II. STANDARD OF REVIEW

After the entry of judgment, the law imposes a high expectation of finality. Post-judgment relief is "an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). To prevail on a motion under Rule 59(e), the movant must establish: (1) an intervening change in the controlling law, (2)

---

[1] Venegas explains that "[o]n the morning of December 4, 2000, Michael Alan Rosario, who I knew as Rock-E, came to Robert *[sic]* and my apartment." (Doc. No. 46, Venegas Decl. ¶ 3.) She then relates what Rosario allegedly told her:

> [Rosario] told me that he got away from the police officer who was chasing him. He said that he came across [Will] and the other police officer. [Will] was handcuffed. [Rosario] told me he snuck up behind the police officer and shot him. [Rosario] tried to shoot the handcuffs off [Will], but he missed and shot [Will] in his hand instead.

(*Id.*) Venegas claims that she told this story to the police, but her declaration gives the inference that no one from Will's defense contacted her:

> Later that day, I gave a statement to police officers at their station. I told them everything I have stated in this affidavit. They told me they would contact me if they needed anything else. *That was the last time anybody ever asked me about the day of the murder until now.* I have not spoken to Robert Will since the year 2001. If I had been asked by anyone prior to this time about the above information, I would have been happy to talk about it and to testify.

(*Id.* ¶ 5 (italics added).)

previously unavailable evidence, or (3) a manifest factual or legal error. *See Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). Will urges the Court to find, under the second prong of the Rule 59(e) analysis, that Venegas' declaration is previously unavailable evidence which makes relief under Rule 59(e) appropriate. A court may reopen judgment in light of new evidence only under "extraordinary circumstances." *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 445 F.3d 841, 847 (5th Cir. 2006). The movant bears the burden of showing that his evidence is truly new; that is, that the evidence could not have been raised prior to the entry of judgment. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1, at 127-28 (2d ed. 1995)); *see also Schiller*, 342 F.3d at 567.

In assessing the newly presented evidence, the Fifth Circuit has outlined a non-exhaustive list of factors a court may consider under Rule 59(e): (1) the reasons for the default, (2) the importance of the evidence to the movant's case, (3) whether the evidence was available to the movant before judgment, and (4) the likelihood of unfair prejudice if the case is reopened. *See ICEE Distribs., Inc.*, 445 F.3d at 848; *Ford v. Elsbury*, 32 F.3d 931, 937-38 (5th Cir. 1994); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). The Court applies these factors to Will's post-judgment factual development.

III. ANALYSIS

A. Reasons for the Default

Will argues that his failure to submit Venegas' declaration prior to judgment is due to his counsel's inability to locate Venegas until three days after the entry of judgment in this case. The Court is unpersuaded by Will's arguments, considered in more detail below, as to why Venegas could not have been located sooner. While this factor counsels against the motion to reopen, the Court notes that, "[u]nlike a rule 60(b) motion . . . a rule 59(e) motion need not 'make any particular showing of inadvertence or excusable neglect.'" *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401 (5th Cir. 2003) (quoting *Ford*, 32 F.3d at 938). Thus, this factor is not determinative, and must be considered in conjunction with the others.

B. Importance of Evidence to the Movant's Case

Will is using Rule 59(e) in an attempt to obtain consideration of his actual-innocence argument, which would provide a vehicle for review of his procedurally-barred ineffective-assistance-of-counsel claim. Thus, the "importance" prong is best analyzed by looking at the legal standard that would apply to individuals seeking review of procedurally-barred claims through arguments of actual innocence. Ultimately, while the Court cannot review Will's actual-innocence argument without first granting the Rule 59(e) motion,[2] the standard applicable to the actual-innocence argument is relevant to the determination of how important Venegas' testimony is to Will's case.

---

[2] As to Will's substantive ineffective-assistance claim, the Court cannot consider that claim until (1) the Court grants Will's Rule 59 motion; and (2) the Court concludes that Will's actual-innocence arguments warrant consideration of his procedurally-barred ineffective-assistance claim. Thus, the Rule 59 motion is only the first of three steps toward obtaining substantive relief.

