IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT GENE WILL, II, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| RICK THALER, DIRECTOR, | § | H-07-CV-1000 |
| TEXAS DEPARTMENT OF CRIMINAL | § | (Death Penalty Case) |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISIONS | § | |
| | § | |
| RESPONDENT | § | |

## ROBERT WILL'S BRIEF CONCERNING IMPACT OF
## _MARTINEZ V. RYAN_, 132 S. CT. 1309 (2012), ON HIS CASE

Samy Khalil
GERGER & CLARKE
1001 Fannin Street, Suite 1950
Houston, Texas 77002
Phone: 713-224-4400
Fax:    713-224-5153

**ATTORNEY FOR ROBERT WILL**

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Table of Authorities ............................................................................ iv

I.      Procedural Background ............................................................. 1

II.     Factual Background .................................................................. 4

III.    State Habeas Counsel – Les Ribnik ........................................ 7

IV.     Rosario's Inculpatory Statements .......................................... 14

        A.      Rosario confesses to handling the gun just before the murder .......... 15

        B.      Rosario gave two different stories about his knowledge that "a cop had got shot." ................................................................. 16

        C.      Rosario "solicit[ed] to make [a] hit on Co-Def Robt. Will (Gene)." . 18

        D.      Four days later, Rosario admits to Harris County Deputy that he is "part of the reason" that Deputy Hill was murdered .......................... 18

V.      The Green Jacket ................................................................... 19

VI.     *Martinez* as Applied to Will's Case ...................................... 28

        A.      Texas's Dual-Track Review Procedure .............................. 31

        B.      The Fifth Circuit's Decision in *Ibarra* ............................ 37

        C.      *Ibarra* Contravenes *Martinez* ...................................... 39

                1.      *Martinez* is an equitable decision intended to ensure federal review of *Strickland* claims defaulted by inadequate representation in state court with respect to such claims ......... 40

2.   Texas designates the Article 11.071 proceeding as the proceeding in which *Strickland* claims that are not firmly founded in the appellate record are to be first adjudicated ......42

3.   Texas's choice to channel the adjudication of *Strickland* claims into collateral proceedings by enacting a dual-track review mechanism in capital cases and dissuading appellate counsel from litigating *Strickland* claims on direct appeal is not meaningfully different from Arizona's choice to channel the adjudication of *Strickland* claims into collateral proceedings by adopting a rule against raising *Strickland* claims on direct appeal ......................................................................47

4.   *Ibarra* does not properly apply *Martinez* to extra-record *Strickland* claims like Will's ....................................................50

5.   Expert testimony – George McCall Secrest, Jr. ......................58

6.   10-year case survey of *Strickland* claims brought on direct appeal in Texas ........................................................................60

7.   Hazards of raising *Strickland* claims on direct appeal ............64

8.   Alternatively, ineffective assistance of counsel during Will's direct-review proceedings constitutes cause for procedural default........................................................................................65

VII.   The Court's Alternative "Merits" Holding ....................................69

VIII.   Conclusion....................................................................................74

Certificate of Service ..............................................................................76

EXHIBITS

Chuck Lindell, *Lawyer Makes 1 Case for 2 Killers*, AUSTIN-AMERICAN STATESMAN, Feb. 26, 2006 ..........................................................Exhibit 1

Ribnik Mot. to Withdraw as Counsel of Record and for Appointment of Successor Counsel 1, *Texas v. Villanueva*, Cause No. 730975A .................................Exhibit 2

Ribnik Mot. to Withdraw as Counsel of Record and For Appointment of Successor Counsel 2, Dkt. 18, *Richard v. Quarterman*, H-02-469 (Dec. 29, 2006) ....Exhibit 3

Affidavit of Leslie M. Ribnik (Oct. 8, 2006) ................................................Exhibit 4

Affidavit of Michael G. Adelberg, M.D. (May 14, 2007)...........................Exhibit 5

Statement of Stephen Bright, regarding The Innocence Protection Act, before U.S. H.R. 9 (Sept. 22, 2009) .................................................................................Exhibit 6

Affidavit in Supp. of Appl. for Post-Conviction Writ of Habeas Corpus (Oct. 18, 2003) ...............................................................................................Exhibit 7

Letter from Will (Dec. 13, 2003)..................................................................Exhibit 8

Harris County Sheriff's Department record ..................................................Exhibit 9

Harris County Sheriff's Department record ................................................Exhibit 10

Letter from Morrow to Will (Feb. 26, 2003)...............................................Exhibit 11

George McCall Secrest, Jr. Expert Affidavit and Curriculum Vitae .........Exhibit 12

**APPENDICES**

Texas cases from 2002-2012 rejecting *Strickland* claims on direct appeal (3466 in total) ......................................................................................................Appendix A

Texas cases from 2002-2012 sustaining a *Strickland* claim on direct appeal (47 in total) ......................................................................................................Appendix B

Texas cases from 2002-2012 in which a *Strickland* claim was initially sustained on direct appeal but later rejected by TCCA (8 in total)...............................Appendix C

# TABLE OF AUTHORITIES

## CASES

*Adams v. Thaler*,
    679 F.3d 312, 316 (5th Cir. 2012)..................................................................66

*Alvarez v. State,*
    *79 S.W.3d 679 (2002)*......................................................................................61

*Armstrong v. State,*
    2010 WL 359020 (Tex. Crim. App. Jan. 27, 2010) ......................... 54, 55, 56

*Aldrich v. State*,
    296 S.W. 3d 225, 232 (Tex.App.-Ft. Worth 2009, pet. ref'd) .....................61

*Aldrich v. State*,
    104 S.W.3d 505, 506 (Tex. Crim. App. 2003)...............................................61

*Ayestas v. Thaler*,
    475 F. App'x 518, 518 (5th Cir. 2012) .........................................................66

*Bone v. State*,
    77 S.W. 3d 828, 833 (Tex. Crim. App. 2002)...............................................61

*Balentine v. Thaler*,
    __ F.3d __, 2012 WL 3570766 (5th Cir. Aug. 21, 2012) ............... 38, 51, 67

*Brady v. Maryland*,
    373 U.S. 83 (1963) ..................................................................................16, 59

*Beltran v. Cockrell*,
    294 F.3d 730, 734 (5th Cir. 2002).................................................................71

*Belcher v. State*,
    93 S.W.3d 593, 596 (Tex.App-Houston, 14th Dist. 2002, pet. dismissed) ..62

*Bernard v. State*,
    2002 WL 253822 (Tex.App.-Tyler 2002)......................................................62

*Blumenstetter v. State*,
 117 S.W.3d 541, 547 (Tex.App.-Texarkana, 2003)......................................62

*Coleman v. Thompson*,
 501 U.S. 722 (1991) ....................................................... 39, 41, 42, 72

*Compton v. State*,
 202 S.W.3d 416, 421 (Tex.App.-Tyler 2006) ...............................................61

*Cullen v. Pinholster*,
 131 S. Ct. 1388, 1418 (2011) ...........................................................69

*Ellis v. Wengler*,
 2012 WL 4009565 (D. Idaho Sept. 12, 2012)................................................57

*Ex Parte Adams*,
 2012 WL 476538, at *3 n.6 (Tex. Crim. App. 2012)............................13, 14

*Ex Parte Duffy*,
 607 S.W.2d 507, 513 (Tex. Crim. App. 1980).......................................43, 45

*Ex Parte Gardner*,
 959 S.W.2d 189, 199 (Tex. Crim. App. 1998)..............................................12

*Ex Parte Kerr*,
 64 S.W.3d 414 (Tex. Crim. App. 2002).....................................................12

*Ex Parte Medina*,
 361 S.W.3d 633 (Tex. Crim. App. 2011)....................................................12

*Ex Parte Nailor*,
 149 S.W.3d 125 (Tex. Crim. App. 2004).....................................................64

*Ex Parte Reynoso*,
 257 S.W.3d 715, 720 n.4 (Tex. Crim. App. 2008).......................................34

*Ex Parte Torres*,
 943 S.W.2d 469, 475 (Tex. Crim. App. 1997)................................. 35, 45, 47

*Ex Parte Will*,
No. 63,590-01, 2006 WL 832456 (Tex. Crim. App. 2006) .....................7, 37

*Foster v. Thaler*,
369 F. App'x 598, 601 (5th Cir. 2010) .........................................................66

*Foster v. Thaler*,
2012 WL 4328336 (5th Cir. Sept 21, 2012) ................................................66

*Gallow v. Cooper*,
2012 WL 3641520, at *3 (5th Cir. Aug. 24, 2012).......................................66

*Gates v. Thaler*,
476 F. App'x 336, 2012 WL 2305855, at *6 (5th Cir. 2012).......................66

*Goodspeed v. State*,
198 S.W.3d 390, 392 (Tex. Crim. App. 2005)..............................................63

*Ibarra v. Thaler*,
687 F.3d 222 (5th Cir. 2012)...................................... 4, 37, 38, 39, 50, 54, 74

*Ibarra v. Thaler*,
__ F.3d __, 2012 WL 3537826, at *6 n.1 (5th Cir. 2012) ...........................66

*Horonzy v. Smith*,
2012 WL 4017927 (D. Idaho Sept. 12, 2012)..............................................57

*Jackson v. State*,
877 S.W.2d 768, 773 n.3 (Tex. Crim. App. 1994).......................... 35, 42, 63

*Jackson v. State*,
973 S.W.2d 954, 957 (Tex. Crim. App. 1998)..............................................43

*Landrum v. Anderson*,
2012 WL 3637365 (S.D. Ohio Aug. 22, 2012)............................................58

*Mallet v. State*,
65 S.W.3d 59, 63 (Tex. Crim. App. 2001)..............................................43, 61

*Maples v. Thomas*,
132 S. Ct. 912 (Jan. 18, 2012) ................................................................11, 13

*Martinez v. Ryan*,
132 S. Ct. 1309 (2012) ........................................................................ *passim*

*Massaro v. United States*,
123 S. Ct. 1690, 1694 (2003) ................................................................30, 36

*Mata v. State*,
226 S.W.3d 425, 430 & n.14 (Tex. Crim. App. 2007).............. 42, 45, 51, 63

*McCormack v. Baldridge*,
2012 WL 4138479 (D. Idaho Sept. 19, 2012)...............................................57

*Menefield v. State*,
363 S.W.3d 591, 592 (Tex. Crim. App. 2012)..............................................62

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ......................................................................................3

*Mitchell v. State*,
68 S.W.3d 640, 643 (Tex. Crim. App. 2002).........................................43, 63

*Murray v. Carrier*,
477 U.S. 478 (1986) ................................................................. 39, 41, 52, 53

*Newbury v. Thaler*,
2012 WL 3032718 (5th Cir. July 26, 2012).................................................66

*Robinson v. State*,
16 S.W.3d 808, 810 (Tex. Crim. App. 2000)................ 34, 43, 44, 45, 46, 62

*Romero v. State*,
800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990) ......................................31

*Rylander v. State*,
101 S.W.3d 107 (Tex. Crim. App. 2003).........................................46, 47, 63

*Salinas v. State*,
163 S.W.3d 734, 740 (Tex. Crim. App. 2005)...............................................43

*Sprouse v. State*,
2007 WL 283152 (Tex. Crim. App. 2007).................................. 35, 48, 49, 52

*State v. Morales*,
253 S.W.3d 686, 697 (Tex. Crim. App. 2008)...............................................62

*Strickland v. Washington*,
466 U.S. 668 (1984) ............................................................... *passim*

*Thompson v. State*,
9 S.W.3d 308 (Tex. Crim. App. 1999) .................................................. *passim*

*United States v. Escalante-Reyes*,
689 F.3d 415, 433-49 (5th Cir. 2012) ........................................................64

*Velez v. State*,
No. AP-76,051, slip op. at 60-61 (Tex. Crim. App. June 13, 2012).............51

*Washington v. Thaler*,
464 Fed.Appx. 233 (5th Cir. 2012) .............................................................14

*Wessinger v. Cain*,
2012 WL 1752683 (M.D. La. May 16, 2012) ..............................................58

*Will v. State*,
2004 WL 3093238, at *6 (Tex. Crim. App. 2004) (unpublished)... 30, 31, 36

## STATUTES

TEX. CODE CRIM PROC. art. 11.071................................................................. *passim*

TEX. CODE CRIM PROC. art. 11.071 § 1 .........................................................31

TEX. CODE CRIM PROC. art. 11.071 § 2(b) .........................................................32

TEX. CODE CRIM PROC. art. 11.071 § 3(a) .........................................................34

TEX. CODE CRIM PROC. art. 11.071 § 3(d) ..................................................34

TEX. CODE CRIM. PROC. art. 11.071 § 4(a) ............................................32

TEX. CODE CRIM. PROC. art. 26.04(j)(3) ...............................................33

TEX. CODE CRIM. PROC. art. 26.05(j) ...................................................32

TEX. CODE CRIM. PROC. art. 26.052(k) ................................................32

TEX. R. APP. PROC. 21.4 .........................................................................32

TEX. R. APP. PROC. 31 ............................................................................36

**OTHER AUTHORITIES**

*Capital Punishment Appellate Guidebook* (2006) (prepared by Post Conviction Litigation Division, Office of Attorney General of Texas)...........................50

*Guidelines and Standards for Texas Capital Counsel*, 69 TEX. BAR J. 966 (2006) ……………………………………………………………………...33, 34, 44, 50

Donald A. Dripps, *Ineffective Litigation of Ineffective Assistance Claims: Some Uncomfortable Reflections on* Massaro v. United States, 42 Brandeis L.J. 793, 800 (2004) ...................................................................................................36

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT GENE WILL, II, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| RICK THALER, DIRECTOR, | § | H-07-CV-1000 |
| TEXAS DEPARTMENT OF CRIMINAL | § | (Death Penalty Case) |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISIONS | § | |
| | § | |
| RESPONDENT | § | |

## ROBERT WILL'S BRIEF CONCERNING IMPACT OF *MARTINEZ V. RYAN*, 132 S. Ct. 1309 (2012), ON HIS CASE

Pursuant to the Court's Order on Remand, Mr. Will files this brief addressing the impact of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), on his case:

### I. Procedural Background

On January 24, the Court appointed undersigned counsel in this capital case, citing "grave" errors, "disturbing uncertainties," and substantial "evidence of actual innocence." Dkt. 88 at 19-20. Since our appointment, we have come to the same concerns and found more, including the woefully deficient performance of state habeas counsel.