A federal court may review an inmate's procedurally-barred claims if he shows that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To present a viable actual-innocence argument, an inmate must proffer "reliable" evidence that was absent from trial. *Schlup*, 513 U.S. at 324. The actual-innocence standard "does not require absolute certainty about the petitioner's guilt or innocence," but "requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538; *see also Schlup*, 513 U.S. at 329. Courts applying this standard must keep in mind that "claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

In considering how important Venegas' testimony is to Will's case, the Court looks at (1) the cumulative effect of Venegas' testimony when considered in conjunction with the testimony of other witnesses; (2) how Venegas' testimony would fare if the Court were to reach Will's actual-innocence claim; and (3) the demanding standard that would ultimately be applied to Will's substantive, ineffective-assistance claim.

### 1. Cumulative Effect of Venegas' Testimony

Venegas' declaration asserts that Rosario confessed to the murder, that Venegas relayed that information to the police, and that no one else ever asked her about "the day of the murder." (Venegas Decl. ¶ 5.) Venegas' evidentiary hearing testimony provided more insight into the contents of her declaration. Venegas testified that Rosario showed up at her apartment with "some white windbreaker pants [on], and they had blood on them." (Doc. No. 86, "Federal Evidentiary Hearing Transcript" ("E.H.") at 37.) He also had blood on at least one of his shoes. (*Id.* at 38.) Rosario pulled off his clothing, put it in

the washing machine, and went straight into the shower. (*Id.* at 40.) Rosario then grabbed some of Will's clothing from the closet, over Venegas' protests. (*Id.* at 41.) Afterward, he began wiping down all of the surfaces around the house, including the TV, picture frames, and items on the patio. (*Id.* at 42). Venegas testified that, as he was doing this, Rosario made statements to her regarding Deputy Hill's murder:

| | |
|---|---|
| Venegas: | He was talking amongst doing all this stuff that he was doing, telling me, you know, that they were getting the car or something, and he was just going on about like basically what had happened. |
| Counsel: | Did he give you two different stories? |
| Venegas: | No. |
| Counsel: | Did he tell you something about jumping over a fence? Or tell me what he told you? |
| Venegas: | See, I can't remember exactly no more. I remember he – I remember the instance of him saying that he shot the cop and that he tried to shoot the handcuffs off of [Will], you know. |

(*Id.* at 43-44.)

Initially, Venegas explained that Rosario's admission was "the most important thing [she] remember[ed] . . . [a]s far as anything else, it's like really hard to remember it." (*Id.* at 44.) With additional questioning, however, Venegas provided greater detail about the admission. Rosario allegedly said that "at first, they ran in different directions . . . [Rosario] got away from the cop that was chasing him . . . [and he] went around to try to find [Will] . . . and found him with the other cop[.]" (*Id.* at 46.) Will, who was handcuffed, "was on the ground." (*Id.* at 46.) Rosario then "just pointed and shot [Deputy Hill]. They shot him – he mentioned shooting him in the face. He did mention shots in the face." (*Id.* at 46-47.) Rosario "tried to get the handcuffs off [Will] and . . . shot him in

the hand. And then after that, after they got the handcuffs off of . . . one of his hands . . . they once again split ways." (*Id.* at 47-48.) Rosario told her that the blood on his clothing "was the cop's blood." (*Id.* at 58.)

Venegas' declaration and testimony make her the fifth witness to testify that it was Rosario, and not Will, who murdered Deputy Hill: They confirms the testimony of the three jailhouse informants who did not testify (and whose missing testimony this Court found insufficient to support Will's federal habeas claim). They also bolster the testimony of the one trial witness, Coronado, who testified that Rosario confessed to the murder. Finally, they support a portion of Helalian's testimony, curiously excluded by the trial court as failing to meet the admission against interest exception to the hearsay rule, Federal Rule of Evidence 804(3), regarding a statement by Rosario that the blood had washed out of his pants. The cumulative impact of Venegas' testimony thus cannot be easily ignored.