On March 14, Will filed a Rule 60(b) motion contending that his state habeas counsel was ineffective. Dkt. 102 at 10-11 (specifically discussing *Martinez*) & Dkt. 105. On March 19, the Court denied the motion, but it

emphasized: "Neither this Order nor anything else, however, attenuates the deeply felt concerns expressed in the Court's most recent Memorandum and Order. (Doc. No. 88 at 19-20.) Questions as to Will's possible innocence do remain." Dkt. 106 at 6.

Then, the very next morning, on March 20, one day after Will filed his Notice of Appeal, the Supreme Court decided *Martinez*:  now "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan*, 132 S. Ct. at 1320.

Will's federal habeas petition alleged that "his trial attorneys provided ineffective assistance by not sufficiently proving that a co-defendant committed the murder." Dkt. 66 at 1 (Order). That claim, however, was not presented in the state courts and thus was procedurally defaulted. *Id.* In its Order denying Will's 60(b) motion, the Court noted that Will might seek consideration of a procedurally-defaulted ineffectiveness claim through two potential procedural vehicles: "(1) actual innocence, which the Court has already ruled on; and (2) the ineffective assistance of Will's state habeas counsel, which hinges on the Supreme Court's opinion in a case now before it, *Martinez v. Ryan*, 2011 WL 3467246 (U.S. Aug. 4, 2011)." Dkt. 106 at 4 n.2.

*Martinez* provides the very procedural vehicle anticipated by the Court:

> Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors (or the absence of an attorney) caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim. . . .  [A] prisoner may establish cause for a default of an ineffective-assistance claim . . . where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984).  To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  Cf. *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue).

*Martinez*, 132 S. Ct. at 1318-19.  The Supreme Court concluded:  "[T]he Court of Appeals did not determine whether Martinez's attorney in his first collateral proceeding was ineffective or whether his claim of ineffective assistance of trial counsel is substantial.  And the court did not address the question of prejudice. These issues remain open for a decision on remand."  *Id*. at 1321.

*Martinez* applies to Will's case, and this Court must address these same issues on this remand.  The State, however, will argue that *Martinez* does not help Will because he should have raised ineffective assistance in a motion for new trial within 30 days of his trial – although Will was assigned new counsel, who had no opportunity to read the record (it wasn't even typed within 30 days of trial) much

less investigate extra-record issues, and who believed that extra-record claims must be raised on habeas and not in a motion for new trial.  We describe below why this argument, including the State's interpretation of *Ibarra v. Thaler*, 687 F.3d 222 (5th Cir. 2012), with respect to extra-record issues, fails.  Contrary to the State's position, Will had a right to state habeas.  We ask the Court to find that his state habeas counsel was so ineffective as to trigger *Martinez* relief.[1]

## II. Factual Background

As this Court recognized in its Order of January 17, Will "has repeatedly and persistently argued that Rosario killed Deputy Hill" on December 4, 2000.  Dkt. 88 at 19.  Will "has submitted no less than five witnesses who have stated that Rosario confessed to murdering Deputy Hill."  *Id*.  Further, "the trial court's exclusion of [Natasha] Helalian's testimony linking Rosario to the murder was almost certainly error of grave proportion."  *Id*.  This error, although preserved at trial, Trial Tr. vol. 25, 198, was raised neither on direct appeal nor by state habeas counsel.  Noting "the total absence of eyewitness testimony or strongly probative

---

[1] "Though the Court [has] found that Will's [underlying] IAC claim was procedurally barred, it nonetheless considered that claim in the alternative, and concluded that the claim was substantively flawed as well."  Dkt. 106 at 2.  The Court stated: "Even if the Court were to vacate its orders on the procedural default, the Court would be left with its Final Judgment based on the merits of Will's IAC claim."  Dkt. 106 at 5.  However, the Court's alternative determination of the merits expressly did not take into account additional and significant evidence buttressing Will's claim of innocence, and his related claim of IAC.  As set out below, the Court did not believe it could, under then-existing law, examine this evidence.  But that belief has now been undercut by *Martinez*.

forensic evidence" demonstrating Will's guilt, this Court has wrestled with "disturbing uncertainties" created by this case in light of the "considerable evidence supporting Will's innocence." Dkt. 88 at 19-20. As the Court well knows, before Deputy Hill was tragically killed, he announced over the radio: "I've got one [which was Will], in custody." Dkt 44 at 3.

Since our appointment, we have discovered additional evidence which was not presented in connection with Will's IAC claim. The inferences we offer here in support of Will's IAC claim are at least as plausible as any theory presented by the State of Texas during Will's trial.

First, we have found a "graze" on the back of the jacket that Will was wearing on the day of the murder that apparently was never before investigated. If a bullet graze, as it appears to us, it strongly suggests that Rosario shot Deputy Hill while Will was still handcuffed, with one bullet grazing Will's back. Incredibly, this graze was never raised by any of Will's previous lawyers.

Second, in a statement to police, Rosario admitted to handling the murder weapon just before the murder. Rosario made other inculpatory statements as well – including that "a cop had got shot" – but Mr. Will's trial counsel failed to introduce them, as statements against interest or under any other theory. We have also learned that the day after Deputy Hill's murder Rosario "*solicit[ed] to make [a] hit on co-def Robt. Will (Gene)*." Four days later, Rosario admitted to a Harris

County Deputy that he was "part of the reason" that Deputy Hill was murdered. We have not yet confirmed if these statements were produced to the defense before trial: they were not introduced at trial, and we found them in Rosario's jail records.

And third, Will's state habeas counsel, Les Ribnik, was manifestly ineffective.  Mr. Ribnik appears to have cut and pasted two-thirds of his habeas petition word for word from another, unrelated case, even making the same capitalization errors, raising none of the serious issues in Will's case.  We have also discovered that, around the time of this state writ, Ribnik suffered a debilitating illness that impaired his cognition and memory and that even he admitted – in other cases – prevented him from effective representation as a lawyer.  This evidence outlined below shows that Ribnik completely abandoned Will at a critical stage by failing to uncover any meaningful evidence.  Ribnik even failed to raise the "grave error" excluding Natasha Helalian's testimony and the inexplicable failure of Will's appellate counsel to raise this issue on appeal.

Assuming the Court finds that *Martinez* applies to this case, we believe that we could further develop Will's IAC claim and show that not only Will's state habeas counsel but also "his trial attorneys provided ineffective assistance by not sufficiently proving that [Rosario] committed the murder."  Dkt. 66 at 1.

### III.  State Habeas Counsel – Les Ribnik

State habeas counsel Les Ribnik has boasted to the press that he raised "every worthy issue found during [his thorough] investigation."  Chuck Lindell, *Lawyer Makes 1 Case for 2 Killers*, AUSTIN-AMERICAN STATESMAN, Feb. 26, 2006 (attached as Ex. 1).  Of course, Ribnik did not raise the issue of the green jacket or of Rosario's inculpatory statements.  Or any extra-record issue whatsoever.  And although we take no pleasure in exposing Ribnik's ineffectiveness, we feel compelled to do so.

Ribnik was appointed in 2002 and filed Mr. Will's state post-conviction writ on October 19, 2003.  The Court of Criminal Appeals denied Mr. Will's application on March 19, 2006.  *Ex Parte Will*, No. 63,590-01, 2006 WL 832456 (Tex. Crim. App. 2006).  By August 2006, Mr. Ribnik was diagnosed with "intermediate stage" of Parkinson's disease and resigning from cases due to impaired cognition and memory.  *See* Ribnik Mot. to Withdraw as Counsel of Record and for Appointment of Successor Counsel 1, *Texas v. Villanueva*, Cause No. 730975A ("Given the exigencies of the disease and the limitations it imposes [a]ffecting, in part, cognition and, in part, working memory skills, Counsel concludes that it is advisable for him to retire from a litigation practice.") (June 12, 2007) (Ex. 2); *see also* Ribnik Mot. to Withdraw as Counsel of Record and For

Appointment of Successor Counsel 2, Dkt. 18, *Richard v. Quarterman*, H-02-469 (Dec. 29, 2006) (Ex. 3).

Ribnik's work deteriorated long before 2006. For example, he was appointed to represent capital defendant, Juan Carlos Alvarez, in 1999 and filed a state habeas petition in that case in September 2001. New counsel for Alvarez, however, filed a motion in May 2007 to withdraw Mr. Ribnik's state habeas petition in which he explained: "Counsel Ribnik had not been competent to represent Mr. Alvarez *at the time of his appointment* [in 1999] because of his unmedicated and undiagnosed Parkinson's Disease." Dkt. 1, at 3-5, *Alvarez v. Thaler*, H-09-3040 (Sept. 18, 2009) (emphasis added). Ribnik himself stated:

> On August 4, 2006, I was diagnosed with Parkinson's Disease at an intermediate stage by my neurologist here in Houston, Texas. My neurologist informed me that given the intermediate state of the illness, the onset was estimated to have been at least five to six years prior to that time. ***Thus I would have been afflicted with this disease at least going back to the year 2000***.

> I have a number of symptoms of intermediate stage Parkinson's Disease as confirmed by neurologist. These include, bradykinesia (slowness of movement), bradyphrenia (slowness in thought processing), festination (short, shuffling steps), cognitive impairments, hallucinosis (a state of experiencing hallucinations), hypomimia (decreased facial expression due to rigidity of facial muscles), memory loss and disturbance, micrographia (small, cramped handwriting), ataxia (loss of balance), postural tremors, resting tremors, muffled speech, insomnia, loss of initiative, and fatigue.

. . . .

> *I have been experiencing each of the symptoms listed above
> for some time now*.  In addition to each of the physical symptoms
> listed above, I have also been suffering from memory loss, both short
> term and long term, a noticeable lack of concentration, and a
> lessening of my ability to address and comprehend more complex
> facts and propositions.  For example, I have been noticing that I will
> draft an argument based on legal research connecting facts with legal
> propositions.  I will return to the work within 24 hours of completing
> it initially, and not be able to comprehend the connection between the
> facts and the propositions as written.

Aff. of Leslie M. Ribnik (Oct. 8, 2006) (Ex. 4) (emphasis added), attached to Mot.

to Substitute Counsel, *Ex Parte Alvarez*, Cause No. 787007 (Oct. 11, 2006).  Dr.

Michael Adelberg, a neurologist, submitted an affidavit stating that, *as of his*

*appointment in 1999*, "*Mr. Ribnik was mentally impaired by the [e]ffects of*

*Parkinson's disease to the degree that it made him unfit to serve in [his]*

*capacity as habeas counsel for a capital appeal*."  Aff. of Michael G. Adelberg,

M.D. (May 14, 2007) (Ex. 5) (emphasis added), attached to McGlasson Mot. to

Withdraw Habeas Writ 787007-A and to Set Time to File True Appl. for Post-

Conviction Writ of Habeas Corpus, *Ex Parte Alvarez*, Cause No. 787007-A (May

2007).  Ribnik's appointment in Alvarez' case was more than two years *before* his

appointment in Will's case.

Tragically, in Mr. Will's state habeas proceeding, Mr. Ribnik filed a brief

two-thirds of which was "word-for-word identical, right down to a capitalization

error on page 17," to one that he had filed for another Texas death row inmate,

Angel Maturino Resendiz.  Chuck Lindell, *Lawyer Makes 1 Case for 2 Killers*,

AUSTIN-AMERICAN STATESMAN, Feb. 26, 2006 (Ex. 1); *see also* Chuck Lindell,

*Sloppy Lawyers Failing Clients on Death Row*, AUSTIN-AMERICAN STATESMAN,

Oct. 29, 2006.  As Stephen Bright, President and Senior Counsel of the Southern

Center for Human Rights, has testified:

> As in Alabama, many of those sentenced to death in Texas receive completely incompetent lawyers on appeal and in post-conviction representation.   For example, a lawyer assigned to represent Robert Gene Will filed the same brief for Will that he had filed for another inmate, Angel Resendiz, a year and a half earlier. The lawyer missed the statute of limitations for filing Resendiz' federal habeas corpus petition.  As a result, Resendiz was executed without any habeas review of his case. Will was denied relief based on the shoddy brief that had been filed earlier in Resendiz' case.

Statement of Stephen Bright, regarding The Innocence Protection Act, before U.S.

H.R. 9 (Sept. 22, 2009) (Ex. 6).  In Resendiz' case, Ribnik admitted: "The notion

of binding a client to the acts or omissions of his attorney has no place where,

when counsel was notified of this Court's order, he abandoned his obligations to

his client.  Although counsel's appointment had not been terminated, his complete

failure to engage in any contact with the client – even to notify him of the denial

of his habeas petition and rights to appeal – indicates an ***effective abandonment*** of

his legal representation of Mr. Maturino Resendiz."   Ribnik Mot. to Re-Open

Time to File Notice of Appeal 8, Dkt. 7, *Resendiz v. Dretke*, H-05-1604 (Nov. 15, 2005) (emphasis added).

In *Maples v. Thomas*, 132 S. Ct. 912 (Jan. 18, 2012), decided only one day after this Court denied Mr. Will's Rule 59 motion, the Supreme Court held that, ***even in a state habeas proceeding***, "under agency principles, a client cannot be charged with the acts or omissions of an attorney who has ***abandoned*** him.  Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him."  *Id.* at 924 (emphasis added).