### 2. Consideration of Venegas' Testimony under the Actual-Innocence Standard

Will asks the Court to reopen judgment so that it can consider whether his actual-innocence claim supports the application of "[t]he fundamental miscarriage of justice exception to the rule that state procedural default bars federal habeas review." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). A two-part inquiry explores whether an inmate has shown a fundamental miscarriage of justice. An inmate must first question the integrity of his trial proceedings by producing "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Next, an inmate "must show that it is more likely than not that no reasonable juror would have convicted

him in light of the new evidence." *Id.* at 327; *House*, 547 U.S. at 538 (observing that a petitioner must show that it is "that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt"). While the Court does not reach the actual-innocence question, it notes that, in order to have any importance to Will's case, Venegas' testimony would ultimately have to meet the actual-innocence two-part test.

In assessing the reliability and trustworthiness of Venegas' testimony, the Court notes a number of inconsistencies. Some of the inconsistencies are relatively minor, and are potentially explained by the passage of time and the dulling of memory. For example, Venegas testified that Helalian was the only person who came to Venegas' apartment while Rosario was there. (E.H. at 48-49, 91-92, 105.) In her police statement, however, Venegas said that Will's sister and mother had been in the apartment before Rosario left. (Respondent's Exhibit ("RX") 9 at 5.) Helalian's police statement confirmed that Will's mother had been at the apartment. (*Id.* at 64.)

Other inconsistencies are not easily overlooked. While Venegas insisted in her in-Court testimony that she told "[a]nybody and everybody" and "[a] lot of people" about Rosario's confession (E.H. at 124, 125), the record evidence indicates that, in fact, she told no one. Helalian, whom trial counsel interviewed prior to trial, never mentioned that Rosario had confessed to the murder. (E.H. at 298; RX 9 at 63-65.) Will testified that Venegas never spoke with him about the alleged admission. (E.H. at 145, 162, 185-86.) Trial counsel interviewed Will's sister and mother, neither of whom said that Rosario had confessed. (*Id.* at 298-99.) It strains credulity that so many people would know about Rosario's confession and fail to discuss it with the police or Will's attorneys.

11

Further testing Venegas' credibility, the hearing evidence and testimony suggest that she lied or was seriously mistaken about two important bases of her declaration—first, that she told the police about Rosario's confession, and second, that no one spoke with her about it after her police interview. In Venegas' declaration and testimony, she states that she told the police about Rosario's confession. (*Id.* at 62-64.) She specifically mentions telling the police about Rosario shooting Deputy Hill in the face, trying to shoot off the handcuffs, wiping down his fingerprints in the apartment, and blacking out his phone number in Will's address book. (*Id.* at 63-64.) She claims to have conveyed this information to more than one police officer. (*Id.* at 85-86, 102.) However, the police reports, including Venegas' signed statements, are devoid of any reference to the story Venegas purportedly told about Rosario's alleged admission.[3] To believe Venegas' testimony, the Court would have to believe that the police covered up evidence regarding the true killer of a police officer.

Similarly unbelievable is Venegas' claim that her police statement was "the last time anybody ever asked [her] about the day of the murder until now." (Venegas Decl. ¶ 5.) Will has argued that Venegas "was known to the defense and certainly should have been contacted by the defense." (Doc. No. 63 at 3.)[4] The record and evidentiary hearing testimony prove that trial counsel spoke with Venegas, but that she never related Rosario's alleged confession to them. (E.H. at 238.) Indeed, as Respondent has provided a transcript of an interview that trial counsel conducted with Venegas on March 21, 2001,

---

[3] Harris County Sheriff's Office Sergeant Tracy Shipley, who spoke with Venegas at her apartment, arrested her, and interviewed her at the homicide station, testified that Venegas seemed willing to talk and did not appear to be afraid. (E.H. at 217.) Venegas never told Sergeant Shipley that Rosario admitted to being the killer. (*Id.* at 187.)