Here, Ribnik cut and pasted Will's state habeas petition from an unrelated case, totally abandoning him at a critical stage of his case.  Mr. Will, of course, should not be faulted for failing to act on his own behalf when he lacked any reason to believe Ribnik was not representing him.  Indeed, when Will discovered that Ribnik swore out an affidavit in state court attesting that he had "reviewed the allegations contained [in Will's petition] with Robert Gene Will, II, and the allegations are true according to him [Mr. Will]," *see* Aff. in Supp. of Appl. for Post-Conviction Writ of Habeas Corpus (Oct. 18 2003) (Ex. 7), Will promptly wrote the state court protesting that Mr. Ribnik's affidavit was not true.  *See* Letter from Will ("Your Honor, this sworn statement of Mr. Leslie Michael Ribnik is false.  Mr. Ribnik did not discuss all (or any) of the issues he argued in the [W]rit

of Habeas Corpus with me.") (Dec. 13, 2003) (<u>Ex.</u> 8).  But of course, by that time, the damage had been done.

And the damage was real.  In Mr. Will's state habeas petition, Ribnik raised only two issues, one concerning the burden of proof with respect to mitigation at capital sentencing and the other claiming a First Amendment violation based on evidence of Will's putative gang membership.  Because both of these claims were record-based, they were not even cognizable in habeas court as stand-alone claims. *See, e.g., Ex Parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998). Neither claim required any outside factual development.  And, further, Ribnik's petition did not even mention the "error of grave proportion" committed by the trial court in excluding Natasha Helalian's testimony linking Rosario to the crime.[2] Dkt. 88 at 19.  Ribnik's application was, thus, not a "true" writ.  *See Ex Parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011); *Ex Parte Kerr*, 64 S.W.3d 414 (Tex. Crim. App. 2002).

To make matters worse, Ribnik failed to raise an ineffective-assistance-of-appellate-counsel claim charging appellate counsel with failure to raise this same "error of grave proportion."  Mr. Will's case therefore goes to the heart of the

---

[2] Had the trial court not committed this error, Helalian would have testified regarding a statement by Rosario that "[t]he blood came off" his pants when she observed Rosario laundering clothing in Brenda Venegas' apartment.  Dkt. 88 at 4.

Supreme Court's decision in *Martinez*.   As Judge Price of the Texas Court of

Criminal Appeals has explained:

> The question presented in *Martinez* [was]:   "Whether a
> defendant in a state criminal case who is prohibited by state law from
> raising on direct appeal any claim of ineffective assistance of trial
> counsel, but who has a state-law right to raise such a claim in a first
> post-conviction proceeding, has a federal constitutional right to
> effective assistance of first post-conviction counsel specifically with
> respect to his ineffective-assistance-of-trial-counsel claim."[3]   While
> defendants in criminal cases in Texas are not absolutely prohibited by
> law from challenging the effectiveness of their trial counsel on direct
> appeal, such claims typically call for extensive factual development
> beyond what is disclosed in the appellate record, and thus, as a
> practical matter, post-conviction habeas corpus is the first opportunity
> to raise them.   *Thompson v. State*, 9 S.W.3d 308 (Tex. Crim. App.
> 1999).

*Ex Parte Adams*, 2012 WL 476538, at *3 n.6 (Tex. Crim. App. 2012) (Price, J.,

dissenting) (unpublished).

*Martinez* was argued the same day as *Maples*, October 4, 2011.  In fact,

even before deciding *Martinez*, the Supreme Court stayed the execution of

condemned Texas inmates who argued "that the ineffectiveness of initial state

habeas counsel with respect to an issue that may be raised for the first time only in

a post-conviction application for writ of habeas corpus proceeding ought to justify

allowing the inmate to raise that issue for the first time in a subsequent writ

---

[3] *Martinez* resolved this question on non-constitutional grounds. *Martinez*, 132 S. Ct. at 1315
("This is not the case, however, to resolve whether that exception exists as a constitutional
matter. The precise question here is whether ineffective assistance in an initial-review collateral
proceeding on a claim of ineffective assistance of trial may provide cause for a procedural default
in a federal habeas proceeding.").

application." *Ex Parte Adams*, at \*3-\*4 (Price, J., dissenting) (citing *Balentine v. Texas*, 113 S. Ct. 3017 (2011)[4]).

In Will's case, Ribnik not only failed to raise an ineffective-assistance-of-appellate-counsel claim with respect to the exclusion of Natasha Helalian's testimony that linked Rosario to the murder of Deputy Hill, but he also failed to allege that Will's "trial attorneys provided ineffective assistance by not sufficiently proving that [Rosario] committed the murder." Dkt. 66 at 1.  A review of at least some of the evidence not raised by Ribnik is in order.

## IV.  Rosario's Inculpatory Statements

At the March 30, 2010 status conference, the following colloquy took place:

THE COURT:  You want to say anything, Ms. King?

MS. KING (Mr. Will's counsel):  Your Honor, . . . .  [T]he trial lawyers had an absolute duty to investigate, to obtain the same records that we've obtained in this writ, and an absolute duty to interview [certain]

---

[4] Since *Martinez* was decided, the Supreme Court granted another stay of execution to John Balentine based on his claim of ineffective assistance of state habeas counsel. *See Balentine v. Thaler*, __ F.3d __, 2012 WL 3570766 (5th Cir. Aug. 21, 2012), *petition for cert. filed*, 81 U.S.L.W. 3083 (U.S. Aug. 21, 2012) (No. 12-5906).  In his petition for certiorari Balentine argues (as Will does here) that the Fifth Circuit's decision in *Ibarra* contravenes *Martinez*. Another Texas inmate, Willie Washington, has also filed a petition for certiorari presenting a *Martinez* claim.  *See Washington v. Thaler*, 464 Fed.Appx. 233 (5th Cir. 2012), *petition for cert. filed* (U.S. June 11, 2012) (No. 11-10870).  The Supreme Court ordered the record in both cases and distributed both cases for conference on September 24.  As of this filing, no further action has been taken by the Supreme Court.

witnesses, especially since Michael Rosario is saying that he's the actual shooter.

> THE COURT:  Mr. Rosario, I take it, has never given a statement?

> MR. WILLIAMS (Mr. Will's counsel):  That's correct, Your Honor.

Tr. 9, *Will v. Thaler*, H-07-1000 (Mar. 30, 2010).

A.    <u>Rosario confesses to handling the gun just before the murder.</u>

In fact, we have learned that Rosario gave several (different) stories to the police on the night of December 4-5, 2000, especially on the crucial issue of the gun.  At 10:50 p.m. on December 4 – the day of the murder – Rosario signed a statement:

> "I know that Rob has a black gun that is 40 caliber.  I don't know what  brand it is.  You don't need to cock it to shoot it.  I think it's called a Sig.  Rob carries the gun with him most of the time."

Some three hours later, at 2:10 am on December 5, Rosario signed a second written statement.  This time, perhaps thinking that his fingerprints would turn up on the murder weapon, Rosario changed tack:

> "Robert and I continued to ride around other complexes until he found a set of rims that were on a Mazda 626 or 929. . . .  Robert got out of the Honda ***and gave me the gun (black finish, 40 caliber, semi-auto)***.  I got into the driver seat of the Honda.  Robert got into the Mazda and I followed Robert to a street near a freeway sign that read, "Wayside."  We both got out of each of the vehicles.  He said that he was having trouble driving the vehicle and holding the screwdriver at the same time.  (***I still had the gun in the passenger seat of the Honda at that time.***)  We drove to a Mobil Station at

Greens Road and I-45.  Robert gave me $5 to put gas in the Honda.  I
went into the station and gave the male attendant the money.  I gave
Robert back his gun.  Robert then drove the Honda to Wal-Mart at
1960 and Walters Road.  I rode with him.  We took 4 concrete cinder
blocks from the back of the store and rode back to the apartments."

"When we arrived back at the location where the Mazda was located,
Robert got out of the Honda and drove the Mazda. I got into the
Honda and parked at the backside of the building and Robert pulled
up beside me in the Mazda.  Robert got his tools ready. And he took
the bags out of the car. . . .  I saw a police vehicle and told Robert,
'Here come the laws.' Robert said to get ready to run.  Then the
officer said something."

Assuming these statements were made available to Mr. Will's trial counsel,[5]

and even though Rosario claims he gave the gun back to Will, trial counsel should

have, at the very least, sought to admit Rosario's statements that he omitted, and

then confessed, handling the gun *just before the murder*.

B.   <u>Rosario gave two different stories about his knowledge that "a cop
had got shot."</u>

Rosa Carpenter was the assistant manager of the nearby apartment complex

where Rosario appeared a couple of hours after the murder.  Called by Will's trial

counsel, Ms. Carpenter testified that Rosario "seemed kind of nervous acting and

he happened to know, you know, what was going on down the street, even though

he wasn't there."  Trial Tr. vol. 26, 49-50.  Trial counsel, however, failed to elicit

---

[5] If they were not made available, then the State violated its obligations under *Brady v.
Maryland*, 373 U.S. 83 (1963).

the most critical part of Carpenter's statement to police – that Rosario had told her, at approximately 8:50 a.m., that "[a] cop had got shot."

This testimony would have been critical to show Rosario's knowledge and state of mind just two hours after Deputy Hill was murdered.  Notably, it contradicts Rosario's later statement to police, on December 9, that he did **not** discover that a cop had been shot until he arrived at Brenda Venegas' apartment much later that morning (after going to a washateria for an hour or two, a Stop N Go, a Subway, and then taking a bus to Venegas' apartment).  Indeed, according to this version of his story, Rosario claims that, when he arrived at Venegas' apartment, he still "thought Robert had been shot, because I didn't know who had been shot."

Trial counsel made no attempt to establish these multiple versions of Rosario's story in front of the jury.[6]  It would not have been necessary to call Rosario to do so.  These statements are not hearsay, since they would **not** have been offered for their truth, but rather to show Rosario's state of mind and shifting story-line.[7]

---

[6] Here, too, if the State failed to disclose these statements to the defense, it violated its obligations under *Brady*.

[7] Even if somehow hearsay, they still could have been offered as statements against interest, excited utterances, or present sense impressions.

C.   Rosario "solicit[ed] to make [a] hit on Co-Def Robt. Will (Gene)."

Nor is this all.  The day after Deputy Hill was murdered Rosario was "written up" in jail, according to Harris County Sheriff's Department records.  The reason:  he had been "**soliciting to make [a] hit on co-def Robt. Will (Gene)**." The motive for such a threat against Mr. Will is damning – Rosario feared Will would implicate him – and it should have been argued vigorously at trial.  Again, assuming this record was made available to trial counsel,[8] trial counsel made no attempt establish this damning fact before the jury.  If the record was not made available, trial counsel performed ineffectively in failing to discover and utilize Rosario's threat against Will's life just one day after the murder.

D.   Four days later, Rosario admits to Harris County Deputy that he is "part of the reason" that Deputy Hill was murdered.

Harris County Jail records establish that four days later – on December 9, 2000 – the following exchange took place between Rosario and Deputy Patricia Schifani:

> Upon returning with the inmates to probable cause court, I was about to close the door to the court holdover cells, when inmate Rosario approached me at the door and said, in the presence of all the other inmates, "Hey!  I am not suppose[d] to be in here."  He then looked directly at the mourning badge cover I was wearing over my badge (in honor of slain Deputy Barry Hill).  He pointed at my badge cover and sarcastically asked me, "Do you know why you are wearing

---

[8]  If the State suppressed this Harris County Sheriff's Department record and any related information, its conduct constitutes a *Brady* violation.  The record is attached as Ex. 9.

that?"  I replied to him, "Yes, I know why I am wearing it."  He then proclaimed, "Well, ***I am part of the reason you are wearing it***."  . . . He then stuck his armband caution text which indicated "*PROTECTION*". . . .  As he was walking through the door, he swaggered out in a cocky manner, with a bounce and with a slight drag of his foot behind him.  He then stated as he exited the doorway, "I'm high-profile!  Do you know who my father is?"  I replied to him, "Yes, I know your father works for HPD."  His demeanor was arrogant at this point and appeared to take pleasure in his notoriety.

Assuming here, too, that this record was disclosed to trial counsel,[9] trial counsel made no attempt present these statements to the jury.  The statements would have been critical to Will's defense that Rosario was the shooter.  They also supported the defense theory that Rosario's father traded on his status as an HPD officer to help his son.  If this record was not made available, however, trial counsel should have discovered and utilized these statements as statements against interest or some other theory.  Unlike witnesses with criminal history, Harris County Deputy Schifani – along with the Harris County deputies who could have testified about their investigation of Rosario's plan to knock off Will – would have presented with few credibility problems.

## V.  The Green Jacket

State's Exhibit 151 is the green jacket worn by Will on the morning of the murder.  Trial testimony established that the front of the jacket and the inside left

---

[9] If the State did not produce this record, its conduct violated *Brady*.  This Harris County Sheriff's Department record is attached as Ex. 10.

sleeve were stained with Will's blood.  Trial Tr. vol. 24, 21.  ***But the green jacket appears to have a graze on the back right shoulder area, consistent with a third party (such as Rosario) firing a bullet and grazing the back of Will's jacket.***[10] Moreover, folding the sleeves of the jacket backwards (as though Mr. Will were handcuffed behind his back) reveals large amounts of blood still present, but only in the top and center portions of the back of the jacket.  Indeed, there is a distinct outline on the back of the jacket (almost in the shape of a large "V") below which no noticeable blood is present, i.e., those portions of the jacket which would have been shielded by Mr. Will's arms while handcuffed behind his back.[11]  The right forearm sleeve of the jacket is also caked with blood.

At trial, the State established that the green jacket was found in the car that Will drove to Brenham after Deputy Hill's murder.  Trial Tr. vol. 23, 18.  The sole testimony presented by the State concerning forensic analysis of the green jacket concerned the front and inside sleeve, as follows:

Q: (by the prosecutor):  In reference to State's Exhibit No. 151, did you take some stains from this jacket?

A: (by forensic scientist Katherine Long):  Yes, I did.