[4] The Court notes the inconsistency between Will's argument that trial counsel should have contacted Venegas, and his assertion that his habeas counsel was justified in failing to locate her.

the Court is unpersuaded by Venegas' claim that she never spoke to Will's trial counsel, and finds that this assertion further undermines her credibility. In her interview with Will's trial counsel, Venegas provided an account of Rosario's statement that fundamentally differed from her evidentiary hearing testimony:

> [Will] ran one way and he ran another. And then he said that he had heard a bang and then he heard another bang. And then that, you know, that he thought [Will] had got shot. And he said he start – that's when he started running and jumping over fences.

(RX 12, "Defense Attorney Interview with Brenda Venegas – 3/22/2001" at 22.) She claimed not to know anyone to whom Rosario had admitted to shooting the victim. (*Id.* at 45.) Thus, even in an interview with Will's own defense counsel, Venegas did not relay Rosario's alleged admission.

During the evidentiary hearing, Will alleged that trial counsel could have found out about the story had they asked the right questions. In reading the transcript of Venegas' interview with Will's trial counsel, the Court agrees that counsel could have done a more thorough job of questioning her. For example, after telling trial counsel a story which did not include the admission by Rosario, Venegas stated, "And then [Rosario] said something else. Like, he gave me a totally different story from what— what he had already said." (*Id.* at 22.) Trial counsel never followed up with Venegas on what this second story was. Nevertheless, it is hard to imagine that Venegas would have such critical information—that another person had confessed to the murder for which Will was on trial—and fail to share it because Will's trial counsel did not ask all the right questions.

Finally, other inconsistencies derail Venegas' representation of the story allegedly told to her by Rosario. One of the most opaque factual issues in this case is how Will

13

became freed from his handcuffs. According to Will's trial counsel, Will has given several different versions of the crime, and has failed to provide a credible explanation of how he became freed from the handcuffs. (E.H. at 229-35, 287, 290-91.) Venegas testified that Rosario claimed to have tried shooting the handcuffs off Will, but crime scene photographs and Will's own testimony show that such an event could not have happened. The crime scene photographs show no damage to the handcuffs (RX 9 at 116-17), and Will's testimony at the evidentiary hearing discounted any attempt by Rosario to remove the handcuffs in that manner. (E.H. at 144.) In addition, DNA testing on the white windbreaker pants that Rosario laundered indicated that the blood did not come from Deputy Hill. (RX 9 at 91.)[5]

While Venegas was unwavering in her recent testimony that Rosario confessed to the murder of Deputy Hill, a full review of all available evidence shows that her testimony is neither reliable nor credible. Her account suffers from a number of inconsistencies—some minor, and some significant—which weaken the believability of even those facts on which she remains consistent. Because Will would have to present reliable evidence that was absent from trial in order to prevail on his procedurally-barred actual-innocence claim, *Schlup*, 513 U.S. at 324, and because Venegas' testimony does not meet that standard, her testimony, even if newly discovered, is of little importance to Will's case at this stage. Moreover, even were the Court to find Venegas' evidence both newly discovered and reliable, it could not find, under the evidence presented, that "it is more likely than not that no reasonable juror would have convicted [Will] in light of the new evidence." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513

---

[5] Trial counsel ordered DNA testing on the pants Rosario laundered. The "presumptive test for blood in these pants was positive" but "4 out of 7 cofilers for Rosario are present" and "no profilers" for Deputy Hill were. (RX 12 at 26; E.H. at 301.)

U.S. at 327). Reasonable jurors might have a very hard time squaring the inconsistencies in Venegas' testimony. Or, they could simply choose not to believe her statement over the evidence presented by the government. Indeed, the jury that actually convicted Will did so in spite of Coronado's testimony that Rosario confessed to the murder. While the Court acknowledges that a jury might be far more persuaded by two witnesses telling the same story than it would be by one, the Court cannot find that Venegas' testimony would satisfy the "no reasonable juror" standard. In light of the exacting standard that would be applied to Will's actual-innocence claim, the Court finds that Venegas' testimony is of little importance to Will's case at this late stage.