---

[10] That "[t]he slain officer's unfired gun was still in its holster when his body was found" is not in dispute.  Respondent's Answer 3, Dkt.10 (quoting *Will v. State*, 2004 WL 3093238, at *1).

[11] This Court has noted that "[o]ne of the most opaque factual issues in this case is how Will became freed from his handcuffs."  Dkt. 88, at 13-14.

Q:  Okay.  Now, just for the record, I'm showing this in front of the jury.  How would you characterize the level of blood on this jacket?

A:  It's got quite a bit of blood on it.

Q:  Now, did you take a stain from this particular jacket?

A:  Yes.  I actually took two stains from this jacket.

Q:  . . . [W]here were they located?

A:  One of the stains was on the bottom of the left sleeve.  It would actually be on the inside of the sleeve.  . . . [I]t's marked with a B on the inside of the sleeve.

Q:  Why did you choose that particular stain . . . ?

A:  The other stuff seemed to be somebody just bleeding out onto the jacket.  That didn't give me any indication of what it – two people had come into contact with each other.  And the stain on the left sleeve actually had some characteristic where it looked like it may have come from another party.

Q:  Okay.  And is that one of the things that you're looking for when you're trying to do an analysis between two people's blood?

A:  Yes.

Q:  Where was the other stain taken from?

A:  The other stain was taken from the front, actually near where the juncture of the sleeve and the actual body of the jacket and it's been labeled as Stain A.

Q:  So, . . . for the record, in your report, what are these stains, the numbers that you associate with these two stains on the green jacket?

A:  Those would have been both – I'm sorry.  The case number in this particular instance is 2792.  I misspoke earlier.  They both had the case number, 2792, both had the item number which, in this instance, was 111 and each stain received an alphabetical indication, A being the one from the front left shoulder area and B being the one from the bottom of the sleeve.

Q:  Why did you choose this particular stain?

A:  It appeared to have movement to it and would be consistent with not somebody just bleeding out on the jacket but maybe two people coming into contact with each other.

Trial Tr. vol. 23, 95-97.  The State subsequently established that these two stains – from the *front* left shoulder area and from the inside of the left sleeve – came from Mr. Will.  Trial Tr. vol. 24, 21.

No one has ever tested the blood on the *back* of the jacket, or even to make an issue of the blood pattern on the back of the jacket.  Yet, even more importantly, no one – including trial counsel – appears to have ever examined,

analyzed, or tested the ***apparent bullet graze*** across the back of Will's jacket, for example, for traces of metal.  *Compare below* Bullet Graze on Will's Green Jacket *with* Bullet Graze on Deputy Hill's Shirt.  Forensic analysis of the green jacket is critical in this case, and we ask the Court for permission to do so.[12]

---

[12] If the State did not disclose its knowledge of the apparent bullet graze, its conduct violated *Brady.*

## Bullet Graze to Will's Green Jacket







## Bullet Graze to Deputy Hill's Right Shirt Pocket







## HARRIS COUNTY SHERIFF'S DEPARTMENT
### INJURY CHART SUPPLEMENT REPORT

Complainant: Barrett Travis Hill          Case Number: 00-12040292
Race: W Sex: M Height: 73" Weight: 193 LBS DOB:
M. E. Tag # 00-3408                       Date: 12-4-00
Remarks: Gunshot wound to Rt. shoulder, left side.

Entrance Gunshot wound

Abrasion-Contusion caused by projectile strike to ballistic armor vest.

Exit Gunshot Wound

106

## VI. *Martinez* as Applied to Will's Case

As mentioned, although state habeas counsel raised none of these issues or any other extra-record claims, we expect the State to argue that Will had a fair opportunity to do so beforehand, in a motion for new trial within 30 days of his conviction.   Will has an equal, or greater, chance of winning next month's Presidential election on write-in votes: possible in theory, but so remote as to be impossible to a moral certainty.   Consider the following procedural facts relevant to Will's *Martinez* claim:

1. Will was arrested on December 4, 2000, and later charged with capital murder.

2. Jury selection covered 11 trial days commencing on October 15, 2001, and ending on October 29, 2001.

3. The guilt-innocence phase covered 8 trial days commencing on January 7, 2002, and ending on January 16, 2002.

4. The punishment phase covered 4 trial days commencing on January 17, 2002, and ending on January 23, 2002.

5. On January 23, 2002, the District Court granted defense counsel's motion to withdraw and appointed Janet Morrow as attorney on direct appeal.

6. The District Court appointed Les Ribnik as state habeas counsel on January 24, 2002, and that the District Court formalized this appointment by written order on March 19, 2002.

7. Janet Morrow requested the trial record on January 30, 2002.

8.  The trial record consists of 34 Volumes, and was not finished until after the deadline to file a motion for new trial.  Specifically, the Court Reporter signed and certified Volumes 2-8 on February 12, 2002; Volumes 9-15 on February 22, 2002; Volumes 16-27 on March 13, 2002; Volumes 28-32 on March 14, 2002; Volume 33 at an unspecified date; and Volume 34 on March 18, 2002.

9.  On February 22, 2002, Janet Morrow filed a Motion for New Trial, in which she requested an evidentiary hearing.  The Motion for New Trial contended that Texas's special issues and capital sentencing procedures are unconstitutional.  Morrow believed that she could not raise extra-record issues in a motion for new trial.

10. Janet Morrow attached the affidavit of investigator Cynthia Patterson to the Motion for New Trial.  The affidavit recounted Patterson's interview with juror Monica Martinez, who reported the impact of the special issues on the jurors' punishment deliberations.  In her affidavit Patterson stated:  "Mr. Will was sentenced to death on January 23, 2002, and my investigations had to be completed in time for the filing of a timely motion for new trial on or before February 22, 2002."  Investigator Patterson further noted:  "The first juror I called, and the only one to whom I was able to speak by February 22, was Monica Martinez."

11. The District Court held a hearing on the Motion for New Trial on April 8, 2002.  The Court denied the Motion for New Trial without an evidentiary hearing.

12. Janet Morrow filed Will's direct appeal brief on January 24, 2003, raising seventeen record-based claims, including (1) that Mr. Will received ineffective assistance of counsel when his trial counsel failed to object to a prosecutorial argument calling Will "the embodiment of evil" and comparing him to terrorists [Point of Error Three]; (2) that Mr. Will received ineffective assistance of counsel when his trial counsel failed to object to the prosecutor's improper and highly inflammatory argument asking the jury to return a death sentence for reasons outside the scope of their answers to the special issues, namely as a deterrent to others' commission of capital crimes [Point of Error Four]; and (3) the District Court committed reversible error in denying the admission of juror

Martinez's testimony on the Motion for New Trial on the ground that she was not a competent witness under Tex. R. Evid. 606(b), denying Will of effective assistance of appellate counsel and denying Will his due process right to a meaningful appeal [Point of Error Seventeen].

13. State habeas counsel Les Ribnik filed in the District Court what he called a skeletal petition for writ of habeas corpus on July 21, 2003, and then what he called a finalized petition for writ of habeas corpus on October 19, 2003.

14. The Texas Court of Criminal Appeals denied Will's direct appeal and affirmed his conviction and death sentence on April 21, 2004.

15. Regarding Point of Error Three, the Texas Court of Criminal Appeals stated: "Appellant . . . claims that his lawyer was ineffective for not objecting to the argument because this 'outrageous, ludicrous argument should have drawn an objection, but did not.'  We have held several times in cases where an ineffective assistance of counsel claim is raised for the first time on appeal that 'the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel.'  *See, e.g., Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999); *see also Massaro v. United States*, 123 S. Ct. 1690, 1694 (2003) (when ineffective assistance of counsel claim is raised for the first time on direct appeal, 'appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose').  The record in this case is insufficient to support a conclusion that appellant's lawyer was ineffective for not objecting to the prosecution's closing jury argument.  *See Thompson*, 9 S.W.3d at 815."  *Will v. State*, 2004 WL 3093238, at *5 (Tex. Crim. App. 2004) (unpublished).

16. Regarding Point of Error Four, the Texas Court of Criminal Appeals stated: "[A]ppellant claims that his lawyer was ineffective for not objecting to the following prosecution jury argument at the punishment hearing. . . .  Here, the record is insufficient to support a conclusion that appellant's lawyer was ineffective for not objecting to this argument.  *See Thompson*, 9 S.W.3d at 815."  *Will v. State*, 2004 WL 3093238, at *6 (Tex. Crim. App. 2004) (unpublished).

17. Regarding Point of Error Seventeen, the Texas Court of Criminal Appeals stated: "We do not reach the Rule 606(b) issue because the trial court could have excluded the affidavit on hearsay grounds. *See Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990) (appellate court may uphold trial court's evidentiary ruling if the record supports it and it is correct on any theory of law applicable to the case even if the trial court gives the wrong reason for its ruling)." *Will v. State*, 2004 WL 3093238, at *12 (Tex. Crim. App. 2004) (unpublished).

18. The District Court denied the purported state habeas petition on October 26, 2005, and the Texas Court of Criminal Appeals affirmed that denial of relief on March 29, 2006.

A.   Texas's Dual-Track Review Procedure

As the procedural facts set forth above show, Will's case became subject to a dual-track review procedure for capital cases that the Texas legislature enacted in 1995 in which his direct appeal and his initial collateral challenge to the judgment occur simultaneously. The mechanism by which this dual-track review procedure was created was the enactment of Article 11.071 of the Texas Code of Criminal Procedure, which establishes the procedures for an application for a writ of habeas corpus in which the applicant seeks relief from a judgment imposing death. *See* TEX. CODE CRIM PROC. art. 11.071 § 1. The dual-track review structure, accordingly, applies only to capital cases. Before the change in Texas law, a collateral challenge to a criminal judgment could not be filed until the conviction became final. That rule still applies to non-capital cases, but in capital cases in which death has been assessed, the deadline for filing an application for

post-conviction relief generally runs well before the direct appeal – which in capital cases is automatic to Texas's highest court – is adjudicated. TEX. CODE CRIM. PROC. art. 11.071 § 4(a) (habeas application must be filed no later than 180 days after counsel is appointed or 45 days after the State's brief on direct appeal is filed, whichever is later).

Pursuant to the dual-track review procedure for capital cases, after a judgment imposing death is entered, the trial court must appoint two different counsel to represent an indigent defendant: appellate counsel and Article 11.071 counsel. TEX. CODE CRIM. PROC. art. 26.05(j); *id.* art. 11.071 § 2(b). The trial court has the duty to appoint both counsel after trial, but Texas law prohibits the trial court from appointing an attorney as appellate counsel if the attorney represented the defendant at trial, unless the defendant and the attorney request the appointment on the record and the court finds good cause for the appointment. TEX. CODE CRIM. PROC. art. 26.052(k). Only persons sentenced to death are afforded the statutory right to collateral counsel for habeas corpus proceedings if indigent; indigent defendants sentenced to less than death have no right to counsel to pursue collateral challenges to their criminal judgments.

Texas law also requires that a motion for a new trial, if any, be filed within 30 days of the date that judgment is entered. TEX. R. APP. PROC. 21.4. Because Texas relies almost exclusively on private attorneys to comply with its

constitutional obligations to afford counsel to indigent criminal defendants, post-trial appointments of appellate and Article 11.071 counsel do not always occur immediately.  Where after trial a defendant who has been convicted is not yet represented by appellate counsel, Texas law accordingly imposes a duty on trial counsel to advise the defendant of his or her right to file a motion for new trial and a notice of appeal and, if replacement counsel is not appointed promptly and the defendant wishes to pursue an appeal, file a timely notice of appeal.  TEX. CODE CRIM. PROC. art. 26.04(j)(3).

Once appointed, Texas imposes separate duties on appellate counsel and Article 11.071 counsel in capital cases.  The State Bar of Texas has outlined these duties in its *Guidelines and Standards for Texas Capital Counsel*.  *See* 69 TEX. BAR J. 966 (2006).  Appellate counsel has no meaningful investigative duties imposed upon him or her.  Appellate counsel's duties include "fully review[ing] the appellate record for all reviewable errors, preparing a well-researched and drafted appellate brief which conforms with Court of Criminal Appeals rules and policies, ensuring that the brief is filed in a timely manner, [and] timely notifying the Court of Criminal Appeals of his [or her] desire to present oral argument in the case, if appropriate."  SBOT Guidelines at 976.

Article 11.071, by contrast, imposes a statutory duty on Article 11.071 counsel to "expeditiously" investigate upon appointment "***before and after*** the

33

appellate record is filed."   Tex. Code Crim. Proc. art. 11.071 § 3(a) (emphasis added).   *See also Ex Parte Reynoso*, 257 S.W.3d 715, 720 n.4 (Tex. Crim. App. 2008) (statute imposes a duty on Article 11.071 counsel to "diligently pursue the investigation"); SBOT Guidelines at 977 (Article 11.071 counsel has a duty "to conduct a thorough and independent investigation of both the conviction and sentence.  Habeas corpus counsel must promptly obtain the investigative resources necessary to examine both phases, including the assistance of a fact investigator and a mitigation specialist, as well as any appropriate experts.").   State law covers the reasonable investigative expenses of Article 11.071 counsel.   Tex. Code Crim. Proc. art. 11.071 § 3(d).   State law also permits Article 11.071 counsel – but not appellate counsel – to seek not only reimbursement for reasonable investigative expenses already incurred but also prepayment of anticipated investigative expenses so that the statutorily mandated investigation is not unduly impeded by Article 11.071 counsel's inability to finance investigation.   *Id. § 3*(b).