### 3. Standard under which Will's Substantive, Ineffective-Assistance Claim Would Ultimately Be Considered

Even if the Court were to reopen judgment under Rule 59(e) and conclude that Venegas' testimony warrants consideration of Will's procedurally-barred ineffective-assistance claim, Will would have to overcome the rigorous ineffective-assistance standard. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. Ultimately, "[j]udicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effects of hindsight." *Id.* at 689. Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

Trial counsel testified at the evidentiary hearing that their decision not to call Venegas was based on consideration of the benefits and disadvantages of having Venegas testify. Indeed, trial counsel "considered Brenda Venegas to be radioactive" and "wanted her nowhere near the courthouse." (E.H. at 266.) Furthermore, trial counsel believed "they could get the same sort of evidence in through Natasha Helelian ... without the baggage that came with Brenda Venegas." (*Id.* at 260.) While the Court does not reach Will's ineffective-assistance claim, it does note that the importance of Venegas' testimony is further diminished by consideration of the demanding standard applied to ineffective-assistance claims. Ultimately, Will is unable to show how Venegas' testimony would be important to his case.

### C. Availability of Evidence Before Judgment

Rule 59(e) requires that "the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence." *Infusion Resources, Inc. v. Minimed, Inc.*, 351 F.3d 688, 696-97 (5th Cir. 2003). Will must show that knowledge of the events relied on in the motion for reconsideration was beyond his reach before judgment. *ICEE Distribs. Inc.*, 445 F.3d at 848. To demonstrate that he could not have procured Venegas' declaration earlier, Will has submitted a declaration from Rebecca Dobkin. (Doc. No. 64-1, "Declaration of Rebecca Dobkin," signed January 14, 2011.)[6] Dobkin, now a capital habeas investigator with the Office of the Federal Public Defender in the Central District of California, has spent several years investigating Will's case. Though she was not licensed as an investigator until 2010 (E.H. at 18),[7] Dobkin began

---

[6] Dobkin testified only briefly in the evidentiary hearing. Will stipulated that the content of her declaration would explain the substance of her attempts to locate Venegas.

[7] Dobkin's declaration, however, explains that she has worked as an investigator for the Office of the Federal Public Defender in the Central District of California since 2005.

volunteering her time to help with Will's case in 2003.

According to Dobkin's declaration, Will's federal habeas attorneys gave Dobkin a list of individuals, including Venegas, to contact in 2006. (Dobkin Decl. ¶¶ 4-6.) Dobkin tried to find Venegas through three old addresses, but was unable to locate her. (*Id.* ¶¶ 7-8.) Dobkin states that every few months thereafter she "searched the Lexis, Westlaw and ChoicePoint databases for new contact information," but "kept coming up with the same addresses [she] had already tried." (*Id.* ¶ 9.) Only on May 28, 2010—three days after the entry of judgment—did Dobkin try a "different approach," reaching out to Venegas through the social networking website "Facebook."[8] (*Id.* ¶¶ 10-13.) Venegas responded to Dobkin's request, and agreed to swear out a declaration relating Rosario's alleged statements. (*Id.* ¶ 15.) Venegas signed her declaration on June 17, 2010.[9]

The testimony and evidence presented at evidentiary hearing suggest that a diligent investigation could have resulted in securing Venegas' declaration prior to the entry of judgment. While she initially "disappeared" after the murder (E.H. at 126), Venegas pleaded guilty to transporting illegal aliens in 2002. *United States v. Venegas*, 1:02-cr-635 (S.D. Tex. Nov. 14, 2002). At the evidentiary hearing, Venegas testified that she has lived in Houston since her release from federal prison in 2004, remaining on federal supervised release until 2007. During this time, Venegas was not hiding, intentionally avoiding investigative efforts, or "trying to live under the radar." (E.H. at

---

[8] In a letter to the Court, however, Will himself said that Dobkin told him that "a day of two *before* [the entry of judgment], a very important witness was found, Brenda Venegas." (Doc. No. 48 at 3, "Letter from Robert Gene Will dated June 14, 2010" (emphasis added).)

[9] The record is not clear as to who prepared the declaration for Venegas to sign. Dobkin's declaration says "she drafted the declaration[.]" (Dobkin Decl. ¶ 15.) During the evidentiary hearing, however, Venegas affirmed that another investigator employed by Will's federal habeas attorneys prepared the declaration. (E.H. at 84.)