In Will's case, appellate counsel filed a motion for new trial on February 22, 2002.  The motion did not raise an ineffective-assistance-of-counsel-at-trial claim (a "*Strickland* claim").   This was appropriate.   Texas courts disfavor use of the motion for new trial for raising and adjudicating *Strickland* allegations.   *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000) ("a post-conviction writ proceeding, rather than a motion for new trial, is the preferred method for

gathering the facts necessary to substantiate" a *Strickland* claim).  This is in part due to the recognition that the trial lawyer is frequently the attorney who files the motion for new trial and that such counsel have obvious conflicts of interest with respect to adjudication of such claims. *Id.* at 811 (recognizing that "it would be absurd to require trial counsel to litigate his own ineffectiveness in a motion for new trial" to preserve the issue).  Texas courts also consider the vehicle simply inadequate for the task.  *Id.* at 810 ("[T]here is not generally a realistic opportunity to adequately develop the record for appeal in post-trial motions."); *Sprouse v. State*, 2007 WL 283152 (Tex. Crim. App. 2007) (recognizing that trial court's failure to appoint appellate counsel within the deadline for filing a motion for new trial thereby rendering defendant's ability to expand the record and litigate *Strickland* claim on appeal was harmless because the transcript of the trial proceedings had not yet been completed so any appellate counsel could not have been expected to make relevant *Strickland* allegations) (unpublished).  *See also Ex Parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (expansion of the record in a motion for new trial is inadequate to adjudicate *Strickland* claims because of time constraints, because the trial record has generally not been transcribed, and because trial counsel may remain counsel during the time required to file such a motion); *Jackson v. State*, 877 S.W.2d 768, 773 n.3 (Tex. Crim. App. 1994) (Baird, J., concurring) (motion for new trial impractical for adjudication of a

*Strickland* claim because "the time constraints for filing a motion for new trial, TEX. R. APP. PROC. 31, do not provide for adequate investigation … [and] the trial record will generally not be transcribed").  *Accord Martinez*, 132 S. Ct. at 1318 (abbreviated deadlines to expand the record on direct appeal that do not allow adequate time for an attorney to investigate *Strickland* claims is a sound reason for deferring consideration of such claims until the collateral-review stage).

Will's case shows these concerns about the inadequacy of the record to be true.  The trial court denied his motion for new trial on April 8.  Although Will's direct appeal lawyer (Janet Morrow) did not raise a *Strickland* claim in the motion for new trial, she nevertheless attempted to do so on direct appeal.  Yet, even on direct appeal, the Texas Court of Criminal Appeals ("TCCA") rejected both *Strickland* claims (for failure to object to prosecutorial argument) because the record was "inadequate" and "undeveloped."  *Will v. State*, 2004 WL 3093238 (Tex. Crim. App. 2004) at *5-*6 (citing *Thompson v. State*, 9 S.W.3d 808, 813-15 (Tex. Crim. App. 1999) & *Massaro v. United States*, 123 S. Ct. 1690, 1694 (2003)).[13]

---

[13] "*Massaro* suggests that with respect to ineffective assistance of counsel claims, the first round of state collateral attack proceedings is the first practical right of review."  Donald A. Dripps, *Ineffective Litigation of Ineffective Assistance Claims: Some Uncomfortable Reflections on* Massaro v. United States, 42 Brandeis L.J. 793, 800 (2004).  Indeed, "[t]he heart of that decision is that ineffective assistance claims typically cannot be litigated effectively on direct appeal." *Id*. at 797.

While Will's direct appeal was pending before the Court of Criminal Appeals, Ribnik purported to file a habeas corpus application, but the application alleged **no** extra-record factual allegations in support of the claim. State habeas counsel thus alleged no facts that could have been discovered through reasonable investigation in support of prejudice. The application also failed to allege a single fact regarding trial counsel's investigation or the availability of any witnesses or evidence that could have been presented. The state court denied habeas relief. *Ex Parte Will*, No. 63,590-01, 2006 WL 832456 (Tex. Crim. App. 2006) (adopting trial court's findings).

B.    The Fifth Circuit's Decision in *Ibarra*

*Martinez* arose in a prosecution from Arizona. In *Ibarra*, the Fifth Circuit concluded that *Martinez* did not apply to federal habeas corpus cases arising from Texas. *Ibarra,* in a 2-to-1 decision, reasoned that "Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings, and they do not by law deprive Texas defendants of counsel- and court-driven guidance in pursuing ineffectiveness claims." *Ibarra*, 687 F.3d at 227. *Ibarra* relied on the TCCA's *Thompson* decision for the proposition that "the TCCA sometimes reach the merits of ineffectiveness claims on direct appeal," even though in *Thompson* the TCCA explicitly held that it was **not** deciding the merits of the *Strickland* claim in the appeal. *Id*; *Thompson*, 9 S.W.3d at 814.

37

*Ibarra* further observed that "[w]here [the Texas courts] do not [adjudicate the *Strickland* claim on direct appeal], Texas habeas procedures remain open." *Ibarra*, 687 F.3d at 227. Accordingly, *Ibarra* itself recognized the existence of a class of *Strickland* claims that the TCCA does not adjudicate on appeal and for which the Article 11.071 proceeding must be the initial-review collateral proceeding. The TCCA recognizes that within this class is situated the "vast majority" of *Strickland* claims: those alleging "errors *de hors* the [appellate] record." *Thompson*, 9 S.W.3d at 814.

We suggest that *Ibarra* is not the last word on this issue. It issued in response to a non-dispositive motion in the course of a proceeding on a COA application. No oral argument was held, nor was the issue ever briefed or considered in the District Court or on appeal. As Judges Higginson and Southwick have written, dissenting from the appeals court's denial of rehearing *en banc* in *Balentine*, "This court has yet to entertain any oral argument at all, or examine in full Rule 28 briefing, whether and how *Martinez* would apply or affect Texas's sovereign complexity of new trial, direct appeal and post-conviction ineffectiveness procedures." *Balentine v. Thaler*, __ F.3d __, 2012 WL 3570766, at *4 (5th Cir. Aug. 21, 2012). Indeed, in their opinion, the Fifth Circuit had yet to even "resolve with certainty Texas's exact system for raising ineffectiveness

claims in capital cases." *Id.*[14]   And the Supreme Court has stayed at least one

execution where the State is relying on *Ibarra* without regard to *Martinez*.

C.    *Ibarra* Contravenes *Martinez.*

No meaningful equitable difference exists between Will and the petitioner

in *Martinez*.   Both petitioners have substantial *Strickland* claims that were not

previously raised by state habeas counsel.   The cause of the default in both

instances was the ineffective assistance of counsel in state collateral proceedings.

Neither could rely on *Murray v. Carrier*, 477 U.S. 478 (1986), to excuse the

default.   Until now both had been precluded by *Coleman v. Thompson*, 501 U.S.

722 (1991), from relying on the ineffective assistance of state collateral counsel to

establish cause for the default.   Accordingly, both had need of an exception to

*Coleman* in order to "ensure that proper consideration [i]s given to [] substantial

claim[s]" of ineffective assistance of trial counsel by federal reviewing courts.

*Martinez*, 132 S. Ct. at 1318.

Despite the lack of any meaningful equitable difference, the Fifth Circuit

has concluded that a Texas habeas petitioner – no matter the nature of his claim

---

[14] Judges Dennis and Graves also dissented from the appeals court's denial of rehearing *en banc*, explaining that in Texas a collateral proceeding "is the first realistic opportunity a prisoner has to raise a claim of ineffective assistance of trial counsel." *Balentine*, __ F.3d __, 2012 WL 3570766, at *2.

We ask this Court to resolve Texas's exact system for raising ineffectiveness claims in capital cases, including making findings as to whether a "motion for new trial" and "direct appeal" are adequate procedural vehicles to raise extra-record IAC claims.

(record based vs. extra-record) – is not entitled to the relief afforded Martinez. The Fifth Circuit's overly narrow reading of *Martinez* treats similarly situated prisoners differently and nullifies the Supreme Court's attempt to use equity to fill a perceived jurisprudential gap and protect the "bedrock principle in our justice system" that is the right to counsel during criminal trials.  132 S. Ct. at 1315.

1.   *Martinez* is an equitable decision intended to ensure federal review of *Strickland* claims defaulted by inadequate representation in state court with respect to such claims.

*Martinez* is an equitable decision intended to "ensure that proper consideration [i]s given to [] substantial claim[s]" of ineffective assistance of trial counsel by federal reviewing courts.  132 S. Ct. at 1318.  It holds that when a state court initial-review collateral proceeding is the first proceeding designated by a state to adjudicate a *Strickland* claim, a prisoner may establish cause for default of such claim where, *inter alia*, counsel in the initial-review collateral proceeding was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). 132 S. Ct. at 1318.  Collateral proceedings which provide the first occasion to adjudicate a *Strickland* claim are "initial-review collateral proceedings." *Id.* at 1315.

Before *Martinez*, the Supreme Court had recognized that ineffective assistance of counsel during a stage at which a defendant has a constitutional right

to counsel – trial and direct appeal – could serve as cause to excuse procedural default.  *Murray*, 477 U.S. at 488-89.  In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Court held that ineffective assistance of counsel in a stage of proceedings during which a prisoner does *not* have a constitutional right to counsel–*e.g.*, state court collateral review proceedings–cannot serve as cause for default.  *Id.* at 754.  The *Martinez* court accordingly operated on the premise that where a state court requires *Strickland* claims to be raised on direct appeal, a petitioner is already empowered to rely upon the ineffective assistance of appellate counsel to establish cause in federal court for default of such claims, but where the state court designates the initial-review collateral proceeding as the proceeding in which *Strickland* claims are to be first adjudicated, *Coleman* prevented a federal court from relying on the ineffective assistance of state collateral counsel to establish cause to excuse procedural default.

Recognizing that some states defer consideration of *Strickland* claims until collateral proceedings, and in recognition of the "bedrock principle in our justice system" that is the right to counsel during criminal trials, the *Martinez* court sought to create an exception to *Coleman*'s general rule that ineffective assistance of counsel during a stage of proceedings at which a prisoner does not have a Sixth and/or Fourteenth Amendment right to counsel cannot serve as cause for default. 132 S. Ct. at 1315.  This exception was intended to fill a jurisprudential gap

created by *Coleman* that left federal courts powerless to review *Strickland* claims

that were defaulted by inadequate representation in state collateral proceedings

where that proceeding was designated by the State as the appropriate forum for

adjudication of such claims.  The decision accordingly sought to empower federal

courts to reach the merits of all defaulted *Strickland* claims where the default was

a consequence of no or inadequate assistance of counsel during whatever stage of

state court proceedings the state designates as the appropriate forum to adjudicate

the claim–whether direct appeal or collateral proceedings.

    2.    <u>Texas designates the Article 11.071 proceeding as the proceeding in which *Strickland* claims that are not firmly founded in the appellate record are to be first adjudicated.</u>

Article 11.071 proceedings are the first proceeding designated by Texas for

a capitally-sentenced prisoner to adjudicate *Strickland* claims based upon extra-

record evidence, *i.e.*, evidence that does not appear in the appellate record.  In

view of, *inter alia*, the separate and concurrent roles that state law assigns to

appellate counsel and Article 11.071 counsel, discussed *supra*, the TCCA has

designated Article 11.071 proceedings as the first proceeding for a capitally-

sentenced prisoner to adjudicate *Strickland* claims.  *See Mata v. State*, 226 S.W.3d

425, 430 n.14 (Tex. Crim. App. 2007) ("As a general rule, one should *not* raise an

issue of ineffective assistance of counsel on direct appeal.") (citing *Jackson*, 877

S.W.2d at 772 (Baird, J., concurring) (emphasis in original); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallet v. State*, 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999); *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Ex Parte Duffy*, 607 S.W.2d 507, 513 (Tex. Crim. App. 1980). *See also Mitchell v. State*, 68 S.W.3d 640, 643 (Tex. Crim. App. 2002) (habeas corpus "is the appropriate vehicle [in Texas] to investigate ineffective-assistance claims"); *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000) ("a post-conviction writ proceeding, rather than a motion for new trial, is the preferred method for gathering the facts necessary to substantiate" a *Strickland* claim); *Duffy*, 607 S.W.2d 507, 513 (court would be hard pressed to find that habeas corpus petitioner had available remedy for a *Strickland* claim in Texas courts other than habeas corpus).

An exception to the TCCA's rule against adjudicating *Strickland* claims on appeal exists.  Notably, *Strickland* claims alleging deficiencies that are "firmly founded in the [appellate] record" may be adjudicated on direct appeal. *Thompson*, 9 SW 3d at 814.  This exception is exceedingly narrow: it applies only to errors that are obvious from the record.  For the "vast majority" of cases, the Article 11.071 proceeding is the designated proceeding for a capital prisoner to adjudicate *Strickland* claims.  *Id.* at 814 n.6.  *See also id.* at 814 ("where the

alleged derelictions primarily are errors of omission *de hors* the record rather than commission revealed in the trial record," collateral attack is the vehicle by which an examination of ineffectiveness may be developed); SBOT Guidelines at 977 ("state habeas corpus is the first opportunity for a capital client to raise challenges to the effectiveness of trial or direct appeal counsel"); State Bar of Texas Task Force on Habeas Counsel Training and Qualification, *Task Force Report* at 3 (Apr. 27, 2007) ("[h]abeas proceedings are the only opportunity available to those sentenced to death to raise post conviction claims of . . . ineffective assistance of trial counsel [in Texas courts].").  Only "in the rare case where the record on direct appeal is sufficient to prove that counsel's performance was deficient [should] an appellate court . . . address the claim in the first instance." *Robinson*, 16 S.W.3d at 813 n.7.

Martinez's rationale for permitting cause for default of *Strickland* claims to be established by inadequate representation in the initial-review collateral proceeding applies to Texas prisoners whose *Strickland* claims are based on extra-record evidence, as Will's is.  The *Martinez* court recognized that where the collateral proceeding is the first designated proceeding for a prisoner to raise a *Strickland* claim, the proceeding is similar to a prisoner's direct appeal with respect to that claim because (1) the state habeas court looks to the merits of the claim, (2) no other court has addressed the claim, and (3) defendants pursuing

first-tier review are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim. *Martinez*, 132 S. Ct. at 1317.

As to the first factor, Texas courts address the merits of all extra-record *Strickland* claims raised in Article 11.071 proceedings. No extra-record *Strickland* claim raised in an Article 11.071 proceeding is considered defaulted for not having been raised on direct appeal nor barred by *res judicata* if it was raised on direct appeal. *See Duffy*, 607 S.W.2d 507, 512-13 (*Strickland* claim was not waived by failure to raise claim on direct appeal); *Torres*, 943 S.W.2d at 475 *(*doctrine of *res judicata* is not applied to *Strickland* claims because, due to the "inherent nature" of such claims, direct appeal cannot be expected to provide an adequate record to evaluate the claim).

Regarding the second factor, Texas courts will not have addressed the merits of the claim prior to the Article 11.071 proceeding. While Texas's rule against raising *Strickland* claims on direct appeal admits of an exception, when such claims are nevertheless raised there, the TCCA will not adjudicate them except in the "rare case" where the allegations of deficient performance are "firmly founded in the [appellate] record" and the deficiency is "so outrageous that no competent attorney would have engaged in it." *Robinson*, 16 S.W.3d at 813 n.7; *Thompson*, 9 S.W.3d at 814; *Mata*, 141 S.W.3d at 869. Otherwise, Texas

courts do "not decid[e] on [] direct appeal [whether] appellant did or did not receive the effective assistance of counsel during trial." *Thompson*, 9 S.W.3d at 814. *See also id.* at 813 ("Rarely will a reviewing court be provided with the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation"); *Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003) (reversing appeals court's decision on *Strickland* claim but holding that the court was not "deciding on this direct appeal whether appellant did or did not receive effective assistance of counsel). Instead, "the proper procedure will be for the appellate court to overrule an appellant's Sixth Amendment claim without prejudice to appellant's ability to dispute counsel's effectiveness collaterally." *Robinson*, 16 S.W.3d at 813 n.7. In short, denials of the vast majority of *Strickland* claims on direct appeal merely reflect a finding of the record's inadequacy to adjudicate the claim, not that the claim lacks merit.

Third, Texas prisoners pursuing first-tier collateral review are ill-equipped to represent themselves with respect to *Strickland* claims – Texas itself recognizes this and affords a statutory right to counsel to capitally sentenced prisoners for an initial habeas corpus proceeding – and lack a brief from prior counsel or a court opinion addressing the claim. While briefs raising *Strickland* claims on direct appeal in capital cases may occasionally exist, they are the exception to the

general rule.   Such briefs will necessarily be limited to alleged deficiencies appearing in the record and will not contemplate extra-record evidence of deficient performance nor of prejudice.  *See Torres*, 943 S.W.2d at 475 (a writ of habeas corpus is "essential" to gathering the facts necessary to adequately evaluate *Strickland* claims); *Thompson*, 9 S.W.3d at 813 ("Rarely will a reviewing court be provided with the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation").   TCCA opinions disposing of such claims on direct appeal simply note the inadequacy of the record.  *Thompson*, 9 S.W.3d at 814; *Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003).   Accordingly, at least for *Strickland* claims raised in capital cases arising from Texas that assert "omissions *de hors* the [appellate] record," *Thompson*, 9 S.W.3d at 814, the Article 11.071 proceeding is the initial-review collateral proceeding within the meaning of *Martinez*.

      3.    <u>Texas's choice to channel the adjudication of *Strickland* claims   into collateral proceedings by enacting a dual-track review mechanism in capital cases and dissuading appellate counsel from litigating *Strickland* claims on direct appeal is not meaningfully different from Arizona's choice to channel the adjudication of *Strickland* claims into collateral proceedings by adopting a rule against raising *Strickland* claims on direct appeal.</u>

The Director will attempt to distinguish Arizona from Texas on the ground that the states accomplish the same end—channeling *Strickland* claims into state collateral proceedings—differently.   But *Martinez* is an equitable decision, and it is the end that matters in terms of the consequences to a prisoner's ability to vindicate the bedrock principle in our justice system in federal court that is the right to counsel at a criminal trial.   No meaningful equitable difference exists between a federal habeas petitioner from Arizona arriving into federal court with a defaulted *Strickland* claim attributable to state collateral counsel and a habeas petitioner from Texas arriving into federal court with a defaulted *Strickland* claim attributable to state collateral counsel.

This Court should not be misled by the Director's enthusiasm for the theoretical availability of the motion for new trial.   Will has already explained why non-capital defendants may resort to that mechanism notwithstanding the TCCA's admonitions about its inadequacy for that purpose.   A Texas case demonstrates why any assertion of Texas's purported seriousness about ensuring that prisoners can use Rule 21 proceedings to develop IAC claims for direct appeal ought to be taken with a grain of salt.   In *Sprouse v. State*, 2007 WL 283152 (Tex. Crim. App. 2007) (unpublished), the TCCA on direct appeal in a capital case described the *Sprouse* petitioner's argument on appeal:

> First, appellant argues that [appellate] counsel was not properly appointed under Article 26.052(k).   Second, because [appellate] counsel was not properly appointed under the statute, appellant was deprived of counsel during the critical thirty-day period after sentencing in which counsel could have filed a motion for new trial and developed the record concerning any claims of ineffective assistance of counsel.  Finally, because counsel could not develop the record regarding any ineffective assistance claims, appellant was deprived of the opportunity of raising these claims on appeal.

*Sprouse,* 2007 WL 283152, at *6.  The TCCA overruled the ground of error.

The court observed that Sprouse could not have been harmed by the failure to appoint different counsel within the 30-day window because the reporter did not finish transcribing the record in the case until more than sixty days after the time had expired to file a motion for new trial and "[t]herefore[] had [different counsel] been appointed during the period in which he could have filed a motion for new trial, he would not have had the benefit of the written record on which to base his motion."  *Id.* at *7.  In short, the court again recognized—as it always had—that *Strickland* claims cannot realistically be raised in a motion for new trial when the trial record is not prepared before the time for filing a motion for new trial expires. Texas cannot be as serious as the Director purports it to be if it considers it harmless for a defendant to go without counsel during his 30-day window of time in which to develop the record regarding any ineffective assistance claims to be raised on direct appeal.

4.    *Ibarra* does not properly apply *Martinez* to extra-record *Strickland* claims like Will's.

The *Ibarra* decision is inconsistent with the Supreme Court's attempt in *Martinez* to ensure federal review of extra-record *Strickland* claims that are defaulted in state court due to inadequate assistance of counsel and fails to give due respect to Texas's legitimate interests in channeling the resolution of constitutional claims to the most appropriate forum and in the integrity of its judicial procedural regime.  During the time at which a capitally-sentenced Texas prisoner has a constitutional right to effective assistance of counsel–trial and direct appeal–such counsel have no state law duty to raise *Strickland* claims.  In fact, appellate counsel is affirmatively dissuaded by Texas from doing so.  The dual-track structure of post-trial proceedings established by Texas's legislature for capital cases clearly allocates the duty to investigate and raise extra-record *Strickland* claims to Article 11.071 counsel.  The State Bar of Texas's *Guidelines and Standards for Texas Capital Counsel* allocate the responsibility for discovering and raising *Strickland* claims to Article 11.071 counsel.  SBOT Guidelines at 977 ("state habeas corpus is the first opportunity for a capital client to raise challenges to the effectiveness of trial or direct appeal counsel"); *see also* Capital Punishment Appellate Guidebook (2006) (prepared by Post Conviction Litigation Division, Office of Attorney General of Texas) at 5 ("A death-sentenced

defendant is also entitled to seek state *habeas* review, an additional appeal differing from the direct appeal in that the defendant may raise claims outside the trial record (for example, ineffective assistance of trial counsel).") (emphasis in original).  Texas's highest criminal court has adopted a general rule that appellate counsel ought not raise *Strickland* claims on direct appeal, *Mata*, 226 S.W.3d at 430 n.14, and that such claims ought to be raised in Article 11.071 proceedings.

Accordingly, direct appeal counsel in capital cases rarely raise *Strickland* claims on direct appeal, and, when they do, they are even more rarely addressed on the merits by the court.  *See Thompson*, 9 S.W.3d at 813 ("Rarely will a reviewing court be provided with the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation"); *Velez v. State*, No. AP-76,051, slip op. at 60-61 (Tex. Crim. App. June 13, 2012) (unpublished) (concluding that "the record is not sufficient to address appellant's ineffective-assistance-of-counsel claims"). Capitally-sentenced Texas prisoners depend exclusively upon Article 11.071 counsel to adjudicate (exhaust) *Strickland* claims in Article 11.071 proceedings, at peril of procedural default in federal court.  *Balentine*, __ F.3d __, 2012 WL 3570766, at *2 (Dennis, J., joined by Graves, J., dissenting from denial of reh'g *en banc*) ("capitally sentenced prisoners are virtually required to first raise a claim of ineffective assistance of trial counsel during collateral proceedings").

51

Like a state that strictly prohibits *Strickland* claims from being raised on appeal, a failure to raise a *Strickland* claim on appeal in Texas does not create a procedural default in federal court because Texas courts permit *all* extra-record *Strickland* claims to be adjudicated on the merits in an Article 11.071 proceeding. Because Texas courts dissuade appellate counsel from raising *Strickland* claims on direct appeal and because Texas law clearly places the duty to investigate and raise *Strickland* claims on Article 11.071 counsel, appellate counsel in Texas capital cases can never be ineffective for deferring *Strickland* claims to collateral review. *Sprouse v. State*, 2007 WL 283152 (Tex. Crim. App. 2007). Appellate counsel who does not use direct review to try to adjudicate a *Strickland* claim is merely adhering to the capital procedural regime created by Texas. And because no procedural default is created when appellate counsel defers *Strickland* claims to Article 11.071 counsel, *Murray*, *supra*, can afford no relief to a capitally-sentenced Texas prisoner whose appellate counsel **properly** forgoes raising a *Strickland* claim on appeal.

In fact, in Will's own case, correspondence between Janet Morrow (his appellate counsel) and Will reveals that Morrow properly decided to forego raising extra-record *Strickland* claims on direct appeal due to Texas's provision of state habeas counsel. On February 26, 2003, Morrow wrote Will:

I was certainly sorry to learn from your letter of February 23, 2003 that my brief upset you. It needn't have. Your letter tells me you have a fundamental misunderstanding about the difference between a direct appeal and a writ. As I have attempted to make clear in the past, my job, as your lawyer on direct appeal, is to raise points of error that are underline apparent from the record underline. You suggest issues I should have raised, investigation I should have done, all on facts which are outside the record. That is not my function. In fact, I have no right or ability to do that. Your writ lawyer is the one who will offer new evidence on your behalf. I can only work with what is already in the record. The direct appeal is also not the place to re litigate your innocence, except perhaps on a sufficiency claim where possible. The direct appeal is about procedure. Was your trial conducted within the rules? That is the focus. *What happened behind the scenes or outside the record is the writ lawyer[']s area*, as I have said.

Letter from Morrow to Will (Feb. 26, 2003) (Ex. 11) (first emphasis in original; second emphasis added).

Prisoners such as Will are therefore equitably situated identically to prisoners with defaulted *Strickland* claims whose cases arise in states that have absolute bars against raising *Strickland* claims on appeal. In both instances, it is the state *habeas* court that looks to the merits of the claim; no other court will have addressed the claim; and prisoners pursuing first-tier review will lack a brief from counsel or a court opinion addressing the claim. For both prisoners, the procedural default applied in federal court occurs in the state collateral proceeding–the proceeding designated by both as the first-tier review proceeding for *Strickland* claims. Moreover, neither prisoner can rely upon *Murray* to excuse

the procedural default.  Both therefore equally require the equitable benefit of *Martinez* to "ensure that proper consideration [i]s given to [] substantial claim[s]" of ineffective assistance of trial counsel by federal reviewing courts.  The *Ibarra* decision elevates form over substance and as a result renders the capitally-sentenced prisoner in Texas *worse off* than a capitally-sentenced prisoner in Arizona after *Martinez*, despite the lack of any meaningful equitable difference between them.

In capital cases, it is simply not expected that appellate counsel – or any counsel other than 11.071 counsel – will undertake to investigate and litigate a *Strickland* claim on behalf of the capitally-sentenced client.  Appellate counsel can never be found ineffective for deferring such claims to Article 11.071 counsel—the counsel to whom Texas law clearly allocates the responsibility of *Strickland* litigation in the state courts.  The Director may rely upon the unpublished TCCA decision in *Armstrong v. State*, 2010 WL 359020 (Tex. Crim. App. Jan. 27, 2010), as an example of a capital case in which appellate counsel pursued a *Strickland* claim based on trial counsel's failure to conduct a reasonable sentencing investigation in a motion for new trial and on appeal.  Far from demonstrating that Texas's choice to channel *Strickland* claims into collateral proceedings should not implicate *Martinez*, *Armstrong* confirms why it must.

Given all the obstacles to developing a record in the abbreviated deadlines to expand the record on direct appeal that the TCCA and the Supreme Court in *Martinez* recognized, the *Armstrong* defendant unsurprisingly did not present any evidence of prejudice in his hearing on a motion for new trial.  2010 WL 359020 at *6.  The TCCA accordingly denied the claim because "Armstrong . . . asks this Court to speculate that additional mitigation evidence does exist."  *Id.* at *7.  The court held that it could not grant relief because the claim was not "firmly founded in the record."  *Id.*  In other words, it was within the class of cases that is not adjudicable on direct appeal.[15]

Despite the direct appeal decision in *Armstrong*, the *Armstrong* defendant's state habeas counsel is still the person on whom state law directs Armstrong to rely in adjudicating his *Strickland* claim, and, indeed, collateral proceedings remain open to Armstrong to litigate his *Strickland* claim there based upon extra-record evidence and at peril of procedural default in federal court.  That is, in fact, precisely what the *Armstrong* defendant's Article 11.071 counsel have done.  *See* Application for Postconviction Writ of Habeas Corpus at 43-50, *Ex Parte Armstrong*, No. CR-2095-06-G(l) (370th Dist. Ct. Feb. 19, 2009) (raising extra-

---

[15] Indeed, the TCCA still made a point to observe in *Armstrong* that "a claim of ineffective assistance of counsel *generally may not be addressed on direct appeal* because the record on appeal is not sufficient to assess counsel's performance."  *Armstrong*, 2010 WL 359020 at *65 (emphasis added).

record *Strickland* claim based on trial counsel's failure to conduct reasonable sentencing investigation that includes extra-record evidence of prejudice).  Had Article 11.071 counsel not fulfilled his or her state-imposed duty to litigate this *Strickland* claim in the Article 11.071 proceeding—notwithstanding the fact that appellate counsel was attempting to litigate the claim contemporaneously on direct appeal[16]—Armstrong's extra-record *Strickland* claim would arrive in federal court procedurally defaulted.  Without the availability of *Martinez*, the federal reviewing court would be powerless to reach its merits.  *Armstrong* accordingly stands as an example of *Martinez*'s equitable necessity to federal habeas corpus cases brought by Texas capital prisoners.

The State of Texas is now trying to capitalize on Texas's decision to channel *Strickland* claims into collateral proceedings by protesting the applicability of *Martinez* because its direct review process remains nominally open.  But it is Texas that has made the decision to dissuade raising such claims on direct appeal, and it is Texas that has made the decision to channel *Strickland* claims into collateral proceedings, especially in capital cases in which it appoints collateral counsel with duties to litigate such claims.  While the Director may

---

[16] As explained above, unlike in non-capital cases, the habeas application in capital cases is filed before the direct appeal is finally adjudicated.  Article 11.071 counsel accordingly cannot wait to see the result of the adjudication.  This is one reason why the TCCA dissuades adjudication of *Strickland* claims on direct appeal, because it imposes unnecessary costs on the system in capital cases to have two lawyers duplicating effort and work at the same time.

assert that Texas has not deliberately opted to absolutely bar defendants from raising *Strickland* claims on direct appeal, Texas has nevertheless chosen to direct defendants where to litigate such claims.  That choice is not materially different from the choice Arizona made, because the results are the same: federal habeas petitioners will arrive in court with defaulted *Strickland* claims due to ineffective assistance of counsel in the proceeding in which ***the State*** has chosen for them to litigate it.  *See Martinez*, 132 S. Ct. at 1317 (describing relevant criteria for *Martinez*'s applicability as the proceeding in which the State has "designated" as the forum for adjudication of *Strickland* claims); *see also McCormack v. Baldridge*, 2012 WL 4138479 (D. Idaho Sept. 19, 2012) ("In Idaho, the post-conviction setting is the 'preferred forum for bringing claims of ineffective assistance of counsel,' although in limited instances such claims may be brought on direct appeal 'on purported errors that arose during the trial, as shown on the record' (as opposed to matters arising outside the record).  Thus, in Idaho, *Martinez* can be applied to ineffective assistance of trial counsel claims arising from Idaho state court convictions and sentences, where the post-conviction setting was the first forum in which the ineffective assistance of trial counsel claim based on matters arising outside the record could have been brought and developed in an evidentiary hearing.") (citation omitted); *Ellis v. Wengler*, 2012 WL 4009565 (D. Idaho Sept. 12, 2012) (same); *Horonzy v. Smith*, 2012 WL

4017927 (D. Idaho Sept. 12, 2012) (same); *Landrum v. Anderson*, 2012 WL 3637365 (S.D. Ohio Aug. 22, 2012) (rejecting State's argument that *Martinez* inapplicable because petitioner had  opportunity – though not required – to raise ineffectiveness claim on direct appeal where petitioner represented on appeal by same attorney as at trial); *Wessinger v. Cain*, 2012 WL 1752683 (M.D. La. May 16, 2012) (*Martinez* applies where "there is a jurisprudential rule in Louisiana that ineffective assistance claims are *generally* best suited for post-conviction proceedings") (citations omitted) (emphasis added).

Absent application of *Martinez* to capital federal habeas corpus cases arising from Texas, this Court will continue to see defaulted, extra-record *Strickland* claims come before it notwithstanding ineffective representation in the forum designated by Texas as the proper forum in which to adjudicate the claim.

5.   Expert testimony – George McCall Secrest, Jr.

George "Mac" Secrest, Jr. – a leading authority on Texas criminal procedure – combines academic research with real-world practical experience, including personal involvement at all levels of capital litigation in Texas.  We offer his expert affidavit and curriculum vitae (Ex. 12).

As Mr. Secrest attests, it is "neither practical nor appropriate" to raise ineffective assistance of counsel on direct appeal in virtually all capital cases.  Ex. 12 at 7.  "Counsel on direct appeal theoretically can attempt to develop or expand

the record via the procedural vehicle of filing a motion for new trial but . . . in virtually all capital cases, it is literally doomed to failure" due to the abbreviated 30-day deadline.  *Id.* at 8.  "This narrow window will almost never provide sufficient time for counsel on direct appeal to meaningfully develop a record and present a meritorious claim with respect to ineffective counsel of claims for a number of reasons, not the least of which is that the record on direct appeal will *not* even be available for review in this time frame for virtually every capital murder defendant."  *Id.* at 8-9 (emphasis in original).  And when ineffective assistance of claims are raised on direct appeal, the TCCA almost always declines to address them because the record has not been adequately developed (which is precisely what happened in Will's case).  *Id.* at 7-9.

Here, the direct appeal lawyer (Janet Morrow) "clearly and irrefutably did not have did not have access to *19* volumes of transcripts (Volumes 16 through 34) of this death penalty trial until *after* the deadline had passed for filing the motion for new trial."  *Id.* at 9.  Yet, in Mr. Secrest's view, even if she had access to and digested the entire transcript before the 30-day deadline, "[b]ased on [his] experience, cognizable habeas claims in capital cases are almost never going to be found within the record on direct appeal."  *Id.*  That is to say, "evidence giving rise to claims of prosecutorial misconduct, judicial misconduct, actual innocence, *Brady v. Maryland* violations, and ineffective assistance of counsel will ultimately

59

be developed from sources *outside* the record, such as from the client files of counsel, the district attorney's file, files of law enforcement personnel, and, of course, those developed based upon an independent factual and legal investigation conducted by counsel, which invariably means *habeas* counsel." *Id.* at 9-10 (emphasis in original). According to Mr. Secrest, in the "real world of capital litigation, to think that any of this can be accomplished in 30 days in order to raise claims *via* a motion for new trial is sheer sophistry." *Id.* at 10. It often takes "literally *years* to investigate, develop, research, brief and present claims of this nature." *Id.* (emphasis in original).

6.  <u>10-year case survey of *Strickland* claims brought on direct appeal in Texas.</u>

To test the State's theory that direct appeal provides a meaningful opportunity to raise IAC, we have undertaken the task of reviewing all IAC claims brought in Texas on direct appeal from 2002-2012. Our survey identified more than 3500 cases. Our results preliminarily show that only 1.33% of all IAC claims brought on direct appeal in Texas over the last decade have been successful. Significantly, ***not one*** of the successful claims brought on direct appeal involved a capital murder case. Again: IAC has never been raised successfully in a Texas

capital case on direct appeal in our 10-year survey.[17]   And while we are still

analyzing the data, it appears that in the vast majority of cases the appellate courts

rejected IAC claims on direct appeal because the record was inadequately

developed.   This empirical evidence offers powerful support for Mr. Secrest's

testimony.

And, even in those few cases (47 out of 3521) where an IAC claim has been

successful on direct appeal, appellate courts *still* emphasize just how rare it is for

the record – any record on direct appeal – to reveal *Strickland* error.   *See, e.g.,*

*Aldrich v. State*, 296 S.W. 3d 225, 232 (Tex.App.-Ft. Worth 2009, pet. ref'd)

("[U]nder normal circumstances, the record on direct appeal will not be sufficient

to show that counsel's representation was so deficient and so lacking as to

overcome the presumption that counsel's representation was reasonable and

professional.") (citing *Bone v. State*, 77 S.W. 3d 828, 833 (Tex. Crim. App.

2002)); *Compton v. State*, 202 S.W.3d 416, 421 (Tex.App.-Tyler 2006) ("We

recognize that the Texas Court of Criminal Appeals has held that, under normal

circumstances, the record on direct appeal will not be sufficient . . . .  *The proper*

*procedure for raising this claim is therefore almost always habeas corpus*.")

(citing *Mallet v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) & *Aldrich v.*

---

[17] The only possible exception is *Alvarez v. State*, 79 S.W.3d 679 (2002), where trial counsel was appointed on appeal even though he declared that he would not argue his own ineffectiveness, thereby creating a conflict of interest between him and his client at the outset of the appeal.

*State*, 104 S.W.3d 505, 506 (Tex. Crim. App. 2003) (emphasis added));

*Blumenstetter v. State*, 117 S.W.3d 541, 547 (Tex.App.-Texarkana, 2003) ("Direct

appeals often present a limited record for review of the typical issues raised in an

ineffective assistance point.") (citing *Thompson v. State*, 9 S.W.3d 808, 813-14

(Tex. Crim. App. 1999)); *Belcher v. State*, 93 S.W.3d 593, 596 (Tex.App-Houston,

14th Dist. 2002, pet. dismissed) ("Rarely will a reviewing court be provided the

opportunity to make its determination on direct appeal with a record capable of

providing a fair evaluation of the merits of the claim involving such a serious

allegation.") (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App.

1999)); *Bernard v. State*, 2002 WL 253822 (Tex.App.-Tyler 2002) ("[I]n 'rare

cases,' the record on direct appeal will be sufficient for the appellate court

evaluate the claim.") (quoting *Robinson v. State*, 16 S.W.3d 808, 813 n.7 (Tex.

Crim. App. 2000)).

Moreover, where lower courts do grant *Strickland* relief on direct appeal,

the TCCA often **reverses** the granting of such relief precisely because the record is

insufficiently developed to determine whether trial counsel was ineffective.  *See,*

*e.g., Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) ("An

ineffective-assistance claim must be 'firmly founded in the record' and 'the record

must affirmatively demonstrate' the meritorious nature of the claim."); *State v.*

*Morales*, 253 S.W.3d 686, 697 (Tex. Crim. App. 2008) (en banc) ("We do not

regard the record in this case as sufficient to show that . . . trial counsel acted

outside the bounds of what any competent attorney would have done."); *Mata v.*

*State*, 226 S.W.3d 425, 430 & n.14 (Tex. Crim. App. 2007) ("[A] reviewing court

on direct appeal will rarely be able to fairly evaluate the merits of an ineffective-

assistance claim, because the record on direct appeal is usually undeveloped and

inadequately reflective of the reasons for defense counsel's actions at trial.")

(citing cases, including *Jackson v. State*, 877 S.W.2d 768, 772 (Tex. Crim. App.

1994) (Baird, J., concurring), for proposition: "As a general rule, one should *not*

raise an issue of ineffective assistance of counsel on direct appeal.") (emphasis in

original)); *Goodspeed v. State*, 198 S.W.3d 390, 392 (Tex. Crim. App. 2005)

("Direct appeal is usually an inadequate vehicle for raising [a *Strickland*] claim

because the record is generally undeveloped."); *Rylander v. State*, 101 S.W.3d 107

(Tex. Crim. App. 2003) (en banc) ("[A]n application for a writ of habeas corpus is

the more appropriate vehicle to raise ineffective assistance of counsel claims.")

(citing *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)); *id.* at 111

(Meyers, J., dissenting) ("Again, the majority chooses to dispose of an ineffective

assistance of counsel claims rather than analyzing it.  The Court instead explains

that the record is insufficient to show that the *Strickland* requirements have been

met.").

We attach the results of our survey:

Appendix A – Texas cases from 2002-2012 rejecting *Strickland* claims on direct appeal (3466 in total).

Appendix B – Texas cases from 2002-2012 sustaining a *Strickland* claim on direct appeal (47 in total).

Appendix C – Texas cases from 2002-2012 in which a *Strickland* claim was initially sustained on direct appeal but later rejected by TCCA (8 in total).

The Fifth Circuit has conducted a similar case survey concerning the number of cases reversed on plain-error review. *See United States v. Escalante-Reyes*, 689 F.3d 415, 433-49 (5th Cir. 2012) (Smith, J., joined by Jones, Clement & Garza, JJ., dissenting) (listing cases in appendices).

7.    <u>Hazards of raising *Strickland* claims on direct appeal.</u>

Mr. Secrest further notes that it is "not appropriate" to raise ineffectiveness claims on direct appeal in virtually all capital cases. <u>Ex.</u> 12 at 7.  And for good reason.  In *Ex Parte Nailor*, 149 S.W.3d 125 (Tex. Crim. App. 2004), the TCCA addressed whether the court of appeals erred in a habeas case "in refusing to consider allegations of trial counsel's deficient performance that were rejected on appeal in determining whether the totality of the representation was ineffective." *Id.* at 127 n.1.  The TCCA found no error and held: "specific allegations of deficient attorney performance that were rejected on direct appeal are not

64

cognizable on habeas corpus as a part of a larger ineffective assistance of counsel claim when the defendant does not offer additional evidence to support that specific claim of deficient performance in the habeas proceeding." *Id*. at 131-32. In other words, unless additional evidence of the claims raised on direct appeal is offered in state habeas, ***none*** of those claims can be considered – even in conjunction with other ineffectiveness claims brought in habeas – as part of the larger ineffectiveness inquiry.  Thus, there are real risks for Texas prisoners who bring ineffectiveness claims on direct appeal – their chances of success in the state habeas proceeding diminish if they raise *any* ineffectiveness claims on direct appeal.

        8.      <u>Alternatively, ineffective assistance of counsel during Will's direct-review proceedings constitutes cause for procedural default.</u>

If the Court decides that *Martinez* does not operate in the context of Will's state collateral-review proceeding, then the Court must still address an additional, alternative reason to relieve Will from its procedural-default ruling.   This predicate is important: the Court would only reach this alternative if it accepts the State's argument that Texas allowed Will to meaningfully assert his IAC claim on direct appeal; which is to say, the Court would have concluded that for Will's state proceedings, new-trial and direct appeal is "the first designated proceeding for a

prisoner to raise a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1317.

If that is so, then under *Martinez*, ineffective assistance of counsel at the direct-appeal stage of Will's Texas proceedings constitutes cause for procedural default. Because such ineffective assistance of counsel caused the default in Will's state proceedings, federal courts cannot fault Will for failing to obtain a necessary ruling there. Instead, they must respect Will's right to have at least one court adjudicate the merits of his ineffective-assistance claims.

Existing *Martinez* precedent does not decide this question because every Fifth Circuit decision so far has involved ineffective assistance in collateral proceedings.[18] For a claim of cause due to ineffective assistance of counsel in direct-review proceedings, *Martinez* itself gives a clear answer. In other words, if

---

[18] *See Ibarra v. Thaler*, __ F.3d __, 2012 WL 3537826, at *6 n.1 (5th Cir. 2012) ("counsel for Ibarra who filed his first state habeas application . . . did not raise issues Ibarra now would like to argue"); *Adams v. Thaler*, 679 F.3d 312, 316 (5th Cir. 2012) ("Adams stated . . . ineffective assistance of state post-conviction counsel"); *Ibarra v. Thaler*, 687 F.3d 222, 224 (5th Cir. 2012) ("Ibarra now argues that his initial habeas counsel was also ineffective"); *see also Foster v. Thaler*, 2012 WL 4328336 (5th Cir. Sept 21, 2012) (unpublished) (affirming denial of Rule 60 relief from *Foster v. Thaler*, 369 F. App'x 598, 601 (5th Cir. 2010) (unpublished)) ("he argues that he has shown cause and prejudice . . . because his state habeas counsel was ineffective"); *Gallow v. Cooper*, 2012 WL 3641520, at *3 (5th Cir. Aug. 24, 2012) (unpublished) ("it was a claim for ineffective assistance by his post-conviction counsel"); *Newbury v. Thaler*, 2012 WL 3032718 (5th Cir. July 26, 2012) (unpublished) ("Newbury argues in supplemental briefing that . . . collateral proceedings were his first opportunity to assert an ineffective assistance of counsel claim"); *Ayestas v. Thaler*, 475 F. App'x 518, 518 (5th Cir. 2012) (unpublished) ("claim of ineffective  assistance of state habeas counsel"); *Gates v. Thaler*, 476 F. App'x 336, 2012 WL 2305855, at *6 (5th Cir. 2012) (unpublished) ("Gates merely contends that the lawyer who filed his first state habeas petition was ineffective").

*Martinez* does not apply to Texas collateral-review proceedings, then it must apply to Texas direct-review proceedings.

Properly viewed, the question is not whether *Martinez* applies to Texas at all.  *See, e.g.*, *Balentine v. Thaler*, 2012 WL 3570766 (5th Cir. Aug. 21, 2012) (on petition for reh'g *en banc*).  Rather, the question is *when* during each state's proceedings *Martinez*-style ineffective assistance can excuse procedural default.

All states have such a *Martinez* juncture—a point at which the defendant can and must raise an ineffective-assistance claim or be faulted by the state courts for failing to do so.  The key question for *Martinez* purposes is simply about *when* that juncture occurs.  In answering the "when" question for Arizona, *Martinez* answers it for Texas as well.

The adopted test for identifying a state's *Martinez* juncture—the one at which ineffective assistance of counsel constitutes cause for procedural default—is no mystery.  The opinion spells it out expressly by searching for the state's first true opportunity to rule on the underlying ineffective-assistance claim's merits:

> Where, as here, the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim.  *This is because* the state habeas court "looks to the merits of the clai[m]" of ineffective assistance, no other court has addressed the claim, and "defendants pursuing first-tier review ... are generally ill equipped to represent themselves" because they do not have a brief

from counsel or an opinion of the court addressing their claim of error.

*Martinez*, 132 S. Ct. at 1317 (emphasis added).  The Court should employ just that kind of analysis here to determine when *Martinez* applies to Texas.

To be clear, as set out above, Will's primary position is that for all of *Martinez*'s intents and purposes, the proper *Martinez* juncture for Texas is on collateral review, just as it is in Arizona.  Systemic, practical realities compel this conclusion.  But if the Court holds that the collateral-review system does not provide a sufficient match, there is only one rational conclusion left to be drawn: *Martinez* applies to direct-appeal.

Everything that was true of Arizona's initial-review collateral proceedings is true of Texas's direct-review proceedings.  When Texas courts address an ineffective-assistance claim on direct review, "no other court has addressed the claim." *Martinez*, 132 S. Ct. at 1317.  And defendants in Texas's direct-review proceedings "'are generally ill equipped to represent themselves' because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Id.*  There is no need to look for an "equivalent of a prisoner's direct appeal" here, since the Texas proceeding at issue *is the direct appeal*.

Thus, under *Martinez*, Will can demonstrate cause for his procedural default by establishing the ineffective assistance of his direct-review counsel.  Because

there is already strong evidence of such ineffective assistance, the Court should allot time for Will to discover the facts necessary to fully develop this ground for cause.

## VII.  The Court's Alternative "Merits" Holding

Although this Court reached (in the alternative) the merits of Will's underlying IAC-at-trial claim, it did so without having before it all the relevant evidence – perhaps because it understood that, prior to *Martinez*, it was without authority to consider that evidence.   *Martinez* makes clear that a habeas applicant in Will's position can place before the District Court all evidence relevant to establishing "prejudice," regardless of whether that evidence was before the state tribunal.  Indeed, following *Martinez*, federal habeas courts may very well permit more expansive discovery and process to develop procedurally-defaulted IAC claims more fully than a truncated, alternative merits review of an IAC claim might allow.  Here, for example, before *Martinez*, the Court was not inclined to consider Will's additional evidence that his trial counsel failed to develop his claim of actual innocence.  That additional evidence includes inculpatory statements by Rosario as well as the apparent bullet graze on Will's jacket.

The State will characterize this additional evidence as "new" IAC claims.  The State, however, incorrectly assumes that additional facts supporting an IAC claim constitute new claims altogether.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1418

(2011) ("New evidence does not usually give rise to a new claim; it merely provides additional proof of a claim already adjudicated on the merits.") (Sotomayor, J., joined by Ginsburg and Kagan, JJ., dissenting).  Moreover, it makes no sense (and would be deeply unfair) to penalize Will now, *i.e.*, to put Will in a worse position than he otherwise would be in, simply because he failed to fully develop his procedurally-defaulted IAC claim in federal court.  Indeed, prior to *Martinez*, given then-settled excuse-for-cause jurisprudence, developing ***any*** aspect of Will's IAC claim in federal court was doomed (from the outset) to be an exercise in legal futility, since Will's state habeas counsel inexplicably failed to raise IAC at all.  After *Martinez*, the legal landscape has changed: as Justice Scalia recognized, "[T]oday's holding as a practical matter . . . eliminates the pre-existing assurance of escaping federal-habeas review for claims that appointed [state habeas] counsel fail[ed] to present."  *Martinez*, 132 S. Ct. at 1327 (Scalia, J., joined by Thomas, J., dissenting).  Thus, development of Will's IAC claim in federal court no longer constitutes an exercise in legal futility.

Given the Court's obvious and "deeply felt" concerns about Will's possible innocence, Dkt. 106 at 6, further development of Will's IAC claim, post-*Martinez*, is warranted.  In his federal habeas petition Will raised a claim of actual innocence, as well as ineffective assistance of trial counsel for failing to develop the claim of actual innocence.  Will alleged that "[t]rial counsel's strategy was to create reasonable doubt by implicating Rosario as the individual who killed Deputy Hill."  Dkt. 6, at 9.  In his

petition Will cited *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002), for the proposition that "failing to investigate and present available evidence suggesting that petitioner's co-defendant had actually committed the murder" constitutes ineffectiveness. *Id.*

The State has vigorously opposed any development of Will's actual-innocence and related IAC claims because both had been procedurally defaulted.  *See, e.g.*, Dkt. 10 at 7 ("[W]here a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court."); *id.* at 9 ("The IAC claim was presented to the state court in Will's second application for state writ, which was dismissed as successive, making the claim unexhausted and procedurally defaulted."); *id.* at 16 ("If Will had raised this claim . . . in his first application for state habeas relief, the state court would have had an opportunity to develop the record"); *id.* at 17(distinguishing case cited in Will's federal petition on the ground that "there, the petitioner presented his IAC claim in the procedurally proper manner, permitting a full development of the record through a hearing in state court"); Dkt. 17 at 1 ("Will hopes that this information will help him develop his new, unexhausted, and procedurally-barred claim that his attorney rendered ineffective assistance of counsel.  However, . . . Will has not established good cause for discovery and his motion should be denied."); *id.* at 7 ("Because Will is raising his Strickland accusation for the first time in this Court, . . . his request for

71

discovery to further develop factual support should be denied because his claim is procedurally barred under clearly established federal law.").

This Court, nonetheless, considered whether Will's claim of actual innocence afforded a procedural vehicle to consider his defaulted IAC claim.  The Court answered that question, "No."   Dkt. 44, at 18.   But the Court did so under a "fundamental-miscarriage-of-justice exception" analysis.  *Id*. at 18 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  It did not consider the (different) "cause" and "prejudice" analysis set forth in *Coleman*.   And it is that analysis which is now available after *Martinez*, and it calls for a review of all the evidence relevant to "prejudice."

Furthermore, this Court acknowledged that the procedurally-defaulted nature of Will's IAC claim compromised its viability.  The Court stated:

> At trial, Will's defense counsel attempted to pin the murder on [Rosario], who was with Will on the morning of the offense. . . .  Since his conviction and death sentence, Will has continued to maintain his innocence.  ***The manner in which he has presented claims to the courts, however, has frustrated judicial consideration***.  Will's initial state appellate and habeas proceedings did not fault counsel for failing to call three inmates who, according to Will's later arguments before this Court, would have testified as to incriminating states allegedly made by Rosario.  It was not until his federal habeas petition that Will raised actual-innocence and ineffective-assistance claims based on affidavits from three more inmates.  By that point, federal law foreclosed judicial consideration of procedurally deficient claims unless Will made a demanding procedural showing.

Dkt. 88 at 3-4 (emphasis added).

The Court nevertheless reached the merits of Will's claim that his trial counsel "provided ineffective assistance by not sufficiently proving that a co-defendant committed the murder." Dkt. 66 at 1. But when it do so, given the procedurally-defaulted nature of the claim, the Court addressed the claim only "briefly." Dkt. 44 at 25. As part of its analysis, the Court recounted trial counsel's strategy:

> Will's lawyers performed a three-pronged investigation into the possibility that Rosario was the shooter. Trial counsel explained: "First, obviously, we attempted to speak with Michael Rosario. His lawyer, Christopher Downey, refused to allow us to speak with his client." Trial counsel then tried to verify Will's proposed defense by scientific investigation: "Second, we sought to investigate the physical and forensic evidence to see if it would support a factual scenario implicating Rosario as the shooter. After securing the expert assistance and reviewing the physical/forensic evidence with the expert, we decided against presenting his testimony at trial." Third, trial counsel sought to verify that witnesses could credibly testify that Rosario confessed to killing Deputy Hill.

Dkt. 44 at 28 (citations omitted). The Court characterized the State's position as follows:

> The affidavits from Will's trial attorneys affirm that they "spent a substantial amount of time trying to develop the defensive theory relating to [] Rosario" but witnesses were unhelpful or provided damaging information. They "explored several different avenues to pursue this theory of the case and utilized the witnesses [they] believed would be considered credible and not hurt Mr. Will."

*Id.* at 31 (citation omitted).   The Court then concluded that Will had not met *Strickland*'s deficient-performance prong "by showing that trial counsel did not engage in a reasonable investigation, made ill-informed decisions, or should have done more to bolster the chosen defense."   *Id.* at 32.   The Court further determined that Will had not shown *Strickland* prejudice.   *Id.* at 33.

But additional evidence in support of Will's IAC claim – both the forensic evidence (the green jacket) and the inculpatory statements of Rosario (unencumbered by credibility problems) – now changes the analysis of Will's underlying IAC claim. And as the State acknowledges, *see supra* at 71-72, had state habeas counsel Ribnik properly presented this and other evidence in support of Will's now-procedurally-defaulted actual-innocence and IAC claims, this Court would have a less truncated, more comprehensive view of *all* the evidence supporting the claims.   And, critically, this Court would have had a less truncated, more comprehensive view of the evidence *before* it reached the merits of Will's IAC claim.   Now, after *Martinez*, the Court has the unique opportunity to consider additional points in support of Will's IAC claim.

## VIII.  Conclusion

*Martinez* impacts Mr. Will's case – replete with "grave" errors, "disturbing uncertainties," and "considerable evidence of actual innocence" – in fundamental ways.   In light of *Martinez*, we ask the Court to (1) determine whether Will's state habeas counsel was "ineffective"; (2) consider whether the application of *Martinez*

by *Ibarra* applies to extra-record IAC claims like Will's;  (3) make findings that, in Texas, a "motion for new trial" and "direct appeal" are not adequate procedural vehicles to raise extra-record IAC claims (as well as address Will's alternative argument concerning cause for his procedural default); and (4) given the unique factual and legal posture of Will's case, permit more time and discovery to further develop Will's underlying ineffectiveness claim.   We respectfully request a hearing on these matters.

Respectfully submitted,

 /s/ Samy Khalil
Samy Khalil
GERGER & CLARKE
1001 Fannin Street, Suite 1950
Houston, Texas 77002
Phone: 713-224-4400
Fax:    713-224-5153

**ATTORNEY FOR ROBERT WILL**

## <u>CERTIFICATE OF SERVICE</u>

A copy of this pleading was served on all attorneys of record on October 1, 2012, by electronic mail from the Clerk of Court.

/s/ Samy Khalil
Samy Khalil