131.) In fact, Venegas testified that she would have been available had someone tried to contact her. (*Id.* at 81-82.)

Moreover, Venegas committed a number of offenses while on supervised release, and has been in custody several times in recent years.[10] This evidence establishes beyond doubt that Venegas was not unavailable, but rather could have been easily located through criminal background checks. In fact, while questioning Venegas to prove that trial counsel could have called her as a trial witness, Will's counsel emphasized that a criminal background search would have located Venegas at the time of trial. (*Id.* at 74-75.) Will has not shown that a similar inquiry would not have located her after trial. Finally, Will fails to address the fact that, in addition to Dobkin's volunteer investigative efforts, Will's attorneys employed an investigator of their own. (*Id.* at 24-25.) Will does not indicate whether or how his attorneys or other members of his defense team (aside from Dobkin) attempted to locate Venegas before the entry of judgment. Ultimately, the Court finds no evidence to suggest that Venegas was not "plainly available or easily discovered before judgment." *ICEE Distribs., Inc.*, 445 F.3d at 848.

Because the Fifth Circuit has instructed that "a 59(e) motion to reconsider should not be granted unless . . . the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence," *Infusion Resources, Inc.*, 351 F.3d at 697, Will's "unexcused failure to present evidence available at the time of . . . judgment provides a valid basis for denying [his] ... motion for reconsideration," *ICEE Distribs.,*

---

[10] The Court appointed counsel for Will on April 10, 2006. During the nearly one year period before Will filed his federal habeas petition, Venegas was arrested for theft and received a 30 day jail sentence. After that, but before the entry of judgment on May 25, 2010, Venegas was arrested several more times and received jail sentences which totaled several months. Will's trial counsel testified that, given her arrest record and residence in Houston, it should not have been difficult for an investigator to locate Venegas. (E.H. at 306.)

*Inc.*, 445 F.3d at 847 (internal quotations omitted); *see also Templet*, 367 F.3d at 479. Venegas' prior availability provides a sufficient basis to deny Will's Rule 59 Motion.

### D. Likelihood of Unfair Prejudice if the Case is Reopened

While the parties have not briefed the issue of unfair prejudice, the Court finds its consideration unnecessary. Even if there were no risk of unfair prejudice to the government, the Court would have to deny Will's Motion based upon its weaknesses under the second and third prongs of the analysis, discussed above.

### IV. CONCLUSION

This Court does not approach this dismissal lightly. Will has repeatedly and persistently argued that Rosario killed Deputy Hill. Now, with Venegas' testimony, Will has submitted no less than five witnesses who have stated that Rosario confessed to murdering Deputy Hill. Beyond that, the trial court's exclusion of Helalian's testimony linking Rosario to the murder was almost certainly error of grave proportion. Moreover, as set forth in the Court's Memorandum and Order of May 25, 2010, the presence in the trial courtroom of so many uniformed policemen would have likely justified post-trial relief had the issue arisen on direct appeal rather than in a petition for habeas corpus. (Doc. No. 44 at 33-42.) On top of the considerable evidence supporting Will's innocence and the important errors in the trial court, there must also be addressed the total absence of eyewitness testimony or strongly probative forensic evidence. With facts such as these, and only circumstantial evidence supporting Will's conviction and death sentence, the Court laments the strict limitations placed upon it.

Within the narrow borders of federal review, this Court has allowed liberal exploration of Will's various arguments. The questions raised during post-judgment

factual development about Will's actual innocence create disturbing uncertainties that, under federal habeas jurisprudence, the Court is powerless to address. While this Court cannot answer those questions, it notes that the state executive branch might consider the evidence of actual innocence in this case and exercise restraint in the execution of Will's sentence.

Given the entirety of the evidence against Will, and the standards under which Venegas' testimony must be considered, the Court follows well-settled procedural law and **DENIES** the remaining portion of Will's Rule 59 motion.

**SIGNED** at Houston, Texas, on this 17th day of January 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE